UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| CHIEF OF STAFF LLC, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. _____ |
| Plaintiff, ) ) | |
| vs. ) ) | |
| HISCOX INSURANCE COMPANY INC., ) ) | |
| Defendant. ) ) ) | |

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Chief of Staff LLC ("Plaintiff" or "Chief of Staff") by way of Complaint against Defendant Hiscox Insurance Company Inc. ("Defendant" or "Hiscox"), alleges as follows:

## INTRODUCTION

1.      On March 11, 2020, World Health Organization ("WHO") Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2.      On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.[2]  On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19.  This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, and food courts.[3]

3.      Following this advice for individuals to adopt far-reaching social distancing measures, and in response to the COVID-19 pandemic, many state government administrations

---

[1]      *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]      *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13. 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3]      *See The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread,* WHITE HOUSE, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

across the nation recognized the need to take steps to protect the health and safety of their residents from the human-to-human and surface-to-human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of businesses that interact with the public and provide gathering places for the individuals. Currently, almost all states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.     The result of these far-reaching restrictions and prohibitions has been catastrophic for many businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.     In addition to their contribution to the national economy in providing jobs, restaurants are also vital to the national spirit because shared meals are an important mental relief. As Oscar Wilde noted, "After a good dinner, one can forgive anybody, even one's relations."

6.     Moreover, food is part of the national psyche. As Anthony Bourdain noted, "Food is everything we are. It's an extension of nationalist feeling, ethnic feeling, your personal history, your province, your region, your tribe, your grandma. It's inseparable from those from the get-go."

7.     Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order

that restricts or prohibits access to the property.  This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

8.      Defendant, and most insurance companies who have issued all-risk commercial property insurance policies with business interruption coverage, is denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities in response to the COVID-19 pandemic.  This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendant is liable for the losses suffered by policyholders.

9.      In addition, this action brings a claim against Defendant for breach of its contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

10.      Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for all-risk commercial property insurance Policies that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) in that this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of Defendant.

- 3 -

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events and/or omissions giving rise to the claims occurred in this District, and Defendant conduct business in this District and thus resides in this District, in accordance with 28 U.S.C. §1391(c).

## PARTIES

13. Plaintiff Chief of Staff is a Connecticut corporation with its principal place of business in Hartford, Connecticut. Chief of Staff operates a hospitality support agency.

14. Defendant Hiscox is a Chicago, Illinois domiciled corporation licensed to do business in all 50 states and the District of Columbia.

15. Hiscox issued to Chief of Staff Policy No. UDC-1575520-BOP-20 for the period between April 30, 2020 and April 30, 2021. This was a renewal of Policy No. UDC-1575520-BOP-19 that Hiscox issued to Chief of Staff for the period between April 30, 2019 and April 30, 2020. Both policies were the same in all material respects.

## FACTUAL BACKGROUND

16. The Global COVID-19 PandemicViruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[4]

---

[4] *See* Roujian Lu, et al., *Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding*, CTR. FOR DISEASE CONTROL, (Jan. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly $10^{-4}$ nucleotide substitutions per site per year, with mutations arising during every replication cycle. This finding suggests that COVID-19 originated from one source within a short period and was detected rapidly. However, as the virus transmits to more individuals, constant surveillance of arising mutations is needed. The fact that at least one patient had not visited the market suggests either possible droplet transmission or that the patient was infected by a currently unknown source. Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.).

- 4 -

17.     In December 2019, an initial cluster of patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, at least one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[5]

18.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[6]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[7]

19.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.  On January 30, 2020, the WHO declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the disease caused by SARS-CoV-2 was named "COVID-19" by the WHO Director-General.[8]  As of April 23, 2020, the WHO reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the

---

[5]     *See id*; Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL. RESEARCH & PUB. HEALTH, (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably represent avian species.).

[6]     *See* Di Gennaro, *supra* note 5.

[7]     *See id*. (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 5'-cap structure and 3'-poly-A tail.).

[8]     *See id*.

