Christopher A. Seeger
Stephen A. Weiss
Christopher L. Ayers
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHIEF OF STAFF LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HISCOX INSURANCE COMPANY INC.<br><br>Defendant. | Civil Action No. 1:20-cv-03169<br><br><br>**AMENDED COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Chief of Staff LLC by way of Complaint against Defendant Hiscox Insurance

Company Inc. ("Defendant" or "Hiscox"), alleges as follows:

### <u>INTRODUCTION</u>

1.  On March 11, 2020, World Health Organization ("WHO") Director General Tedros

Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been

assessing this outbreak around the clock and we are deeply concerned both by the alarming levels

of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2. On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.[2] On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, and food courts.[3]

3. Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals. Currently, almost all states within

---

[1] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13. 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] *See The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread,* WHITE HOUSE, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.      The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.      Restaurants provide economic benefits far beyond their own business. They are anchors to revitalizing down-and-out neighborhoods and can become a tourist attraction themselves, as well as a key part of the identity of smaller cities and large towns.[4]

6.      In addition to their contribution to the national economy in providing jobs, restaurants are also vital to the national spirit because shared meals are an important mental relief. As Oscar Wilde noted, "After a good dinner, one can forgive anybody, even one's relations."

7.      Moreover, food is part of the national psyche.  As Anthony Bourdain noted, "Food is everything we are. It's an extension of nationalist feeling, ethnic feeling, your personal history, your province, your region, your tribe, your grandma. It's inseparable from those from the get-go."

8.      Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business

---

[4]      Jennifer Steinhauer, et al., *As Restaurants Remain Shuttered, American Cities Fear the Future*, N.Y. TIMES (May 7, 2020), https://www.nytimes.com/2020/05/07/us/coronavirus-restaurants-closings.html?action=click&module=Top%20Stories&pgtype=Homepage (last visited July 2, 2020).

operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

9.      Defendant, and most insurance companies who have issued all- risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendant is liable for the losses suffered by policyholders.

10.      In addition, this action brings a claim against Defendant for breach of its contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

11.      Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for business insurance policies that included lost business income and extra expense coverage

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the Amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of the Defendant.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendant does business in this District and thus reside in this District, in accordance with 28 U.S.C. §1391(c).

## PARTIES

14.     Plaintiff Chief of Staff LLC ("Chief of Staff") is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  Chief of Staff operates a hospitality support agency.

15.     As a result of the Closure Orders reference below, Chief of Staff had to cease operations.

16.     Defendant Hiscox Insurance is a Chicago, Illinois domiciled corporation licensed to do business in all 50 states and the District of Columbia. .

17.     Hiscox issued to Chief of Staff Policy No. UDC-1575520-20-BOP-20 for the period between April 30, 2020 and April 30, 2021.  This was a renewal of Policy No. UDC-1575520-20-BOP 19 that Hiscox issued to Chief of Staff for period between April 30 2019 and April 30 2020.  Both policies were the same in all material respects.

## FACTUAL BACKGROUND

### A.     The Global COVID-19 Pandemic

18.     Viruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus

(SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[5]

19.     In December 2019, an initial cluster of patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, at least one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[6]

20.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[7]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[8]

---

[5]     *See* Roujian Lu, et al., *Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding*, CTR. FOR DISEASE CONTROL, (Jan. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly $10^{-4}$ nucleotide substitutions per site per year, with mutations arising during every replication cycle.  This finding suggests that COVID-19 originated from one source within a short period and was detected rapidly.  However, as the virus transmits to more individuals, constant surveillance of arising mutations is needed. The fact that at least one patient had not visited the market suggests either possible droplet transmission or that the patient was infected by a currently unknown source. Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.).

[6]     *See id*; Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL. RESEARCH & PUB. HEALTH, (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably represent avian species.).

[7]     *See* Di Gennaro, *supra* note 6.

[8]     *See id*. (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the

6

21.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.  On January 30, 2020, the WHO declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the disease caused by SARS-CoV-2 was named "COVID-19" by the WHO Director-General.[9]  As of April 23, 2020, the WHO reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country.[10]

22.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[11]  There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[12]

---

largest known RNA genomes – 30-32 kb – with a 5'-cap structure and 3'-poly-A tail.).