United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country.[9]

20.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[10]  There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[11]

21.     It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission.[12]  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another

---

[9]     *See Coronavirus disease 2019 (COVID-19) Situation Report – 94*, WORLD HEALTH ORGANIZATION (Apr. 23, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

[10]     *See* Di Gennaro, *supra* note 5 (Asymptomatic infections have also been described, but their frequency is unknown.  Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[11]     *See id*. (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.  Home management is appropriate for asymptomatic or paucisymtomatic patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[12]     *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[13]

22.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[14]  During this period, also known as the "presymptomatic" period, some infected persons can be contagious.  For that reason, transmission from a presymptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[15]

23.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[16]

24.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces.  According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to

---

[13]     *See id*. (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[14]     *See id*.

[15]     *See id*. (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[16]     *See id*.

24 hours on cardboard, and up to two to three days on plastic and stainless steel.[17]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

25.     Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[18]  At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter.  Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[19]  Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

26.     On March 27, 2020, the CDC released a report entitled "*Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[20]  The report

---

[17]     *See* News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *see also* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

[18]     *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820% 2930046-3.

[19]     *See id*. (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected.  The WHO recommends ensuring that "environmental cleaning and disinfection procedures are followed consistently and correctly.").

[20]     *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and ten deaths.[21] Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships. What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[22] The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses.

27. Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six

---

[21] *See id*. ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3. . . . On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

[22] *See id*. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine. . . . On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. . . . A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew. . . . Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

feet of each other or when a person comes in contact with a surface or object that has the virus on it.[23] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[24]

28.     The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation. This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside. However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the population. This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions. In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

---

[23]     *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID- spreads.html (last visited Apr. 27, 2020).

[24]     *See* Kampf, *supra* note 18 (remains infectious from two hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, UCSF (Feb. 13, 2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar. 19, 2020), https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal and plastic for several days).

29.     Such "stay-at-home" orders are in effect in all but five states: 35 states have closed all non-essential businesses with other states enacting measures to curtail business operations; all 50 states have closed schools; and all but one state has closed restaurants and bars for services other than take-out and delivery (the "Closure Orders").[25]

30.     For example, on March 16, 2020, Illinois Governor J.B. Pritzker issued Executive Order 2020-07, stating that "the number of suspected COVID-19 cases in Illinois is increasing exponentially" and mandating that from March 16, 2020 through March 30, 2020, "all businesses in the State of Illinois that offer food or beverages for on-premises consumption – including restaurants, bars, grocery stores, and food halls – must suspend service for and may not permit on-premises consumption."[26]   In enacting Executive Order 2020-07, Governor Pritzker noted that previous efforts to appeal to the public's judgment to stay home were ineffective and stated, "[t]he time for persuasion and public appeals is over" and "[t]he time for action is here."[27]   On April 1, 2020, Governor Pritzker extended Executive Order 2020-07 and additional stay-at-home mandates through April 30, 2020.   As noted, orders similar in form or substance are in effect in states throughout the country.

**Defendants' Standard Uniform All-Risk Commercial Property Insurance Policies**

31.     Defendant's insurance policies issued to Plaintiffs and the Class members are "all risk" commercial property polices which cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

---

[25]     *See* Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[26]     *Executive Order in Response to Covid-19 (Covid-19 Executive Order No. 5)*, STATE OF ILLINOIS (Mar. 16, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-07.pdf.

[27]     *See* Erik Runge, *All Illinois bars, dine-in restaurants will close to the public for 2 weeks due to COVID-19 concerns*, WGN9 (Mar. 15, 2020), https://wgntv.com/news/coronavirus/all-bars-restaurants-to-be-closed-to-dine-in-customers-in-illinois-due-to-covid-19-concerns/.

32.     Plaintiff's Policy, as well as the Policies of other Class members, are standard forms that are used by Defendants for all insureds having applicable coverage and provide identical or substantially similar coverage for all Class members.

### Plaintiff's Factual Allegations

33.     Plaintiff's Policies, as is set forth in the Businessowners Coverage Form BP 00 03 01 10, provide:

**Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

34.     A Covered Cause of Loss means any physical loss not excluded by the policy.

35.     Among the coverages provided by the Policy were business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits if its business was shut down.

36.     The Business Income section of form BP 00 03 01 10 in the Policies provided coverage for Plaintiff as follows:

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located."

37.     **Business Income** is defined as:

(i)     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii)    Continuing normal operating expenses incurred, including payroll.

38.     In the same form, the Policies provide the following additional coverage for Plaintiff:

**Extra Expense**

(1)     We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(a)     The portion of the building which you rent, lease or occupy; and

(b)     Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(2)     Extra Expense means expenses incurred:

(a)     To avoid or minimize the suspension of business and to continue "operations:"

(i)     At the described premises; or

(ii)     At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b)     To minimize the suspension of business if you cannot continue "operations".