[9]     *See id.*

[10]     *See Coronavirus disease 2019 (COVID-19) Situation Report – 94*, WORLD HEALTH ORGANIZATION (Apr. 23, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

[11]     *See* Di Gennaro, *supra* note 6 (Asymptomatic infections have also been described, but their frequency is unknown.  Other, less common symptoms have included headaches, sore throat, and rhinorrhea.  Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[12]     *See id.* (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.  Home management is appropriate for asymptomatic or paucisymtomatic

23.     It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission.[13]  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[14]

24.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[15]  During this period, also known as the "presymptomatic" period, some infected persons can be contagious.  For that reason, transmission from a presymptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[16]

---

patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[13]     *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[14]     *See id.* (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[15]     *See id.*

[16]     *See id.* (In a small number of case reports and studies, pre-symptomatic transmission has

25.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[17]

26.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[18]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

27.     Another scientific study documented in the Journal *of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate

---

been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[17]     *See id.*

[18]     *See* News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *see also* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

surfaces at room temperature for up to nine days.[19]  At a temperature of 30 degrees Celsius or

more, the duration of persistence is shorter.  Contamination of frequently touched surfaces is,

therefore, a potential source of viral transmission.[20]  Though this study was not conclusive on

COVID-19 itself, scientists are still grappling to understand this implication.

       28.    On March 27, 2020, the CDC released a report entitled "*Public Health Responses*

*to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[21]  The report

detailed that during this time frame, COVID-19 outbreaks associated with three different cruise

ship voyages caused over 800 confirmed cases and ten deaths.[22]  Of the individuals tested, a high

proportion were found to be asymptomatic, which may explain the high rates on cruise ships.  What

is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in

---

[19]    *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820% 2930046-3.

[20]    *See id*. (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected.  The WHO recommends ensuring that "environmental cleaning and disinfection procedures are followed consistently and correctly.").

[21]    *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

[22]    *See id*. ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3. . . .  On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[23] The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses.

29.     Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[24] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[25]

---

[23]     *See id*. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine. . . .  On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. . . . A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew. . . .  Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

[24]     *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-      spreads.html (last visited Apr. 27, 2020).

[25]     *See* Kampf, *supra* note 19 (remains infectious from two hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, UCSF (Feb. 13, 2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar. 19, 2020), https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal and plastic for several days).

30.    The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation.  This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the population.  This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.  In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

31.    Such "stay-at-home" orders are or were in effect in all but five states: 35 states closed all non-essential businesses with other states enacting measures to curtail business operations; all 50 states closed schools; and all but one state closed restaurants and bars for services other than take-out and delivery (the "Closure Orders").[26]

32.    Connecticut Governor Ned Lamont first issued a Closure Order on March 12, 2020. On March 16, 2020, Governor Lamont expanded the Closure Order to close bars and restaurants for all service except food and non-alcoholic bereave takeout.  And on March 20, 2020 Governor

---

[26]    *See* Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

Lamont expanded the Closure Order and prohibited access to all nonessential businesses and not-for-profit enterprises, ordering a 100% reduction in workforces no later than March 23, 2020.[27]

**B.**     **<u>Defendants' Standard Uniform All-Risk Commercial Property Insurance Policies</u>**

33.     Hiscox's insurance policies issued to Plaintiff and the Class Members are "all risk" commercial property polices which cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

34.     Plaintiff's Policies, as well as the policies of other Class Members, are standard forms that are used by Hiscox for all insureds having applicable coverage.

35.     Plaintiff and other Class Members had a reasonable expectation that their all-risk commercial property policies would cover losses in the event their businesses were forced to close by order of civil authority.

**C.**     **<u>Plaintiff's Factual Allegations</u>**

36.     Among the coverages provided by the Policy were business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits if its business was shut down.

37.     Plaintiff's Businessowners Coverage Form, Form BP 00 03 01 10, provided coverage as follows:

**f. Business Income**

**(a)**     We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to ***loss of*** or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located."

---

[27] https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7H.pdf

Cases\4832-0720-4035.v1-7/20/20

38.     Under Plaintiff's Businessowners Coverage Form, Business Income is defined as:

(i).    Net Income (Net Profit or Net Loss before income taxes) that would have been earned or incurred if no physical *loss* or damage had occurred but not including any New Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii)    Continuing normal operating expenses incurred, including payroll.

39.     In addition, Plaintiff's Businessowners Coverage Form provided coverage as follows:

**g. Extra Expense**

(1)     We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical *loss* or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

40.     Plaintiff's Businessowners Coverage Form defines Extra Expense as expenses incurred:

(a)     To avoid or minimize the suspension of business and to continue "operations"

(i)     At the described premises; or

(ii)    At replacement premises or at temporary locations, including: relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b)     To minimize the suspension of business if you cannot continue "operations".

(c)     To:

(i)     Repair or replace any property, or

    (ii)    Research, replace or restore the lost information on damaged "valuable papers and records";

    To the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage f. Business Income.

41.    Plaintiff's Business owners Coverage Form also provided coverage as follows:

**i.**    **Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, ***we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises***, provided that both of the following apply:

    (1)    Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

    (2)    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

42.    Under Plaintiff's Policies, a Covered Cause of Loss is any "[r]isk[] of direct physical loss unless the loss is" excluded under the policy.