39.     In the same form, the Policies also provided the following additional coverage for Plaintiff:

**Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2)     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1)     Four consecutive weeks after the date of that action; or

(2)     When your Civil Authority Coverage for Business Income ends;

whichever is later

40.     Covered Causes of Loss are defined in the same form, BP 00 03 01 10.  A Covered Causes of Loss means "Risks of direct physical loss unless the loss is" excluded or limited in the policy.  The interruption of Plaintiff's and other class members' businesses was were not caused by any of the exclusions set forth in the Policies.

41.     Plaintiff's Policies include an exclusion section that includes a subjection with the header, "Virus Or Bacteria," which provides:

1.     We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

*     *     *

(j)     Virus Or Bacteria

(1)     Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

- 14 -

42.     Plaintiff and all similarly situated Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

43.     The exclusion in the Virus Or Bacteria endorsement does not apply because Plaintiff's, and other Class members', losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease". Rather, the efficient proximate cause of Plaintiff's, and other Class members' losses, were precautionary measures taken by governments of their respective counties and states to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiff's insured property.

44.     Notwithstanding the foregoing, by way of email dated May 15, 2020, Hiscox denied Plaintiff's claims for business interruption losses under the Policies claiming that the business income loss has not been caused as a result of direct physical loss or damage property at the premises, and that the policy contains an exclusion for any damages caused directly or indirectly by a virus.

**The COVID-19 Pandemic has Affected Policyholders Nationwide**

45.     COVID-19 is physically impacting private commercial property throughout the United States and the State of Illinois, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

46.     Hiscox does not intend to cover losses caused by the COVID-19 pandemic as part of business interruption coverage. As aforementioned, Hiscox denied Plaintiff's claim, even though Plaintiff was forced to close due to the Closure Orders. On information and belief, Hiscox has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also: (a) the Small Business

Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an Economic Injury Disaster Loan ("EIDL") loan;[28] and (b) America's SBDC, whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[29]

47.     As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments re-open, small businesses will almost certainly still be under social-distancing mandates and will continue to experience diminishing revenues due to the loss of covered property.

48.     A declaratory judgment determining that the business income loss and extra expense coverage provided in standard Hiscox commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent plaintiff and similarly situated Class members from being denied critical coverage for which they have paid premiums.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of itself and all other persons similarly situated.

**The Nationwide Class is defined as:**

All entities who have entered into standard all-risk commercial property insurance policies with Defendant, where such policies provide for business income loss and

---

[28]     *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_Information_and_Documentation_-_3-30-2020_FINAL_2_pm.pdf (last visited Apr. 30, 2020).

[29]     *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

**The Connecticut Sub-Class is defined as:**

All entities who have entered into standard all-risk commercial property insurance policies with Defendant insuring property in Connecticut, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

50.     Excluded from each class is the Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

51.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

52.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

53.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses.  Defendant sells its insurance policies throughout the State of Illinois, and therefore joinder of the Class members is impracticable.

54.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendant's or its agent's books and records.  Plaintiff anticipates providing appropriate notice to the certified Class in compliance with Fed. R. Civ. P.

- 17 -

23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

55.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Defendant.  Each Class member's insurance policy contains the same form providing coverage for business income loss.  None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic.  As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all Class members.

**Adequacy of Representation**

56.    Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff is aware of no interests antagonistic to or in conflict with other members of the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

57.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the classes.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, but are not limited to:

(a)     Whether there is an actual controversy between Plaintiff and Defendant as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all-risk commercial property insurance policies;

(b)     Whether measures in response to the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

(c)     Whether the measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020 caused physical loss or damage to covered commercial property;

(d)     Whether Defendant has repudiated and anticipatorily breached the all-risk commercial property insurance policies it issued with business interruption coverage by intending to deny claims for coverage; and

(e)     Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Defendant.

**Superiority/Predominance**

58.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.  The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with Defendant.

59.     Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to Defendant, by even a small fraction of the Class members, would be substantial.

- 19 -

60.     In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.  Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).  Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

61.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

**Rule 23(b)(2) Certification**

62.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2).  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant.