43.    Plaintiff and all similarly situated Class members have suffered a direct physical loss of their property because they have been unable to use their property for its intended purpose.

44.    The interruption of Plaintiff's and other Class members' businesses was not caused by any of the exclusions set forth in the applicable Policies.

45.    Plaintiff's Businessowners Coverage Form contains an exclusion for losses caused by:

Any virus, bacterium or other microorganism that induces or is capable off inducing physical distress, illness or disease.

15

46.     The virus exclusion endorsement does not apply because Plaintiff's and other Class members' losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease".  Rather, the sole and proximate cause of Plaintiff's and other Class members' losses were the Closure Orders, not because coronavirus was found in or on Plaintiff's or the Class' insured property.

47.     The Closure Orders fully prohibited access to Plaintiff's property.

48.     Notwithstanding the foregoing, by way of email dated May 15, 2020, Hiscox denied Plaintiff's claims for business interruption losses under the Policies claiming that the business income loss has not been caused as a result of direct physical loss or damage property at the premises, and that the policy contains an exclusion for any damages caused directly or indirectly by a virus.

**D.     <u>The Closure Orders have Affected Policyholders Nationwide</u>.**

49.     The Closure Orders are physically impacting private commercial property throughout the United States and the State of Connecticut, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

50.     Hiscox does not intend to cover losses caused by the Closure Orders as part of business interruption coverage.  As alleged above, Hiscox denied Plaintiff's claim, even though Plaintiff was forced to close due to the Closure Orders.  On information and belief, Hiscox has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also: (a) the Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with

16

an application for an Economic Injury Disaster Loan ("EIDL") loan;[28] and (b) America's SBDC, whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[29]

51.     As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments re-open, small businesses will almost certainly still be under social-distancing mandates and will continue to experience diminishing revenues due to the loss of covered property.

52.     A declaratory judgment determining that the business income loss and extra expense coverage provided in standard commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid premiums.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of itself and all others similarly situated.

54.     The Nationwide Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Hiscox, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by

---

[28]     *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_Information_and_Documentation_-_3-30-2020_FINAL_2_pm.pdf (last visited Apr. 30, 2020).

[29]     *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

The Connecticut Sub-Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Hiscox to insure property in Connecticut, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

Excluded from each class are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

55.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

56.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

57.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Hiscox sells many insurance policies in the State of Connecticut and most, if not all, other states and therefore joinder of the Class members is impracticable.

58.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Hiscox's or their agent's books and records. Plaintiff anticipates providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

59.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Hiscox.  Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policies will address the rights and obligations of all Class members.

**Adequacy of Representation**

60.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies. Plaintiff has no interests antagonistic to or in conflict with other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

61.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. These common questions

predominate over any questions affecting only individual Class members. The questions of law

and fact common to the Class include, but are not limited to:

a. Whether there is an actual controversy between Plaintiff and Hiscox as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

b. Whether Closure Orders are excluded from Plaintiff's and the Class members standard all-risk commercial property insurance policies;

c. Whether the Closure Orders caused physical loss to covered commercial property;

d. Whether Hiscox has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage; and

e. Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Hiscox.

**Superiority/Predominance**

62. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is

superior to other available methods for the fair and efficient adjudication of the rights of the Class

members. The joinder of individual Class members is impracticable because of the vast number of

Class members who have entered into the standard all-risk commercial property insurance policies

with the Defendants.

63. Because a declaratory judgment as to the rights and obligations under the uniform

all-risk commercial property insurance policies will apply to all Class members, most or all Class

Members would have no rational economic interest in individually controlling the prosecution of

specific actions. The burden imposed on the judicial system by individual litigation, and to Hiscox,

by even a small fraction of the Class members, would be enormous.

64. In comparison to piecemeal litigation, class action litigation presents far fewer

management difficulties, far better conserves the resources of both the judiciary and the parties,

and far more effectively protects the rights of each Class member. The benefits to the legitimate

interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

65.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

### Rule 23(b)(2) Certification

66.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2).  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant.

67.     In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

21

68.     Defendant has also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

<u>**COUNT I**</u>
**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and Connecticut Subclass)**

69.     Plaintiff repeats the allegations set forth in paragraphs 1-68 as if fully set forth herein.

70.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Connecticut Subclass.

71.     Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

72.     Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

73.     Hiscox has denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

74.     An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Hiscox's obligations under the Policies to reimburse Plaintiff and Class

members for the full Amount of Business Income losses incurred by Plaintiff and the other Class members in connection with the suspension of their businesses stemming from Closure Orders.

75.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

i.     Plaintiff's and the other Class members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.    Hiscox is obligated to pay Plaintiff and other Class members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders.