63.     In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive

of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

64.     Defendant has also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE

65.     Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

66.     Plaintiff brings this Count individually and on behalf of the other members of the Class.

67.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for their promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

68.     On information and belief, Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

69.     On information and belief, Defendant has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

70.     An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Defendant's obligations under the Policies to reimburse Plaintiff and Class

members for the full amount of Income losses incurred by Plaintiff and the other Class members in connection with the suspension of their businesses stemming from Closure Orders.

71.     Pursuant to 28 U.S.C. §2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

(a)     Plaintiff's and the other Class members' Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from such Orders are insured losses under their Policies; and

(b)     Defendant is obligated to pay Plaintiff and other Class members for the full amount of the Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from such Orders.

## COUNT II
## BREACH OF CONTRACT – BUSINESS INCOME COVERAGE

72.     Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

73.     In the business interruption coverage, Hiscox agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

74.     Hiscox also agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "interruption of [their] operations" during the "Period of Restoration" caused by direct physical loss or damage.

75.     "Business Income" under the Policy means the "Net Income (Net Profit or Net Loss before income taxes), that would have been earned or incurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll."

76.     The Closure Orders caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiff's and the other Class members' Hiscox policies.

77.     Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

78.     By denying coverage for any Business Income losses incurred by Plaintiff and other Class members as a result of the Closure Orders and Orders intended to mitigate the COVID-19 pandemic, Hiscox has breached its coverage obligations under the Policies.

79.     As a result of Hiscox's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

## COUNT III
## DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE

80.     Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

81.     Plaintiff brings this Count individually and on behalf of the other members of the Class.

82.     Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

83.     Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting

them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

84. Hiscox has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

85. An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Hiscox's obligations under the Policies to reimburse Plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

86. Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

(a) Plaintiff's and other Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

(b) Hiscox is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

## COUNT IV
## BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE

87. Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

88.     Plaintiff brings this Count individually and on behalf of the other members of the Class.

89.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the policy.

90.     Plaintiff's Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises. . . ."

91.     The Closure Orders triggered the Civil Authority provision under Plaintiff's and the other members of the Class' Hiscox Policies.

92.     Plaintiff and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

93.     By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Orders and Orders intended to mitigate the COVID-19 pandemic, Hiscox has breached its coverage obligations under the Policies.

94.     As a result of Hiscox's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

## COUNT V
## DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE

95.     Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

96.     Plaintiff brings this Count individually and on behalf of the other members of the Class.

97.     Plaintiff's Hiscox Policy, as well as those of other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

98.     Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

99.     Hiscox has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

100.    An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Hiscox's obligations under the Policies to reimburse Plaintiff and the other Class members for the full amount of Extra Expense losses incurred by Plaintiff and Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID- 19 pandemic.

101.    Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

(a)     Plaintiff's and other Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

- 26 -

(b)     Hiscox is obligated to pay Plaintiff and other Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## COUNT VI
## BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE

102.    Plaintiff repeats the allegations set forth in paragraphs 1-64 as if fully set forth herein.

103.    Plaintiff brings this Count individually and on behalf of the other members of the Class.

104.    Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

105.    Plaintiff's Policy provided that Hiscox agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

106.    Due to the Closure Orders, Plaintiff and other members of the Class incurred Extra Expense at Covered Property

107.    Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

108. By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Orders and Orders intended to mitigate the COVID-19 pandemic, Hiscox has breached its coverage obligations under the Policies.

109. As a result of Hiscox's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated persons, demands judgment against Defendant as follows:

A. Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

B. Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

C. Awarding Plaintiff and the Class compensatory damages from Defendant's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

D. Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

E. Awarding such other and further relief the Court deems just, proper, and equitable, including any amounts pursuant to 215 ILCS 5/155.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

- 28 -

DATED:  May 29, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP


*s/ Stuart A. Davidson*
STUART A. DAVIDSON

Paul J. Geller
Stuart A. Davidson
Bradley M. Beall
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
James E. Barz (IL Bar #6255605)
Frank A. Richter (IL Bar #6310011)
William J. Edelman (IL Bar #6332368)
Gina M. Buschatzke (IL Bar #6332510)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
wedelman@rgrdlaw.com
gbuschatzke@rgrdlaw.com

*Local Counsel*

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

- 29 -

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
cseeger@seegerweiss.com
sweiss@seegerweiss.com

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
  OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

*Counsel for Plaintiffs*