## COUNT II
### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE
#### (Claim Brought on Behalf of the National Class and Connecticut Subclass)

76.     Plaintiff repeats the allegations set forth in paragraphs 1-75 as if fully set forth herein.

77.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Connecticut Subclass.

78.     Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policy.

79.     In the business interruption coverage, Hiscox agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

80.     Hiscox also agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "interruption of [their] operations" during the "Period of Restoration" caused by direct physical loss.

81.    "Business Income" under the Policies means the "Net Income (Net Profit or Net Loss before income taxes), including Income and Royalties, that would have been earned or incurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll".

82.    The Closure Orders caused direct physical loss to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiff's and the other Class Members' Hiscox policies.

83.    Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

84.    By denying coverage for any Business Income losses incurred by Plaintiff and other Class members as a result of the Closure Orders, Hiscox has breached its coverage obligations under the Policies.

85.    As a result of Hiscox's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

## COUNT III
### DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
**(Claim Brought on Behalf of the National Class and Connecticut Subclass)**

86.    Plaintiff repeats the allegations set forth in paragraphs 1-85 as if fully set forth herein.

87.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and Connecticut Subclass.

24

88.     Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

89.     Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

90.     Hiscox has denied claims related to Closure Orders on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

91.     An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Hiscox's obligations under the Policies to reimburse Plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from Closure Orders.

92.     Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class Members seek a declaratory judgment from this Court declaring the following:

i.      Plaintiff's and other Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.     Hiscox is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from those Orders.

25

<u>**COUNT IV**</u>
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the National Class and Connecticut Subclasses)**

93.     Plaintiff repeats the allegations set forth in paragraphs 1-92 as if fully set forth herein.

94.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Connecticut Subclass.

95.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the policy.

96.     Plaintiff's Policy provided for "Civil Authority" coverage, which promises to pay the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises.

97.     The Closure Orders triggered the Civil Authority provision under Plaintiff's and the other members of the Class' Hiscox Policies.

98.     Plaintiff and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

99.     By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders, Hiscox has breached its coverage obligations under the Policies.

100.     As a result of Hiscox's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

**COUNT V**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and Connecticut Subclass)**

101.     Plaintiff repeats the allegations set forth in paragraphs 1-100 as if fully set forth herein.

102.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and the Connecticut Subclass.

103.     Plaintiff's Hiscox Policy, as well as those of other Class Members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

104.     Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

105.     Hiscox has denied claims related to Closure Orders on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

106.     An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Hiscox's obligations under the Policies to reimburse Plaintiff and the other Class members for the full amount of Extra Expense losses incurred by Plaintiff and Class members in

27

connection with Closure Orders and the necessary interruption of their businesses stemming from those Orders.

107.  Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

i.  Plaintiff's and other Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.  Hiscox is obligated to pay Plaintiff and other Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders.

## COUNT VI
### BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
**(Claim Brought on Behalf of the National Class and Connecticut Subclass)**

108.  Plaintiff repeats the allegations set forth in paragraphs 1-107 as if fully set forth herein.

109.  Plaintiff brings this Count individually and on behalf of the other members of the National Class and Connecticut Subclass.

110.  Plaintiff's Hiscox Policy, as well as those of the other Class members, are contracts under which Hiscox was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

111.  Plaintiff's Policy provided that Hiscox agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

112.    Due to the Closure Orders, Plaintiff and other members of the Class incurred Extra Expense at Covered Property

113.    Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hiscox or Hiscox is estopped from asserting them, and yet Hiscox has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

114.    By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Orders, Hiscox has breached its coverage obligations under the Policies.

115.    As a result of Hiscox's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Hiscox is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiff, on behalf of itself and all others similarly situated, demand judgment against the Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) and declaring Plaintiff and their counsel to be representatives of the Class;

(2)    Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

(3)    Awarding Plaintiff and the Class compensatory damages from Hiscox's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4) Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

(5) Awarding such other and further relief the Court deems just, proper, and equitable.

## **DEMAND FOR A JURY TRIAL**

Plaintiff and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

DATED:  July 20, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP


*s/ Stuart A. Davidson*
STUART A. DAVIDSON

Paul J. Geller
Stuart A. Davidson
Bradley M. Beall
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
James E. Barz (IL Bar #6255605)
Frank A. Richter (IL Bar #6310011)
William J. Edelman (IL Bar #6332368)
Gina M. Buschatzke (IL Bar #6332510)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
wedelman@rgrdlaw.com
gbuschatzke@rgrdlaw.com

Cases\4832-0720-4035.v1-7/20/20

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
77 Water Street, 8th Floor
New York, New York 10005
Telephone: 212/584-0700
cseeger@seegerweiss.com
sweiss@seegerweiss.com

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
  OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/994-1700
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of July, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*s/ Stuart A. Davidson*
STUART A. DAVIDSON
