UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHIEF OF STAFF LLC, Individually and on Behalf of All Others Similarly Situated, | * * * | Civil Action No. 1:20-cv-03169 |
| Plaintiff, | * * | |
| vs. | * * * | |
| HISCOX INSURANCE COMPANY INC., | * * | |
| Defendant | * * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF *Mark Raymond*

I, *MARK RAYMOND*, declare and state as follows:

1.    I am over 18 years of age and am competent in all respects to make this Declaration. I make this Declaration on personal knowledge in support of Hiscox Insurance Company Inc's ("Hiscox") Rule 12(b)(6) motion to dismiss.

2.    I am employed as a _Head US Claims Operations_, at Hiscox Insurance Company Inc.

3.    In that capacity, I am familiar with the business records pertaining to Hiscox Businessowners Policy No. UDC-1575520-BOP-20 issued to Chief of Staff, LLC by Hiscox for policy period of April 2019 through April 2020, and renewed for the policy period of April 2020 through April 2021 ("the Hiscox Policy"). I am also familiar with the Guide to Your Business Owner's Policy sent by Hiscox to Chief of Staff, LLC.

4.    A true and correct copy of the Hiscox Policy is attached hereto as Exhibit A.

5.     A true and correct copy of Hiscox's renewal letter for the policy period of April 2020 through April 2021 is attached as Exhibit B.

6.     A true and correct copy of the Guide To Your Business Owner's Policy sent to Chief of Staff, LLC by email delivering the Hiscox Policy is attached as Exhibit C

7.     Exhibits A, B, and C were made by Hiscox in the regular course its business by an employee or representative of Hiscox who had knowledge of the information set forth in the record. The record was made at or near the time or reasonably soon after the time of the events recorded. The record is of the type regularly made and kept by Hiscox.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 26th, 2020.

# Exhibit A



# Your Insurance documents

Enclosed you will find the policy documents that make up your insurance contract with us.

Please read through all of these documents. If you have any questions or need to update any of your information please call us at 800-867-4001 (Mon-Fri, 7am-10pm EST).

## Your insurance documents

**Declarations Page**
This contains specific policy information, such as the limits and deductibles you have selected.

**Policy Wording**
This details the terms and conditions of your coverage, subject to policy endorsements.

**Endorsements**
These documents modify the Policy Wording or Declarations Page. These include relevant terms and conditions as required by your state and are part of your policy.

**Notices**
These documents provide information that may affect your coverage such as optional terrorism coverage (if purchased) and other important items required by your state.

## Reporting a claim

Please inform us immediately if you have a claim or loss to report. Please have your policy number available so we can handle your call quickly.

**Email:** reportaclaim@hiscox.com

**Phone:** 866-424-8508

**Mail:**    Attn: Direct Claims
Hiscox
520 Madison Avenue - 32nd Floor
New York, NY, 10022

**EXHIBIT A**



# Declarations Page



**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, Illinois 60603

## Businessowners Insurance Declarations

**In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance as stated in this Policy.**

| | |
|---|---|
| Policy No.: | UDC-1575520-BOP-19 |
| Renewal of: | UDC-1575520-BOP-18 |
| Named Insured: | CHIEF OF STAFF LLC |
| Address: | 750 Main St Ste 1304 <br> Hartford, CT 06103 |

Policy period:

| From: | April 30, 2019 | To: | April 30, 2020 |
|---|---|---|---|

At 12:01 A.M. (Standard Time) at the address shown above.

| | |
|---|---|
| Form of Business: | Limited Liability Company |

Premises Information:

| Premises Number: | 1 | Building Number: | 1 |
|---|---|---|---|

| Premises Address: | 750 Main St Ste 1304 <br> Hartford, CT 06103 |
|---|---|

## Section I - Property

### Property Coverage Limits of Insurance

| Premises Number: | 1 | Building Number: | 1 |
|---|---|---|---|

| | |
|---|---|
| Limit of Insurance: | $ 50,000 |
| Covered Property: | Business Personal Property |

### Deductibles (Apply per location , per occurrence):

| | |
|---|---|
| Premises Number: | 1 |
| Deductible: | $ 500 |
| Optional Coverage/ Glass Deductible: | $ 500 |

**Additional Coverages - No Optional Higher Limits or extended number of days apply**

**Coverage Extensions - No Optional Higher Limits apply**

**Optional Coverages do not apply**

**Section II - Liability and Medical Expenses**



**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, Illinois 60603

| | |
|---|---|
| Liability and Medical Expenses: | $ 2,000,000    Per Occurrence |
| Products/Completed Operations Aggregate: | See policy for details |
| Other Than Products/Completed Operations Aggregate: | See policy for details |
| Damage to Premises Rented to You: | $ 50,000    Any one premises |
| Medical Expenses: | $ 5,000    Per Person |

**Total Premium:**    $ 619.00

**Attachments:**    See attached Forms and Endorsements Schedule.

IN WITNESS WHEREOF, the Insurer indicated above has caused this Policy to be signed by its President and Secretary, but this Policy shall not be effective unless also signed by the Insurer's duly authorized representative.

President

Secretary

Authorized Representative

# Forms and Endorsements Schedule

Forms and Endorsements made part of this policy at time of issue:

BOP D001 01 10 - Businessowners Insurance Declarations
BP 00 03 01 10 - Business Owners Policy Coverage Form
BOP E5206 CW (03/10) - Exclusion - Personal Information
BOP E5208 CW (03/10) - Definition of Employee
BOP E5211 CW (03/10) - Exclusion - Intercompany Products Suits
BOP E5212 CW (03/10) - Lock and Key Replacement
BOP E5214 CW (03/10) - Notice Information
BOP E5215 CW (03/10) - Right and Duty to Select Defense Counsel
BOP E5217 CW (03/10) - Cancellation Provision (14 Day Full Refund)
BP 05 95 01 06 - Electronic Data Liability
BP 05 01 07 02 - Calculation of Premium
BP 04 54 01 06 - Newly Acquired Organizations
BP 02 11 03 12 - Connecticut Changes
BOP E5202 CW (03/10) - Aggregate Limit Endorsement (Double Limit)
BOP E5422 CW (02/15) - Blanket Additional Insured - Lessors of Premises, Clients
BP 05 23 01 15 - Cap On Losses From Certified Acts Of Terrorism
BP 05 15 01 15 - Disclosure Pursuant To Terrorism Risk Insurance Act
BP 04 04 01 10 - Hired Auto and Non-Owned Coverage
INT N001 CW (01/09) - Economic And Trade Sanctions Policyholder Notice



# Policy Wording


# BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

In Section **II** – Liability, the word "insured" means any person or organization qualifying as such under Paragraph **C.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph **H.** Property Definitions in Section **I** – Property and Paragraph **F.** Liability And Medical Expenses Definitions in Section **II** – Liability.

## SECTION I – PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **2.** Property Not Covered.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Your personal property in apartments, rooms or common areas furnished by you as landlord;

**(5)** Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(6)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the buildings or structures;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**b.** Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

**(1)** Property you own that is used in your business;

**(2)** Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.5.d.(3)(b);**

**(3)** Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(4)** Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2);** and

**(5)** Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

2. **Property Not Covered**

   Covered Property does not include:

   a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

   b. "Money" or "securities" except as provided in the:

      (1) Money And Securities Optional Coverage; or

      (2) Employee Dishonesty Optional Coverage;

   c. Contraband, or property in the course of illegal transportation or trade;

   d. Land (including land on which the property is located), water, growing crops or lawns;

   e. Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants, all except as provided in the:

      (1) Outdoor Property Coverage Extension; or

      (2) Outdoor Signs Optional Coverage;

   f. Watercraft (including motors, equipment and accessories) while afloat;

   g. Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this policy;

   h. "Computer(s)" which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer(s)" while held as "stock";

   i. "Electronic data", except as provided under Additional Coverages – Electronic Data. This Paragraph **i.** does not apply to your "stock" of prepackaged software.

   j. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

3. **Covered Causes Of Loss**

   Risks of direct physical loss unless the loss is:

   a. Excluded in Paragraph **B.** Exclusions in Section **I;** or

   b. Limited in Paragraph **4.** Limitations in Section **I.**

4. **Limitations**

   a. We will not pay for loss of or damage to:

      (1) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

      (2) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

      (3) Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Optional Coverage for Money and Securities.

      (4) Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

      (5) The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

         (a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

         (b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   b. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

      (1) Animals, and then only if they are killed or their destruction is made necessary.

      (2) Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

         (a) Glass that is part of the exterior or interior of a building or structure;

**(b)** Containers of property held for sale; or

**(c)** Photographic or scientific instrument lenses.

**c.** For loss or damage by theft, the following types of property are covered only up to the limits shown:

**(1)** $2,500 for furs, fur garments and garments trimmed with fur.

**(2)** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**(3)** $2,500 for patterns, dies, molds and forms.

**5. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(3)** and **(4),** we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4),** the following provisions apply:

**(a)** The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to Paragraph **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

**(4)** We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

**(5) Examples**

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 − $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

### Example #2

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 − $500) |
| Debris Removal Expense | $ 30,000 |
| Debris Removal Expense | |
| Payable | |
|    Basic Amount | $ 10,500 |
|    Additional Amount | $ 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4),** because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4).** Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500, unless a different limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**d. Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **d.(1)** through **d.(7).**

**(1)** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**(2)** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

**(a)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(b)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(c)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**(d)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

   **(i)** A cause of loss listed in Paragraph **(2)(a)** or **(2)(b);**

   **(ii)** One or more of the "specified causes of loss";

   **(iii)** Breakage of building glass;

**(iv)** Weight of people or personal property; or

**(v)** Weight of rain that collects on a roof.

**(3)** This Additional Coverage – Collapse does **not** apply to:

**(a)** A building or any part of a building that is in danger of falling down or caving in;

**(b)** A part of a building that is standing, even if it has separated from another part of the building; or

**(c)** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(4)** With respect to the following property:

**(a)** Awnings;

**(b)** Gutters and downspouts;

**(c)** Yard fixtures;

**(d)** Outdoor swimming pools;

**(e)** Piers, wharves and docks;

**(f)** Beach or diving platforms or appurtenances;

**(g)** Retaining walls; and

**(h)** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)**, we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this policy and the property is Covered Property under this policy.

**(5)** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**(a)** The collapse of personal property was caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)** of this Additional Coverage;

**(b)** The personal property which collapses is inside a building; and

**(c)** The property which collapses is not of a kind listed in Paragraph **(4)**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **(5)** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**(6)** This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(7)** This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this policy.

**(8)** The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**e. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage; but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

**(2)** Is directly caused by freezing.

**f. Business Income**

**(1) Business Income**

**(a)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(i)** The portion of the building which you rent, lease or occupy; and

**(ii)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(b)** We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

**(c)** Business Income means the:

**(i)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

**(ii)** Continuing normal operating expenses incurred, including payroll.

**(d)** Ordinary payroll expenses:

**(i)** Means payroll expenses for all your employees except:

  **i.** Officers;

  **ii.** Executives;

  **iii.** Department Managers;

  **iv.** Employees under contract; and

  **v.** Additional Exemptions shown in the Declarations as:

    1 Job Classifications; or

    1 Employees.

**(ii)** Include:

  **i.** Payroll;

  **ii.** Employee benefits, if directly related to payroll;

  **iii.** FICA payments you pay;

  **iv.** Union dues you pay; and

  **v.** Workers' compensation premiums.

**(2) Extended Business Income**

**(a)** If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(i)** Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(ii)** Ends on the earlier of:

  **i.** The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

  **ii.** 30 consecutive days after the date determined in Paragraph **(a)(i)** above, unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

**(b)** Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** This Additional Coverage is not subject to the Limits of Insurance of Section **I** – Property.

**g. Extra Expense**

**(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(2)** Extra Expense means expense incurred:

**(a)** To avoid or minimize the suspension of business and to continue "operations":

**(i)** At the described premises; or

**(ii)** At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

**(b)** To minimize the suspension of business if you cannot continue "operations".

**(c)** To:

**(i)** Repair or replace any property; or

**(ii)** Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **f.** Business Income.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section **I** – Property.

**h. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**i. Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority coverage for Business Income ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section **I** – Property.

**j. Money Orders And "Counterfeit Money"**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(1)** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**(2)** "Counterfeit money" that is acquired during the regular course of business.

The most we will pay for any loss under this Additional Coverage is $1,000.

**k. Forgery Or Alteration**

**(1)** We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

**(2)** If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

**(3)** For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

**(4)** The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit of Insurance is shown in the Declarations.

**l. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings insured on a replacement cost basis.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in Paragraphs **(3)** through **(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in Paragraph **(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

  **(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

  **(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants", "fungi", wet rot or dry rot.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under Section **I** – Property, is $10,000. If a damaged building(s) is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for each damaged building, is $10,000.

  The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

  **(a)** We will not pay for the Increased Cost of Construction:

    **(i)** Until the property is actually repaired or replaced, at the same or another premises; and

    **(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

  **(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

  **(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment Property Loss Condition in Section **I** – Property do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in Paragraph **(6)** of this Additional Coverage, is not subject to such limitation.

**m. Business Income From Dependent Properties**

**(1)** We will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property caused by or resulting from any Covered Cause of Loss.

  However, this Additional Coverage does not apply when the only loss to dependent property is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the dependent property sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

  The most we will pay under this Additional Coverage is $5,000 unless a higher Limit of Insurance is indicated in the Declarations.

**(2)** We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

  **(a)** Source of materials; or

  **(b)** Outlet for your products.

**(3)** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**(4)** Dependent property means property owned by others whom you depend on to:

**(a)** Deliver materials or services to you, or to others for your account. But services does not mean water, communication or power supply services;

**(b)** Accept your products or services;

**(c)** Manufacture your products for delivery to your customers under contract for sale; or

**(d)** Attract customers to your business.

The dependent property must be located in the coverage territory of this policy.

**(5)** The coverage period for Business Income under this Additional Coverage:

**(a)** Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property; and

**(b)** Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

**(6)** The Business Income coverage period, as stated in Paragraph **(5),** does not include any increased period required due to the enforcement of any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

**(7)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**n. Glass Expenses**

**(1)** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**(2)** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Extinguisher Systems Recharge Expense**

**(1)** We will pay:

**(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 100 feet of the described premises; and

**(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**p. Electronic Data**

**(1)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

**(2)** The Covered Causes of Loss applicable to Business Personal Property include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

**(3)** The most we will pay under this Additional Coverage – Electronic Data for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved, is $10,000, unless a higher Limit of Insurance is shown in the Declarations. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**q. Interruption Of Computer Operations**

**(1)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss.

**(2)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

**(a)** Coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" and Collapse.

**(b)** If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

**(c)** The Covered Causes of Loss include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

**(3)** The most we will pay under this Additional Coverage – Interruption Of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(4)** This Additional Coverage – Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(3)** above has not been exhausted.

**(5)** Coverage for Business Income does not apply when a suspension of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**(6)** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a suspension of "operations" caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**r. Limited Coverage For "Fungi", Wet Rot Or Dry Rot**

**(1)** The coverage described in Paragraphs **r.(2)** and **r.(6)** only applies when the "fungi", wet rot or dry rot are the result of a "specified cause of loss" other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**(2)** We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

**(a)** Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

**(b)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

**(c)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot are present.

**(3)** The coverage described under this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $15,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

**(4)** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**(5)** The terms of this Limited Coverage do not increase or reduce the coverage provided under the Water Damage, Other Liquids, Powder Or Molten Material Damage or Collapse Additional Coverages.

**(6)** The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Business Income and/or Extra Expense Additional Coverage.

**(a)** If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under the Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**(b)** If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet rot or dry rot, but remediation of "fungi", wet rot or dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

© Insurance Services Office, Inc., 2009 □

## 6. Coverage Extensions

In addition to the Limits of Insurance of Section **I** – Property, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

### a. Newly Acquired Or Constructed Property

#### (1) Buildings

If this policy covers Buildings, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at premises other than the one described, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

#### (2) Business Personal Property

If this policy covers Business Personal Property, you may extend that insurance to apply to:

**(a)** Business Personal Property, including such property that you newly acquire, at any location you acquire;

**(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(c)** Business Personal Property that you newly acquire, located at the described premises.

This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

#### (3) Period Of Coverage

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

### b. Personal Property Off-premises

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $10,000.

### c. Outdoor Property

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, unless a higher Limit of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

**d. Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:

**(1)** Tools or equipment used in your business; or

**(2)** Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

**e. Valuable Papers And Records**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

**(2)** This Coverage Extension does not apply to:

**(a)** Property held as samples or for delivery after sale; and

**(b)** Property in storage away from the premises shown in the Declarations.

**(3)** The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $5,000.

**(4)** Loss or damage to "valuable papers and records" will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical type.

**(5)** Paragraph **B.** Exclusions in Section **I** – Property does not apply to this Coverage Extension except for:

**(a)** Paragraph **B.1.c.,** Governmental Action;

**(b)** Paragraph **B.1.d.,** Nuclear Hazard;

**(c)** Paragraph **B.1.f.,** War And Military Action;

**(d)** Paragraph **B.2.f.,** Dishonesty;

**(e)** Paragraph **B.2.g.,** False Pretense;

**(f)** Paragraph **B.2.m.(2),** Errors Or Omissions; and

**(g)** Paragraph **B.3.**

**f. Accounts Receivable**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

**(a)** All amounts due from your customers that you are unable to collect;

**(b)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

**(c)** Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

**(d)** Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

**(2)** The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

**(3)** Paragraph **B.** Exclusions in Section **I** – Property does not apply to this Coverage Extension except for:

**(a)** Paragraph **B.1.c.,** Governmental Action;

**(b)** Paragraph **B.1.d.,** Nuclear Hazard;

**(c)** Paragraph **B.1.f.,** War And Military Action;

**(d)** Paragraph **B.2.f.,** Dishonesty;

**(e)** Paragraph **B.2.g.,** False Pretense;

**(f)** Paragraph **B.3.;** and

**(g)** Paragraph **B.6.,** Accounts Receivable Exclusion.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

### a. Ordinance Or Law

(1) The enforcement of any ordinance or law:

    (a) Regulating the construction, use or repair of any property; or

    (b) Requiring the tearing down of any property, including the cost of removing its debris.

(2) This exclusion, Ordinance Or Law, applies whether the loss results from:

    (a) An ordinance or law that is enforced even if the property has not been damaged; or

    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

### b. Earth Movement

(1) Earthquake, including any earth sinking, rising or shifting related to such event;

(2) Landslide, including any earth sinking, rising or shifting related to such event;

(3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs **(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    (a) Airborne volcanic blast or airborne shock waves;

    (b) Ash, dust or particulate matter; or

    (c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

### c. Governmental Action

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

### d. Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

### e. Utility Services

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer(s)" and "electronic data".

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

   (a) Foundations, walls, floors or paved surfaces;

   (b) Basements, whether paved or not; or

   (c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1), (3)** or **(4),** or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5),** is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5),** results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. Certain Computer-related Losses**

(1) The failure, malfunction or inadequacy of:

   (a) Any of the following, whether belonging to any insured or to others:

      (i) "Computer" hardware, including microprocessors or other electronic data processing equipment as may be described elsewhere in this policy;

      (ii) "Computer" application software or other "electronic data" as may be described elsewhere in this policy;

      (iii) "Computer" operating systems and related software;

      (iv) "Computer" networks;

      (v) Microprocessors ("computer" chips) not part of any "computer" system; or

      (vi) Any other computerized or electronic equipment or components; or

   (b) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **(a)** above;

   due to the inability to correctly recognize, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

(2) Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **(1)** above.

However, if excluded loss or damage, as described in Paragraph **(1)** above results in a "specified cause of loss" under Section **I** – Property, we will pay only for the loss or damage caused by such "specified cause of loss".

We will not pay for repair, replacement or modification of any items in Paragraph **(1)(a)** or **(1)(b)** to correct any deficiencies or change any features.

**i. "Fungi", Wet Rot Or Dry Rot**

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet rot or dry rot result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

**j. Virus Or Bacteria**

**(1)** Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**(2)** However, the exclusion in Paragraph **(1)** does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in Exclusion **i.;**

**(3)** With respect to any loss or damage subject to the exclusion in Paragraph **(1),** such exclusion supersedes any exclusion relating to "pollutants".

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a. Electrical Apparatus**

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(1)** Electrical current, including arcing;

**(2)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(3)** Pulse of electromagnetic energy; or

**(4)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire.

We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

**(1)** An occurrence that took place within 100 feet of the described premises; or

**(2)** Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

**b. Consequential Losses**

Delay, loss of use or loss of market.

**c. Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**e. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**f. Dishonesty**

Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

This exclusion does not apply to coverage that is provided under the Employee Dishonesty Optional Coverage.

**g. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**i. Collapse**

**(1)** Collapse, including any of the following conditions of property or any part of the property:

**(a)** An abrupt falling down or caving in;

**(b)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(c)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph **i.(1)(a)** or **i.(1)(b).**

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**(2)** This Exclusion **i.,** does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage – Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**j. Pollution**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

**k. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**l. Other Types Of Loss**

**(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer(s)";

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

 © Insurance Services Office, Inc., 2009 □

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(7)** above results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**m. Errors Or Omissions**

Errors or omissions in:

**(1)** Programming, processing or storing data, as described under "electronic data" or in any "computer" operations; or

**(2)** Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**n. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or repair of your "computer" system including "electronic data".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**o. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for under the Additional Coverages of Section **I** – Property.

However, we will pay for direct loss or damage caused by lightning.

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion.

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**5. Business Income And Extra Expense Exclusions**

**a.** We will not pay for:

**(1)** Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage.

**(2)** Any other consequential loss.

**b.** With respect to this exclusion, suspension means:

**(1)** The partial slowdown or complete cessation of your business activities; and

**(2)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**6. Accounts Receivable Exclusion**

The following additional exclusion applies to the Accounts Receivable Coverage Extension:

We will not pay for:

**a.** Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**b.** Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

**c.** Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

## C. Limits Of Insurance

**1.** The most we will pay for loss or damage in any one occurrence is the applicable Limits of Insurance of Section **I** – Property shown in the Declarations.

**2.** The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

**3.** The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to the Limits of Insurance of Section **I** – Property:

**a.** Fire Department Service Charge;

**b.** Pollutant Clean-up And Removal;

**c.** Increased Cost Of Construction;

**d.** Business Income From Dependent Properties;

**e.** Electronic Data; and

**f.** Interruption Of Computer Operations.

**4. Building Limit – Automatic Increase**

**a.** In accordance with Paragraph **C.4.b.,** the Limit of Insurance for Buildings will automatically increase by 8%, unless a different percentage of annual increase is shown in the Declarations.

**b.** The amount of increase is calculated as follows:

**(1)** Multiply the Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit by:

**(a)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 7% is .07); or

**(b)** .08, if no percentage of annual increase is shown in the Declarations; and

**(2)** Multiply the number calculated in accordance with **b.(1)** by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

**Example:**

If:

The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

The amount of increase is

$100,000 x .08 x 146 ÷ 365 = $3,200.

**5. Business Personal Property Limit – Seasonal Increase**

**a.** Subject to Paragraph **5.b.,** the Limit of Insurance for Business Personal Property is automatically increased by:

**(1)** The Business Personal Property – Seasonal Increase percentage shown in the Declarations; or

**(2)** 25% if no Business Personal Property – Seasonal Increase percentage is shown in the Declarations;

to provide for seasonal variances.

**b.** The increase described in Paragraph **5.a** will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

**(1)** The 12 months immediately preceding the date the loss or damage occurs; or

**(2)** The period of time you have been in business as of the date the loss or damage occurs.

**D. Deductibles**

**1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of Section **I** – Property.

**2.** Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is the Optional Coverage Deductible shown in the Declarations:

**a.** Money and Securities;

**b.** Employee Dishonesty;

**c.** Outdoor Signs; and

**d.** Forgery or Alteration.

But this Optional Coverage Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

**3.** No deductible applies to the following Additional Coverages:

**a.** Fire Department Service Charge;

**b.** Business Income;

**c.** Extra Expense;

**d.** Civil Authority; and

**e.** Fire Extinguisher Systems Recharge Expense.

**E. Property Loss Conditions**

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section **I** – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** Resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within two years after the date on which the direct physical loss or damage occurred.

**5. Loss Payment**

In the event of loss or damage covered by this policy:

**a.** At our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **d.(1)(e)** below.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** Except as provided in Paragraphs **(2)** through **(7)** below, we will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation, subject to the following:

**(a)** If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

**(i)** The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

**(ii)** The cost to replace, on the same premises, the lost or damaged property with other property:

**i.** Of comparable material and quality; and

**ii.** Used for the same purpose; or

**(iii)** The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

**(b)** If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

**(i)** The actual cash value of the lost or damaged property; or

**(ii)** A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the cost of repair or replacement.

**(c)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(d)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

**(e)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Actual Cash Value – Buildings option applies, as shown in the Declarations, Paragraph **(1)** above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Used or secondhand merchandise held in storage or for sale;

**(b)** Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

**(c)** Household contents, except personal property in apartments or rooms furnished by you as landlord;

**(d)** Manuscripts; and

**(e)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marble, bronzes, porcelain and bric-a-brac.

**(4)** Glass at the cost of replacement with safety glazing material if required by law.

**(5)** Tenants' Improvements and Betterments at:

**(a)** Replacement cost if you make repairs promptly.

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing if others pay for repairs or replacement.

**(6)** Applicable only to the Optional Coverages:

**(a)** "Money" at its face value; and

**(b)** "Securities" at their value at the close of business on the day the loss is discovered.

**(7)** Applicable only to Accounts Receivable:

**(a)** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

**(i)** We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

      **(ii)** We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

    **(b)** The following will be deducted from the total amount of accounts receivable, however that amount is established:

      **(i)** The amount of the accounts for which there is no loss or damage;

      **(ii)** The amount of the accounts that you are able to reestablish or collect;

      **(iii)** An amount to allow for probable bad debts that you are normally unable to collect; and

      **(iv)** All unearned interest and service charges.

**e.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy; and

    **(1)** We have reached agreement with you on the amount of loss; or

    **(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**6. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At our option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance of Section **I** – Property.

**7. Resumption Of Operations**

We will reduce the amount of your:

**a.** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**b.** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

### 8. Vacancy

#### a. Description Of Terms

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

#### b. Vacancy Provisions

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in Paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

### F. Property General Conditions

#### 1. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

#### 2. Mortgageholders

**a.** The term "mortgageholder" includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this policy at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this policy will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**3. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4. Policy Period, Coverage Territory**

Under Section I – Property:

**a.** We cover loss or damage commencing:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

**b.** The coverage territory is:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

**1. Outdoor Signs**

**a.** We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

**b.** Paragraph **A.3.,** Covered Causes Of Loss, and Paragraph **B.,** Exclusions in Section I – Property, do not apply to this Optional Coverage, except for:

(1) Paragraph **B.1.c.,** Governmental Action;

(2) Paragraph **B.1.d.,** Nuclear Hazard; and

(3) Paragraph **B.1.f.,** War And Military Action.

**c.** We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Rust;

(4) Corrosion; or

(5) Mechanical breakdown.

**d.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

**e.** The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Money And Securities**

**a.** We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

(1) Theft, meaning any act of stealing;

(2) Disappearance; or

(3) Destruction.

**b.** In addition to the Limitations and Exclusions applicable to Section I – Property, we will not pay for loss:

(1) Resulting from accounting or arithmetical errors or omissions;

(2) Due to the giving or surrendering of property in any exchange or purchase; or

(3) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

© Insurance Services Office, Inc., 2009          □

**c.** The most we will pay for loss in any one occurrence is:

   **(1)** The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

     **(a)** In or on the described premises; or

     **(b)** Within a bank or savings institution; and

   **(2)** The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

**d.** All loss:

   **(1)** Caused by one or more persons; or

   **(2)** Involving a single act or series of related acts;

   is considered one occurrence.

**e.** You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**3. Employee Dishonesty**

**a.** We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

   **(1)** Cause you to sustain loss or damage; and also

   **(2)** Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

     **(a)** Any employee; or

     **(b)** Any other person or organization.

**b.** We will not pay for loss or damage:

   **(1)** Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

   **(2)** Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph **a.**), "managers" or directors:

     **(a)** Whether acting alone or in collusion with other persons; or

     **(b)** While performing services for you or otherwise.

   **(3)** The only proof of which as to its existence or amount is:

     **(a)** An inventory computation; or

     **(b)** A profit and loss computation.

**c.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

**d.** All loss or damage:

   **(1)** Caused by one or more persons; or

   **(2)** Involving a single act or series of acts;

   is considered one occurrence.

**e.** If any loss is covered:

   **(1)** Partly by this insurance; and

   **(2)** Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

   the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

   We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**f.** This Optional Coverage is cancelled as to any employee immediately upon discovery by:

   **(1)** You; or

   **(2)** Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

   of any dishonest act committed by that employee before or after being hired by you.

**g.** We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

**h.** If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

   **(1)** This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

**(2)** The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under Paragraph **h.** above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

**(1)** This Optional Coverage as of its effective date; or

**(2)** The prior insurance had it remained in effect.

**j.** With respect to the Employee Dishonesty Optional Coverage in Paragraph **G.3.,** employee means:

**(1)** Any natural person:

**(a)** While in your service or for 30 days after termination of service;

**(b)** Who you compensate directly by salary, wages or commissions; and

**(c)** Who you have the right to direct and control while performing services for you;

**(2)** Any natural person who is furnished temporarily to you:

**(a)** To substitute for a permanent employee as defined in Paragraph **(1)** above, who is on leave; or

**(b)** To meet seasonal or short-term workload conditions;

**(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

**(4)** Any natural person who is a former employee, director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

**(5)** Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

But employee does not mean:

**(1)** Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**4. Equipment Breakdown Protection Coverage**

**a.** We will pay for direct loss of or damage to Covered Property caused by or resulting from a mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment.

Mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment does not mean any:

**(1)** Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

**(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

**(3)** Damage to any vacuum tube, gas tube, or brush; or

**(4)** The functioning of any safety or protective device.

**b.** Paragraphs **A.4.a.(1)** and **A.4.a.(2), Limitations,** do not apply to this Optional Coverage.

**c.** With respect to the coverage provided by this Optional Coverage, the following exclusions in Paragraph **B. Exclusions** do not apply:

**(1)** Paragraph **B.2.a. Electrical Apparatus;**

**(2)** Paragraph **B.2.d. Steam Apparatus;** and

**(3)** Paragraph **B.2.l.(6) Mechanical Breakdown.**

**d.** With respect to the coverage provided by this Optional Coverage, Paragraph **G.1.c.(5)** of the **Outdoor Sign Optional Coverage** does not apply.

**e.** If a dollar deductible is shown in the Declarations for this Optional Coverage, we will first subtract the applicable deductible amount from any loss we would otherwise pay. We will then pay the amount of loss in excess of the applicable deductible up to the applicable limit for this coverage.

If no optional deductible is chosen for this Optional Coverage, the Property Deductible shown in the Declarations applies.

**f.** With respect to **Additional Coverages 5.f. Business Income** and **5.g. Extra Expense**, if the 72-hour time period in the definition of "period of restoration" (hereinafter referred to as time deductible) is amended for this Optional Coverage as shown in the Declarations, we will not pay for any Business Income loss that occurs during the consecutive number of hours shown as the time deductible in the Declarations immediately following a mechanical breakdown or electrical failure. If a time deductible is shown in days, each day shall mean 24 consecutive hours.

As respects the coverage provided by this Optional Coverage, any time deductible shown in the Declarations for Equipment Breakdown Protection Coverage supersedes any time deductible otherwise applicable to the Business Income coverage provided by this policy.

**g.** With respect to the coverage provided by this Optional Coverage, Paragraph **H. Property Definitions** is amended as follows:

  **1.** "Computer" means:

    **a.** Programmable electronic equipment that is used to store, retrieve and process data; and

    **b.** Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

  "Computer" includes those used to operate production type machinery or equipment.

**h.** Whenever any covered pressure, mechanical or electrical machinery and equipment is found to be in, or exposed to, a dangerous condition, any of our representatives may suspend coverage provided by this Optional Coverage for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment.

However, coverage provided by this Optional Coverage may be reinstated for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment if the reasons for the suspension are found by any of our representatives to no longer exist.

We may suspend or reinstate this Optional coverage by mailing or delivering a written notification regarding the suspension or reinstatement to:

  **(1)** Your last known address; or

  **(2)** The address where the pressure, mechanical or electrical machinery and equipment is located.

This notification will indicate the effective date of the suspension or reinstatement.

If the coverage provided by this Optional Coverage is not reinstated, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

**H. Property Definitions**

  **1.** "Computer" means:

    **a.** Programmable electronic equipment that is used to store, retrieve and process data; and

    **b.** Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

  "Computer" does not include those used to operate production type machinery or equipment.

  **2.** "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

  **3.** "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

  **4.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

  **5.** "Manager" means a person serving in a directorial capacity for a limited liability company.

  **6.** "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

**7.** "Money" means:

**a.** Currency, coins and bank notes in current use and having a face value; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

**8.** "Operations" means your business activities occurring at the described premises.

**9.** "Period of restoration":

**a.** Means the period of time that:

**(1)** Begins:

**(a)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

**(b)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**(2)** Ends on the earlier of:

**(a)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(b)** The date when business is resumed at a new permanent location.

**b.** Does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**10.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**11.** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**12.** "Specified causes of loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss of or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

**13.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

**14.** "Valuable papers and records" means inscribed, printed or written:

**a.** Documents;

**b.** Manuscripts; and

**c.** Records;

including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities".

 © Insurance Services Office, Inc., 2009 □

## SECTION II – LIABILITY

### A. Coverages

#### 1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Paragraph **D.** – Liability And Medical Expenses Limits Of Insurance in Section **II** – Liability; and

(2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f.** Coverage Extension – Supplementary Payments.

b. This insurance applies:

(1) To "bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(b) The "bodily injury" or "property damage" occurs during the policy period; and

(c) Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

(2) To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**f. Coverage Extension – Supplementary Payments**

**(1)** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**(a)** All expenses we incur.

**(b)** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

**(c)** The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

**(d)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**(e)** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**(f)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**(g)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the limit of liability.

**(2)** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**(a)** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**(b)** This insurance applies to such liability assumed by the insured;

**(c)** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**(d)** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**(e)** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**(f)** The indemnitee:

**(i)** Agrees in writing to:

**i.** Cooperate with us in the investigation, settlement or defense of the "suit";

**ii.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**iii.** Notify any other insurer whose coverage is available to the indemnitee; and

**iv.** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(ii)** Provides us with written authorization to:

**i.** Obtain records and other information related to the "suit"; and

**ii.** Conduct and control the defense of the indemnitee in such "suit".

**(3)** So long as the conditions in Paragraph **(2)** are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section **II** – Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(a)** We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

**(b)** The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above are no longer met.

**2. Medical Expenses**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the Limits of Insurance of Section **II** – Liability. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

© Insurance Services Office, Inc., 2009

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

    **(i)** Any insured; or

    **(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

    **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

    **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

    **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 51 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

    **(b)** The operation of any of the following machinery or equipment:

        **(i)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        **(ii)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

**(3)** Supervisory, inspection or engineering services;

**(4)** Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(5)** Any health or therapeutic service treatment, advice or instruction;

**(6)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**(7)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(8)** Body piercing services; and

**(9)** Services in the practice of pharmacy.

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Paragraph **D.** Liability And Medical Expenses Limit Of Insurance in Section **II** – Liability.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**l. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**(4)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

**(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(6)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(7)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(8)** Committed by an insured whose business is:

   **(a)** Advertising, broadcasting, publishing or telecasting;

   **(b)** Designing or determining content of websites for others; or

   **(c)** An Internet search, access, content or service provider.

   However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

   For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

**(9)** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

**(10)** With respect to any loss, cost or expense arising out of any:

   **(a)** Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

   **(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants".

**(11)** Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

**(12)** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

   However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**(13)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**s. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage", or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c., d., e., f., g., h., i., k., l., m., n.** and **o.** in Section **II** – Liability do not apply to damage by fire to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D.** Liability And Medical Expenses Limits of Insurance in Section **II** – Liability.

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a.** To any insured, except "volunteer workers".

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Business Liability Coverage.

**3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion**

This insurance does not apply:

**a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

**(1)** The "nuclear material":

**(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

**(b)** Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**d.** As used in this exclusion:

**(1)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(2)** "Hazardous properties" include radioactive, toxic or explosive properties;

**(3)** "Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for:

**(i)** Separating the isotopes of uranium or plutonium;

**(ii)** Processing or utilizing "spent fuel"; or

**(iii)** Handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**(4)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**(5)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**(6)** "Property damage" includes all forms of radioactive contamination of property;

**(7)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(8)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(9)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**(10)** "Waste" means any waste material:

**(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

**(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraphs **(a)** and **(b)** of the definition of "nuclear facility".

## C. Who Is An Insured

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)**; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D. Liability And Medical Expenses Limits Of Insurance**

**1.** The Limits of Insurance of Section **II** – Liability shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The most we will pay for the sum of all damages because of all:

**a.** "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

**b.** "Personal and advertising injury" sustained by any one person or organization;

is the Liability and Medical Expenses limit shown in the Declarations. But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

3. The most we will pay under Business Liability Coverage for damages because of "property damage" to a premises while rented to you or in the case of fire while rented to you or temporarily occupied by you with permission of the owner is the applicable Damage To Premises Rented To You limit shown in the Declarations. For a premises temporarily occupied by you, the applicable limit will be the highest Damage To Premises Rented To You limit shown in the Declarations.

4. **Aggregate Limits**

   The most we will pay for:

   **a.** All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability and Medical Expenses limit.

   **b.** All:

      **(1)** "Bodily injury" and "property damage" except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

      **(2)** Plus medical expenses;

      **(3)** Plus all "personal and advertising injury" caused by offenses committed;

      is twice the Liability and Medical Expenses limit.

   Subject to Paragraph **a.** or **b.** above, whichever applies, the Damage To Premises Rented To You Limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

   The Limits of Insurance of Section **II** – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E. Liability And Medical Expenses General Conditions**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      **(1)** How, when and where the "occurrence" or offense took place;

      **(2)** The names and addresses of any injured persons and witnesses; and

      **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a claim is made or "suit" is brought against any insured, you must:

      **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

      **(2)** Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this policy:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Separation Of Insureds**

Except with respect to the Limits of Insurance of Section **II** – Liability, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**F. Liability And Medical Expenses Definitions**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**(1)** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**(2)** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection or engineering services.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

**SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**

**A. Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** Five days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy;

**(1)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

**(a)** Seasonal unoccupancy; or

**(b)** Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**(2)** After damage by a Covered Cause of Loss, permanent repairs to the building:

**(a)** Have not started, and

**(b)** Have not been contracted for,

within 30 days of initial payment of loss.

**(3)** The building has:

**(a)** An outstanding order to vacate;

(b) An outstanding demolition order; or

(c) Been declared unsafe by governmental authority.

(4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

(5) Failure to:

(a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

(b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**c.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe and healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## G. Liberalization

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

## H. Other Insurance

1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section **I** – Property.

2. Business Liability Coverage is excess over:

   **a.** Any other insurance that insures for direct physical loss or damage; or

   **b.** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

## I. Premiums

1. The first Named Insured shown in the Declarations:

   **a.** Is responsible for the payment of all premiums; and

   **b.** Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   **a.** Paid to us prior to the anniversary date; and

   **b.** Determined in accordance with Paragraph **2.** above.

Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

## J. Premium Audit

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## K. Transfer Of Rights Of Recovery Against Others To Us

1. Applicable to Businessowners Property Coverage:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   **a.** Prior to a loss to your Covered Property.

   **b.** After a loss to your Covered Property only if, at time of loss, that party is one of the following:

      **(1)** Someone insured by this insurance;

      **(2)** A business firm:

         **(a)** Owned or controlled by you; or

         **(b)** That owns or controls you; or

      **(3)** Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

**2.** Applicable to Businessowners Liability Coverage:

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.



# Endorsements



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 1
Endorsement Effective: April 30, 2019

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – PERSONAL INFORMATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to paragraph **B. Exclusions 1. Applicable To Business Liability Coverage** of **Section II – Liability:**

**Personal Information**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" caused by the insured's failure to protect any non-public, personally identifiable information in the insured's care, custody or control.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 2
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEFINITION OF EMPLOYEE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

With respect to **Section II – Liability**, Definition **5.** "Employee" in Paragraph **F. Liability And Medical Expenses Definitions** is deleted and replaced with the following:

**5.** "Employee" includes a "leased worker" and a "temporary worker".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 3
Endorsement Effective: April 30, 2019

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to paragraph **B. Exclusions 1. Applicable To Business Liability Coverage** of **Section II – Liability:**

**Intercompany Product Suits**

This insurance does not apply to any claim for damages by any Named Insured against another Named Insured because of "bodily injury" or "property damage" arising out of "your products" and included within the "products-completed operations hazard".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 4
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LOCK AND KEY REPLACEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section I – Property, A. Coverage**, paragraph **6. Coverage Extensions** is amended to add the following:

**Lock and Key Replacement**

1. You may extend the insurance provided by this policy to apply to the:

    (1) replacement of stolen keys;

    (2) repair of locks;

    (3) replacement of lock sets due to a breach of building security.

2. The most we will pay for loss or damage under this Extension is $1,000 unless a higher Limit of Insurance for Lock and Key Replacement is shown in the Declarations.

3. No Deductible applies to this Extension.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 5
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NOTICE INFORMATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| Where To Send Notice |
|---|
| Phone: 866-424-8508 |
| Email: reportaclaim@hiscox.com |
| Mail: Hiscox |
| 520 Madison Avenue-32nd Floor |
| Attn: Direct Claims |
| New York, NY, 10022 |

Subparagraph **3. Duties In The Event Of Loss Or Damage** in paragraph **E. Property Loss Conditions** of **Section I – Property** and Subparagraph **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit** in paragraph **E. Liability And Medical Expenses General Conditions** of **Section II – Liability** are amended to include the following:

Any notification required by this policy shall be provided to us at the address listed in the above **SCHEDULE**.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 6
Endorsement Effective: April 30, 2019

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# RIGHT AND DUTY TO SELECT DEFENSE COUNSEL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

In regard to any covered "suit" seeking damages under **Section II – Liability 1. Business Liability**, our right and duty to defend shall include the right to select defense counsel.

In regard to any suit arising from claims of owners of property that we elect to defend under subparagraph **f.** of paragraph **5. Loss Payment** of **Section I – Property E. Property Loss Conditions**, our election to defend such suits shall include the right to select defense counsel.



**Hiscox Insurance Company Inc.**

Policy Number:        UDC-1575520-BOP-19
Named Insured:       CHIEF OF STAFF LLC
Endorsement Number:  7
Endorsement Effective:  April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

---

# CONNECTICUT – CANCELLATION PROVISION
# (14 DAY FULL REFUND)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

In paragraph **A. Cancellation** of **Section III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**, subparagraph **5.** is deleted in its entirety and replaced with the following:

**5.** If this Policy is cancelled, we will send the Named Insured any premium refund due.  If we cancel, the refund will be pro rata.

If the Named Insured cancels, the refund may be less than pro rata.  However, if the Named Insured cancels within 14 days of the inception of the policy period shown in the Declarations without there having been:  (i) a Covered Cause of Loss; (ii) an offense arising out of your business that caused a "personal and advertising injury"; or (iii) an "occurrence" that caused "bodily injury" or "property damage"; or (iv) an accident that caused "bodily injury";  then we shall return in full any premium amount actually paid to us.  In such event, the effective date of cancellation shall be deemed to be the inception date of the policy period shown in the Declarations.

The cancellation will be effective even if we have not made or offered a refund.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 8
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ELECTRONIC DATA LIABILITY – LIMITED COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

| |
|---|
| **Loss Of Electronic Data Limit:  $  25,000** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**Section II – Liability** is amended as follows:

**A.** Exclusion **1.q.** is replaced by the following:

  **1. Exclusions**

    This insurance does not apply to:

    **q. Electronic Data**

      Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data" that does not result from physical injury to tangible property.

**B.** The following is added to Paragraph **D. Liability And Medical Expenses Limits Of Insurance:**

  Subject to **2.** and **4.** above, the Loss Of Electronic Data Limit shown in the Schedule above is the most we will pay under Paragraph **A.1.** Business Liability for "property damage" because of all loss of "electronic data" arising out of any one "occurrence".

**C.** The following definition is added to Paragraph **F. Liability And Medical Expenses Definitions:**

  "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**D.** For the purposes of the coverage provided by this endorsement, Paragraph **F.17. Liability And Medical Expenses Definitions** is replaced by the following:

  **17.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it; or

    **c.** Loss of, loss of use of, damage to, corruption of, inability to access, or inability to properly manipulate "electronic data", resulting from physical injury to tangible property. All such loss of "electronic data" shall be deemed to occur at the time of the "occurrence" that caused it.

  For the purposes of this insurance, "electronic data" is not tangible property.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 9
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 10
Endorsement Effective: April 30, 2019

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEWLY ACQUIRED ORGANIZATIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added to Paragraph **C. Who Is An Insured** in **Section II – Liability:**

3. Any organization you newly acquire or form, other than a partnership, joint venture, or limited liability company and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **b.** Paragraph **A.1. Business Liability** does not apply to:

      **(1)** "Bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

      **(2)** "Personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 11
Endorsement Effective: April 30, 2019

<h2 style="text-align:center">THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.</h2>

# CONNECTICUT CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**A. Section I – Property** is amended as follows:

1. The following are added to Paragraph **E.2. Appraisal** Property Loss Condition:

   **a.** You and we must notify the other of the appraiser selected within 20 days of the written demand for appraisal.

   **b.** If the appraisers do not agree on the selection of an umpire within 15 days, they must request selection of an umpire by a judge of a court having jurisdiction.

2. Paragraph **E.8.a.(1)(b) Vacancy** Property Loss Condition is replaced by the following:

   **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant when 70% or more of its total square footage:

   **(i)** Is not rented to a lessee or sub-lessee or is not used by the lessee or sub-lessee to conduct its customary operations; and/or

   **(ii)** Is not used by the building owner to conduct customary operations.

3. Paragraph **F.2. Mortgageholders** Property General Condition is replaced by the following:

   **2. Mortgageholder's Interests And Obligations**

   If loss hereunder is made payable, in whole or in part, to a designated mortgageholder not named herein as the insured, such interest in this policy may be cancelled by giving to such mortgageholder a ten days' written notice of cancellation.

If you fail to render proof of loss such mortgageholder, upon notice, shall render proof of loss in the form specified within sixty (60) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If we claim that no liability existed as to the mortgagor or owner, we shall, to the extent of payment of loss to the mortgageholder, be subrogated to all the mortgageholder's rights of recovery, but without impairing mortgageholder's rights to sue; or we may pay off the mortgage debt and require an assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such mortgageholder may be added hereto by agreement in writing.

4. Paragraph **E.5.g.** of the Property Loss Conditions is replaced by the following:

   **E. Property Loss Conditions**

   **5. Loss Payment**

   **g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all the terms of this Policy and:

   **(1)** We have reached agreement with you on the amount of loss; or

   **(2)** An appraisal award has been made.

Prior to the expiration of the aforementioned time period, we may make partial payment towards the amount of loss as an advance payment, provided we and you agree to such advance payment in writing. The advance payment will be credited towards the total amount of covered loss or damage. An advance payment does not extend the time for payment of the total amount of covered loss or damage.

**B. Section II – Liability** is amended as follows:

The term spouse is replaced by the following:

Spouse or party to a civil union recognized under Connecticut law.

**C. Section III – Common Policy Conditions** is amended as follows:

1. Paragraph **A. Cancellation** is replaced by the following:

   **A. Cancellation**

   1. The Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   2. **Cancellation Of Policies In Effect For Less Than 60 Days**

      If this policy has been in effect for less than 60 days and is not a renewal of a policy we issued, we may cancel this policy for any reason by giving you written notice of cancellation at least:

      a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      b. 30 days before the effective date of cancellation if we cancel for any other reason.

   3. **Cancellation Of Policies In Effect For 60 Days Or More**

      a. If this policy has been in effect for 60 days or more or this is a renewal of a policy we issued, we may cancel this policy by giving you written notice of cancellation at least:

         (1) 10 days before the effective date of cancellation if we cancel for one or more of the following reasons:

             (a) Nonpayment of premium;

             (b) Conviction of a crime arising out of acts increasing the hazard insured against;

             (c) Discovery of fraud or material misrepresentation by you in obtaining the policy or in perfecting any claim under the policy;

             (d) Discovery of any willful or reckless act or omission by you increasing the hazard insured against; or

             (e) A determination by the Commissioner that continuation of the policy would violate or place us in violation of the law; or

         (2) 60 days before the effective date of cancellation if we cancel for one or more of the following reasons:

             (a) Physical changes in the property which increase the hazard insured against;

             (b) A material increase in the hazard insured against; or

             (c) A substantial loss of reinsurance by us affecting this particular line of insurance.

      b. We may not cancel policies in effect for 60 days or more or renewal policies for any reason other than the reasons described in Paragraph **3.a.**

      c. If we cancel for nonpayment of premium, you may continue the coverage and avoid the effect of the cancellation by payment in full at any time prior to the effective date of cancellation.

      d. Notice of cancellation will be sent or delivered by:

         (1) Registered mail;

         (2) Certified mail; or

         (3) Mail evidenced by a United States Post Office certificate of mailing.

   4. We will give notice to you at your last mailing address known to us.

© Insurance Services Office, Inc., 2012                **BP 02 11 03 12**

5. Notice of cancellation will state the specific reason for the cancellation and the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund. Notice of cancellation will state that the excess premium (if not tendered) will be refunded on demand.

7. If notice is mailed, proof of mailing will be sufficient proof of notice.

2. The following paragraph is added and supersedes any provision to the contrary:

**M. Nonrenewal**

1. If we decide not to renew this policy, we will mail or deliver to you a written notice of nonrenewal, stating the specific reason for nonrenewal, at least 60 days before the expiration date of this policy. The notice will be sent to your address last known to us.

2. This notice will be delivered or sent by:

   **a.** Registered mail;

   **b.** Certified mail; or

   **c.** Mail evidenced by a certificate of mailing.

   If notice is mailed, proof of mailing is sufficient proof of notice.

3. However, we are not required to send this notice if nonrenewal is due to your failure to pay any advance premium required for renewal.

**D.** The following paragraph is added to the Businessowners Coverage Form:

If any conditions of The Standard Fire Insurance Policy of the State of Connecticut, as set forth in the General Statutes of Connecticut, are construed to be more liberal than any other policy condition, the conditions of The Standard Fire Insurance Policy will apply.

**E.** The following is added to any provision which uses the term actual cash value as it pertains to direct loss or damage to a covered building caused by a Covered Cause of Loss:

The actual cash value immediately prior to the time of such loss or damage shall be the amount which it would cost to repair or replace such building with material of like kind and quality, minus reasonable depreciation. Depreciation, as used herein, means a decrease in value over a period of time due to wear and tear.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 12
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AGGREGATE LIMIT ENDORSEMENT (DOUBLE LIMIT)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Subparagraph **4. Aggregate Limits** in paragraph **D. Liability and Medical Expenses Limits of Insurance** of **Section II – Liability** is deleted and replaced with the following:

**4. Aggregate Limits**

The most we will pay for all:

(1) "Bodily injury" and "property damage";
(2) Plus medical expenses;
(3) Plus all "personal and advertising injury" caused by offenses committed;

is twice the Liability and Medical Expenses limit.

The Damage To Premises Rented To You Limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of Section **II** – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 13
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BLANKET ADDITIONAL INSURED –LESSORS OF PREMISES, CLIENTS

BUSINESSOWNERS COVERAGE FORM

**A.** The following is added to Paragraph C. **Who Is An Insured in Section II – Liability:**

    **3.** If you have agreed in a written contract or agreement to add them as an additional insured to a policy providing the type of coverage afforded by this insurance, the following persons or organizations are added to this policy as additional insureds:

        **a.** Any person or organization from whom you lease any premises, but only with respect to liability arising out the ownership, maintenance, or use of that part of the premises leased to you.

        However, this insurance does not apply to any structural alterations, new construction, or demolition operations performed by or on behalf of the additional insured.

        A person or organization's status as an additional insured under this subsection a. ends when you cease to be a tenant in the premises.

        **b.** Any person or organization for whom you are performing operations, but only with respect to liability arising out of:

        **(1)** Your acts or omissions or of those acting on your behalf; and

        **(2)** The performance of your ongoing operations for the additional insured.

        A person or organization's status as an additional insured under this subsection b. ends when your operations for that additional insured are completed.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 15
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Policy and apply to Property and Liability Coverages:

**A. CAP ON CERTIFIED TERRORISM LOSSES**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 16
Endorsement Effective: April 30, 2019

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO
# TERRORISM RISK INSURANCE ACT

### SCHEDULE

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**　　$ 6.00 |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses 85% year 2015; 84% year 2016; 83% year 2017; 82% year 2018; 81% year 2019 and 80% year 2020.** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015



**Hiscox Insurance Company Inc.**

Policy Number: UDC-1575520-BOP-19
Named Insured: CHIEF OF STAFF LLC
Endorsement Number: 17
Endorsement Effective: April 30, 2019

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# HIRED AUTO AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| Coverage | Additional Premium |
|---|---|
| **A.  Hired Auto Liability** | $ 179.00 |
| **B.  Non-owned Auto Liability** | $ 0.00 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** Insurance is provided only for those coverages for which a specific premium charge is shown in the Declarations or in the Schedule.

**1. Hired Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability** in **Section II – Liability** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**2. Non-owned Auto Liability**

The insurance provided under Paragraph **A.1. Business Liability** in **Section II – Liability** applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person.

**B.** For insurance provided by this endorsement only:

**1.** The exclusions under Paragraph **B.1. Applicable To Business Liability Coverage** in **Section II – Liability,** other than Exclusions **a., b., d., f.** and **i.** and the **Nuclear Energy Liability Exclusion,** are deleted and replaced by the following:

**a.** "Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of injury.

This exclusion does not apply to:

**(1)** Liability assumed by the insured under an "insured contract"; or

**(2)** "Bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers' compensation law.

**b.** "Property damage" to:

**(1)** Property owned or being transported by, or rented or loaned to the insured; or

**(2)** Property in the care, custody or control of the insured.

**2.** Paragraph **C. Who Is An Insured** in **Section II – Liability** is replaced by the following:

**1.** Each of the following is an insured under this endorsement to the extent set forth below:

**a.** You;

**b.** Any other person using a "hired auto" with your permission;

**c.** For a "non-owned auto":

**(1)** Any partner or "executive officer" of yours; or

**(2)** Any "employee" of yours;

but only while such "non-owned auto" is being used in your business; and

**d.** Any other person or organization, but only for their liability because of acts or omissions of an insured under **a., b.** or **c.** above.

**2.** None of the following is an insured:

**a.** Any person engaged in the business of his or her employer for "bodily injury" to any co-"employee" of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-"employee" as a consequence of such "bodily injury", or for any obligation to share damages with or repay someone else who must pay damages because of the injury;

**b.** Any partner or "executive officer" for any "auto" owned by such partner or officer or a member of his or her household;

**c.** Any person while employed in or otherwise engaged in duties in connection with an "auto business", other than an "auto business" you operate;

**d.** The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

**e.** Any person or organization for the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**C.** For the purposes of this endorsement only, Paragraph **H. Other Insurance** in **Section III – Common Policy Conditions** is replaced by the following:

This insurance is excess over any primary insurance covering the "hired auto" or "non-owned auto".

**D.** The following additional definitions apply:

**1.** "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

**2.** "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", your partners or your "executive officers" or members of their households.

**3.** "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business or your personal affairs.

 © Insurance Services Office, Inc., 2009



# Notices



# ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons. OFAC has also identified Sanctioned Countries. A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries. Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person. Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional. You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.



# Application Summary



**Hiscox Insurance Company Inc.**

# Application Summary

The following outlines the details you have given us about your business. We have relied on the accuracy of this information in order to issue your policy. If any of the items below are incorrect or have changed, please call us at 888-202-3007 so that we can update your policy details.

| Your policy | |
|---|---|
| Policy number: | UDC-1575520-BOP-19 |
| Quote reference number: | 5300690 |
| Product: | Business Owners Policy |
| Business name: | CHIEF OF STAFF LLC |
| Business address: | 750 Main St Ste 1304 |
| City: | Hartford |
| State: | CT |
| Zip code: | 06103 |
| Name: | Bruce Hafford |
| Email address: | STEVE@STSWORLD.NET |
| Telephone number: | 860-875-2259 |
| **Liability and Medical Expense Limit** Coverage for claims of physical injury or property damage that may occur on your premises or where you conduct your business | $ 2,000,000 |
| Deductible: | $ 500 |
| When would you like your policy to start? | April 30, 2019 |

| Your business | |
|---|---|
| What is your primary type of business? | Human Resources (HR) Consulting |
| Your business's ownership structure (please select one). | Limited Liability Company |
| Do you currently have an insurance policy in effect for the coverage requested? | Yes |
| Please provide the name of your insurance carrier: | FOREMOST |
| I consent to engage in electronic transactions. | Agree |
| What are your business's estimated gross sales during the next 12 months? Note: Your best estimate is fine. Include all revenues, fees and commissions. | $ 800,000.00 |

| | |
|---|---|
| Including yourself, how many full-time, part-time, and temporary employees does your business have? (Do not include subcontractors.) | 5-10 |
| Which of the following coverages do you want to include? | Business Property (e.g. office equipment , furniture, computers) |
| Is your business operated out of your home? | No |
| Other than the business address provided above, how many additional locations does your business own or rent? | 0 |

### For each location, please provide

| | |
|---|---|
| Address: | 750 Main St Ste 1304, Hartford, CT 06103 |
| Approximately how many square feet does your business occupy at this location? | 450 |
| Describe the construction of the building: | Fire resistive or modified fire resistive |
| Does the building contain an automatic sprinkler system? | Yes |
| Is any manufacturing performed in this building? | No |
| What is the total value of your business personal property at this location? | $ 50,000 |

| | |
|---|---|
| Please indicate if you use any of the safeguards below at any of your properties:<br><br>Premises equipped with smoke detectors<br>Premises equipped with burglar alarms<br>Exterior doors equipped with dead-bolt locks<br>Utilize safes for valuable items, money, and papers, etc.<br>Other; please explain | <br><br>Yes<br>Yes<br>Yes<br>Yes<br>No |
| To protect your business's electronic data, do you use firewalls and anti-virus software, back up data frequently, and physically secure equipment that holds Electronic Data? | Yes |
| Do you or your business supply, manufacture, or distribute any tangible goods or products?<br>Note: Brochures, documents and reports are not considered as tangible goods. | No |
| Does your business perform any design, construction, installation, removal, or physical repair of any property or tangible good? | No |
| Does your business provide any of the following services?<br>● Actuarial advice<br>● Construction management or architecture<br>● Credit counseling<br>● Engineering<br>● Financing or financial auditing<br>● Investment or tax advice<br>● Insurance placement or advice<br>● Legal advice<br>● Lobbying and/or political advice<br>● Medical advice<br>● Mergers and acquisitions or business valuations | No |
| Does your business use rented or non-owned vehicles (e.g. an employee's car) for business purposes? | Yes |

| | |
|---|---|
| If your partners, officers, directors, trustees or employees use their vehicles for business purposes, do you request that they have insurance for those vehicles? | Yes |
| Of the total value of your business personal property, what is the value of your computer and electronic equipment? This includes PCs, laptops, PDAs, printers, servers, storage devices, multi-functional devices etc. | $10,000 |
| For the next 12 months, what is your estimated payroll expense for yourself, your full-time, part-time, and temporary employees? (Do not include subcontractors.) | $ 800,000.00 |

## Statements About Your Business

| | |
|---|---|
| As the individual completing this transaction, you are authorized to purchase and bind this insurance on behalf of the entity applying for coverage. | I have read and agree |
| Your business is not controlled or owned by any other firm, corporation, or entity. | I have read and agree |
| For the entire period of time that you have owned and controlled the business, You have not sold, purchased or acquired, discontinued, merged into or consolidated with another business. | I have read and agree |
| Your business has never had any commercial insurance cancelled or rescinded. | I have read and agree |
| During the last five years:<br>• You, or your business's current and past partners, officers, directors, trustees and employees have never been indicted for or convicted of any crime involving fraud, bribery, arson or any arson-related crime in connection with any property.<br>• No bankruptcy has been filed by or against your business.<br>• No foreclosure, repossession, judgment or lien has been filed against your business. | I have read and agree |

## Business Activities

| | |
|---|---|
| Your Business does not conduct any of the following activities:<br>• Automotive repair or sales<br>• Food service/restaurant operations<br>• Medical services<br>• Retail operations<br>Note: This does not include the activities of your clients in any of these industries | I have read and agree |

## Claims and Loss History

| | |
|---|---|
| Based upon your knowledge and the knowledge of your business's current and past partners, officers, directors and employees, during the last five years a third party has never made a claim against your business and you do not know of any reason why someone may make a claim. | I have read and agree |
| Based upon your knowledge and the knowledge of your business's current and past partners, officers, directors and employees, during the last five years you have not experienced any property related losses. | I have read and agree |
| Indicate the number of property related losses | 0 |

## Business Owners Insurance

The limits of liability represent the total amount available to pay losses or judgments and settlements for any claims. We are not liable for any amounts that exceed these limits. Some losses may be paid that do not diminish these limits of liability and we may pay these at our expense.

If coverage is provided, it shall apply only to occurrences that take place during the policy period.

Losses, judgments, and settlements incurred may be subject to a deductible amount that applies to an individual coverage. The deductible is the amount you must pay before we will make any payments under the policy. Some coverage may not be subject to a deductible, in which case you are not required to make payments before any payments are made under the policy. Please consult the policy language for details.

If you have knowledge of any circumstance that may lead to a loss or a claim being made against you, coverage will be excluded if such loss occurs or claim is made.

Losses or occurrences that took place prior to the inception of the policy are excluded.

## Other information

**Fraud Warning**
It is a crime to knowingly and intentionally attempt to defraud an insurance company by providing false or misleading information or concealing material information during the application process or when filing a claim. Such conduct could result in your policy being voided and subject you to criminal and civil penalties.

| | |
|---|---|
| **Optional Terrorism coverage:** You have elected to purchase optional terrorism coverage for: | $ 6.00 |
| You have confirmed that you agree with the General Statements provided. | Yes |
| I agree to accept delivery of my insurance policy via email to the address provided. | Yes |
| I have read the information above and confirm it is all correct. I understand that by checking this box I am agreeing to enter into a binding agreement with Hiscox Insurance. | Yes |

# Exhibit B

PO BOX 6260
AURORA IL 60598-6260



Hiscox Insurance Company Inc.
104 South Michigan Avenue, Suite 600
Chicago, Illinois 60603

June 16, 2020

Notice of Renewal

Bruce Hafford
750 Main St Ste 1304
Hartford, CT 06103

Named Insured: CHIEF OF STAFF LLC
Policy: Business Owners Policy
Policy Number: UDC-1575520-BOP-19

Dear Bruce Hafford,

It's been our pleasure to serve you this past year. As your next period of coverage approaches, we look forward to continuing our relationship for another year.

Your new period of policy coverage is scheduled to begin on April 30, 2020 at which time your current policy will expire. There have been no changes made to your coverage.

Your new policy documents are attached. Please review them carefully. As a reminder, your annual premium for your next period of coverage is $619.00 and no rate increases have been applied to your policy.

Your payments will be collected in the amounts and on the dates outlined in the attached billing summary, and they will be charged to the same account you provided to us. If you chose our no-fee installment plan, you will continue to pay by convenient monthly payments.

Each new policy year is a good opportunity to review your coverage against any changes in your business to make sure your policy still fits your needs. Have any of the following happened in the last year?

- Your business grew or reduced gross sales or payroll by more than 25%.
- You have merged with or acquired another organization.
- Someone else bought your business.
- You or your business had a claim made against you or experienced a loss.

If any of these took place, please call us and have your policy number ready so we can discuss the relevant details with you. If we do not hear from you, your policy will renew based on the information we already have on file, at our current rates. Your next period of coverage will then start on the date referenced above.



EXHIBIT
B




If you have any questions or need to make a change to your coverage, please contact one of our friendly licensed advisors at 800-867-4001.

Thank you for choosing Hiscox. We look forward to working with you in the upcoming year.

Sincerely,


Ben Walter, President, Hiscox Insurance Company Inc.

# Exhibit C



# A Guide To Your Business Owners Policy

The following is a guide to your Business Owners policy. We have identified several key coverage items along with the limits and deductibles you have selected. To make it easier, we have also added a brief explanation of those items.

We want you to feel confident about your new policy. If any of the information below is incorrect or if you have any questions, please contact one of our advisors at 888-202-3007 (Mon-Fri, 7am-10pm EST) or manage your policy at:www.hiscox.com/manage-your-policy.

## Your business details

| | |
|---|---|
| **Name:** | Bruce Hafford |
| **Business name:** | CHIEF OF STAFF LLC |
| **Address:** | 750 Main St Ste 1304 |
| **City:** | Hartford |
| **State:** | CT |
| **Zip code:** | 06103 |
| **Occupation:** | Human Resources (HR) Consulting |
| **Telephone number:** | 860-875-2259 |
| **Email address:** | STEVE@STSWORLD.NET |

## Your Business Owners Policy

| | |
|---|---|
| **Policy number:** | UDC-1575520-BOP-19 |
| **Policy effective dates:**<br>This determines the time period during which your coverage applies. | From: April 30, 2019<br>To: April 30, 2020 |
| **Form of business:**<br>This identifies the legal structure of your business and determines who is insured under your policy. | Limited Liability Company |
| **Total cost of policy:** | $ 619.00 |

## Specific coverage selected

| | |
|---|---|
| **Business Personal Property** | Included |
| **Buildings** | Excluded |
| **Crime package** | Excluded |
| **Electronic data package** | Excluded |
| **Business interruption and extra expense** | Included |
| **Hired/non-owned vehicle liability** | Included |



| Liability and medical expenses | Included |
|---|---|
| Optional terrorism coverage | Elected |

## Properties listed on your policy

| Premises no: | 1 |
|---|---|
| Address: | 750 Main St Ste 1304 |
| City: | Hartford |
| State: | CT |
| Zip code: | 06103 |

## Your limits for this property

| | |
|---|---|
| **Business Personal Property (BPP) limit**<br>The most we will pay (per occurrence) for loss or damage to your business equipment and property (e.g. computers, furniture) at this location. | $ 50,000 |
| **Deductible**<br>The amount you must pay (per occurrence) for property losses covered under the policy before the policy makes any payments. | $ 500 |

## Additional coverage and limits

| | |
|---|---|
| **Business income and extra expense**<br>We will pay for the actual income your business loses and extra expenses you incur as a result of an insured loss that prevents you from running your business. | Actual loss amount<br>for up to 12 months |
| **Forgery or alteration**<br>The most we will pay for losses resulting from forgery or alteration of checks or similar instruments. | $2,500 |
| **Electronic data**<br>The most we will pay to replace or restore your business's lost or damaged electronic data. | $10,000 |
| **Interruption of computer operations**<br>The most we will pay for lost income your business may experience as a result of an insured loss of electronic data, due to an interruption of your computer operations. | $10,000 |
| **Business Personal Property away from your premises**<br>The amount we will pay for loss or damage to property that is away from your business's premises. | $ 10,000 |
| **Personal effects**<br>The most we will pay for loss or damage (apart from theft and equipment used in your business) to personal property. | $2,500/premises |
| **Valuable papers and records**<br>The most we will pay (per occurrence) for loss or damage to your business's valuable papers and records. | $10,000 on premises<br>$5,000 off premises |
| **Accounts receivable**<br>This is the most we will pay (per occurrence) for lost receivables due to physical damage to your records (e.g. invoices). | $10,000 on premises<br>$5,000 off premises |

## Your liability coverage and limits

| | |
|---|---|
| **Liability and medical expenses**<br>The most we will pay, to the extent you are liable, for all damages and medical expenses that arise out of any one occurrence as well as personal and advertising injury (e.g., libel, slander) sustained by any one person or organization. Defense costs we incur, in the defense of a lawsuit filed against you, will not reduce this limit. | $ 2,000,000 |
| **Aggregate limit**<br>On your declaration page this appears as 'Other than products/completed operations aggregate limit.' It is the most we will pay for all damages and medical expenses for the duration of the policy. See the aggregate limits endorsement in your policy. | $ 4,000,000 |
| **Damage to premises rented to you**<br>The most we will pay for your liability for damage by fire to premises rented to you. This limit also applies to your liability to premises you rent for a period of 7 or fewer consecutive days. If you are a home-based business, this coverage does not apply to damage to your home. | $ 50,000 any one premises |
| **Medical expenses**<br>The most we will pay for all medical expenses sustained by any one person. | $ 5,000 any one person |
| **Deductible**<br>No deductible applies to your liability coverage so you are not required to make any payments in the event of such claims. | No deductible |

## Hired/Non-Owned Vehicle Liability

| | |
|---|---|
| **Hired/non-owned vehicle liability**<br>This coverage is for claims arising from the use of a rented or non-owned vehicle in the course of your business. | Included in your Liability and Medical Expenses Limit |

## Other policy information

| |
|---|
| **14 day full refund**<br>Be confident that you have made the right choice. We give you 14 days to review your policy. If you are not satisfied and have not had any claims or losses, you can cancel your policy back to its start date and receive a full refund. |
| **Notice of claim**<br>If you have a claim, please call us at 866-424-8508. You may also e-mail us at reportaclaim@hiscox.com |

**What does my Business Owners Policy cover?**
For a summary showing examples of what you are and are not covered for, please read the Coverage Summary document.

This guide does not modify the terms and conditions of your policy, which are contained in your policy documents, nor does it imply any claim is covered or not covered. We recommend that you read your policy documents to learn the details of your coverage.



# Business Owners Policy
# Business Personal Property Coverage Summary

We want you to understand the Hiscox Business Owners Policy. This summary explains the main areas of coverage and those for which your business is and isn't covered.

If you have any questions about your coverage, please contact one of our advisors at 888-202-3007 (Mon-Fri, 8am-10pm EST) or manage your policy at: www.hiscox.com/manage-your-policy.

## ☑ This part of the policy does cover

**Business equipment**
We cover for loss or damage to your business equipment (e.g., computers, printers, servers, and office furniture).

**Tenant improvements**
We cover improvements to your office space that you have made or acquired, but do not own and cannot legally remove.

**Coverage in and away from the office**
Your business equipment is insured when physically in your office. We also provide coverage for equipment you take away from the office, such as laptops, projectors, or other insured equipment.

**Accidental damage included**
Not only do we protect your business equipment against standard risks like fire, we also cover losses due to accidental damage.

**Replacing damaged items**
Most property protected under this policy is valued at its replacement cost and there is no deduction for depreciation. This means you can replace damaged items with equipment of like kind and quality.

**Personal effects**
We provide up to $2,500 of coverage, per premise, for personal items that are damaged in an insured loss. However, this does not include the theft of those items or equipment used in your business.

**Lost business income and extra expense**
We will pay the actual income your business loses and extra expenses you incur for up to 12 months if you cannot operate your business as a result of damage to your insured equipment. This would include up to 60 days of employee payroll expenses.

**Restoration of electronic data**
We provide up to $10,000 of coverage to replace or restore your electronic data that is lost as a result of an insured loss. This includes losses caused by a virus or malicious code. If you have purchased our Electronic Data Loss upgrade package, the limit is increased to $25,000.

**Lost income due to data loss**
If your business suffers an electronic data loss, we will also cover up to $10,000 for the actual income your business loses and extra expenses you incur if you cannot operate your business. If you have purchased our Electronic Data Loss upgrade package, the limit is increased to $25,000.

**Valuable papers and records**
We will pay for loss or damage to your business's valuable papers and records – up to $10,000 on your business premises and up to $5,000 if the incident happens away from your office.

**Forgery or alteration**
We will pay up to $2,500 for losses that result from the forgery or alteration of a check or similar financial document. Hiscox may also defend you if you are sued for failing to honor a financial document you believe has been forged. You can increase this limit by purchasing our Crime Package upgrade.

**Accounts receivable**
We will pay for lost receivables you cannot collect from your customers and extra collection expenses you incur as a result of damage to your records such as invoices. We cover up to $10,000 for losses to records at your business premises and up to $5,000 for losses to records away from your premises.

## ☒ This part of the policy does not cover

**Earthquakes, floods, and volcanoes**
We won't cover you for losses caused by earthquakes, floods, or volcanoes. However, if a fire results from one of these events, we will cover the loss as a result of the fire.

**Dishonesty/false pretense**
We won't cover your business for dishonest or criminal acts committed by you or your employees. We also won't cover any losses for property given up under false pretense. Destruction of property by your employees may be covered, but theft by your employees is not. You may obtain coverage for employee theft by purchasing our Crime Package upgrade.

**Utilities**
We won't cover losses due to the failure of a power, communication, or other utility service supplier.

**Errors or omissions**
We won't cover any losses due to mistakes in the programming, processing, or storage of electronic data or processing of valuable papers and records.

**Computer testing, installation, or repair**
We won't cover any losses due to mistakes in the design, installation, testing, maintenance, or modifications of your computer systems.

**Insuring for full value**
If you insure your property for less than 80% of the full replacement cost, you may not receive the full amount of your loss.

## Common claims examples

**Stolen property** — A break-in results in stolen business property as well as the theft of a client's property that was in your possession. Your Hiscox Business Owners Policy will cover the loss up to your coverage limits for that location.

**Equipment damaged away from the office** — You take the train to visit a client. Your laptop is damaged during the journey. We offer coverage for equipment damaged outside the office.

**Business interruption** — A fire sweeps through your office space, destroying your computer network and equipment, which you have insured as business personal property. As a result, your business can't operate for two weeks. The lost income and extra expenses incurred from the loss are covered.

Coverage summaries, descriptions, and claims examples are provided for illustrative purposes only and are subject to the applicable policy limits, deductibles, exclusions, terms, and conditions. Not all insurance products and services are available in all states. Hiscox recommends you read the policy documents to learn the full details of coverage.

Underwritten by Hiscox Insurance Company Inc., 233 North Michigan Avenue, Suite 1840, Chicago, IL 60601, as administered by Hiscox Inc., a licensed insurance provider in all states and DC.



**Reinventing Small Business Insurance™**

# Business Owners Policy
# Hired or Non-Owned Vehicle Liability Insurance
# Coverage Summary

We want you to understand the Hiscox Business Owners Policy. This summary explains the main areas of coverage and those for which your business is and isn't covered.

If you have any questions about your coverage, please contact one of our advisors at 888-202-3007 (Mon-Fri, 8am-10pm EST) or manage your policy at: www.hiscox.com/manage-your-policy.

## ☑ This part of the policy does cover

**Liability claims**
We cover claims arising from the use of a rented or non-owned business vehicle for business purposes (e.g., if your employee drove their own car to a client's office). If the employee is involved in an accident, your business may be legally liable. This optional upgrade adds this coverage as part of your General Liability limit in your Business Owners Policy.

**Defense costs**
If you're sued, even if you're not at fault, we will appoint an attorney to defend you, even if the lawsuit is groundless. We will pay these defense costs on your behalf and they will not reduce your limits of liability.

**Actions of your full-time and temporary staff**
This upgrade covers the actions of all your employees (full-time or temporary staff) when driving a non-owned or rented vehicle for business purposes, to the extent your business is liable.

## ☒ This part of the policy does not cover

**Protection for your company, not your employees**
It is important to remember that this coverage protects you for claims made against your business and not your employees driving the vehicles.

**Physical damage**
This coverage doesn't provide protection for physical damage to the rented or non-owned vehicles being used.

**Transportation of property**
This doesn't cover damage to property being transported or property within your care.

## Common claims examples

**The quick errand** – You ask one of your employees to use their car to go on a quick errand and purchase office supplies for your office. While on the errand, the employee is involved in an accident and your business may be found liable for the damages. We will provide protection up to your coverage limits.

**Your employees visiting clients** – Many small business employees will use their own vehicles to make client visits. If they were involved in an accident, the policy would provide protection for the business against any such liability claims.

Coverage summaries, descriptions, and claims examples are provided for illustrative purposes only and are subject to the applicable policy limits, deductibles, exclusions, terms, and conditions. Not all insurance products and services are available in all states. Hiscox recommends you read the policy documents to learn the full details of coverage.

Underwritten by Hiscox Insurance Company Inc., 104 South Michigan Avenue, Suite 600, Chicago, IL 60603, as administered by Hiscox Inc., a licensed insurance provider in all states and DC.



**Reinventing Small Business Insurance®**

# Business Owners Policy
# General Liability Coverage Summary

We want you to understand the Hiscox Business Owners Policy. This summary explains the main areas of coverage and exclusions.

If you have any questions about your coverage, please contact one of our advisors at 888-202-3007 (Mon-Fri, 8am-10pm EST) or manage your policy at: www.hiscox.com/manage-your-policy.

## ☑ This part of the policy does cover

**Bodily injury or property damage**
To the extent you are legally liable, we cover damages or claims expenses if you injure a third party or damage someone else's property (including damage due to a fire at a premise you rent, unless you work from home).

**Medical payments**
We will make medical payments as a result of bodily injury that occurs in the course of your business operations, regardless of fault.

**Defense costs**
If you're sued, even if you're not at fault, we will appoint an attorney to defend you, regardless of whether the lawsuit is groundless. We will pay these defense costs on your behalf and they will not reduce your limits.

**Personal and advertising injury**
We cover claims of libel and slander that are not part of your professional services. We also protect you if your advertisement unintentionally uses a third party's advertising idea or infringes upon another's copyright. We do not provide this coverage to marketing or PR professionals, research consultants, graphic designers, lawyers, real estate agents/brokers or property managers.

**Electronic data liability**
Specifically added for consultants and technology service providers, Hiscox covers your liability for damage to someone's electronic data resulting from the physical damage of property. We provide up to $25,000 of coverage.

**Worldwide insurance coverage**
We cover damage that occurs in the United States, its territories, and Canada. We also offer some coverage for instances outside these areas while you're away on short periods of travel.

**Employees or temporary staff**
Hiscox will cover claims arising from your employees' or temporary staff's actions if they were performed on behalf of your business.

**Supplemental payments**
Your Hiscox policy covers the following expenses, should they be incurred, without reducing your limit of liability:
- All expenses we incur, including the defense of lawsuits
- Up to $250 a day for reasonable expenses (including loss of earnings) you incur as a result of assisting us in the defense of a claim or lawsuit
- Interest on damage awards

## ☒ This part of the policy does not cover

**Intent to injure**
We won't cover you for any act that occurs with the intent to injure. This includes personal and advertising injuries if you knew your actions were false or knew they violated the rights of others.

**Outside the policy period**
We won't cover claims for bodily injury, property damage, or personal and advertising injury that do not occur during the policy period.

**Known claims and circumstances**
We won't cover your business for any claim or circumstance that could result in a claim you knew about prior to the start of your first Hiscox policy.

**Personally identifiable information**
We won't cover your failure to protect any personally identifiable information that is in your care.

**Professional services**
We won't cover any professional services performed by you. These types of risks may be covered as part of our Professional Liability policy.

**Vehicles and boats**
We won't cover any claims arising out of the ownership or use of an automobile or a watercraft.

**Workers' compensation**
We won't cover any obligation you may have under a workers' compensation claim or similar law.

**Your property**
We won't cover claims for damage to property you own or have in your care. However, protection for your own business equipment is part of your Business Personal Property coverage.

**Personal and advertising injury**
We don't provide this coverage to marketing or PR professionals, research consultants, graphic designers, lawyers, real estate agents/brokers or property managers. However, this coverage is available as part of our Professional Liability policy.

## Common claims examples

**Bodily injury** — A client falls over your bag and you are legally liable for the injury. We will cover the subsequent claim and related medical expenses up to your limit of liability.

**Property damage and data loss** — You spill coffee on a client's server, causing damage and loss of data. We will cover the subsequent claim up to your limit of liability.

**Personal injury** — One of your employees is at lunch. He talks to the owner of the shop about one of your clients in a false and unflattering way. The client learns of this discussion and sues for slander. We will cover the subsequent claim, up to your limits of liability, and pay for an attorney to defend you, if necessary.

Coverage summaries, descriptions, and claims examples are provided for illustrative purposes only and are subject to the applicable policy limits, deductibles, exclusions, terms, and conditions. Not all insurance products and services are available in all states. Hiscox recommends you read the policy documents to learn the full details of coverage.

Underwritten by Hiscox Insurance Company Inc., 104 South Michigan Avenue, Suite 600, Chicago, IL 60603, as administered by Hiscox Inc., a licensed insurance provider in all states and DC.

# Exhibit D

**PROTECTION OF PUBLIC HEALTH AND SAFETY DURING COVID-19 PANDEMIC AND RESPONSE – RESTRICTIONS ON WORKPLACES FOR NON-ESSENTIAL BUSINESSES, COORDINATED RESPONSE EFFORT**

**WHEREAS**, on March 10, 2020, I issued declarations of public health and civil preparedness emergencies, proclaiming a state of emergency throughout the State of Connecticut as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed spread in Connecticut; and

**WHEREAS,** my Executive Order No. 7, dated March 12, 2020, among other things, prohibited gatherings of 250 people or more for social and recreational activities, including but not limited to, community, civic, leisure, and sporting events; parades; concerts; festivals; movie screenings; plays or performances; conventions; and similar activities, and suspended various statutes and regulations to protect public health and safety; and

**WHEREAS,** my Executive Order No. 7A, dated March 13, 2020, authorized the Commissioner of Public Health to restrict entrance into nursing homes and similar facilities to protect people who are most vulnerable to COVID-19; and

**WHEREAS,** my Executive Order No. 7B, dated March 14, 2020, among other things, modified in-person open meetings requirements, waived certain rules to mitigate the critical shortage of hand sanitizer and personal protective equipment (PPE), maintain and increase the availability of childcare, and provide for increased healthcare resources and facilities; and

**WHEREAS,** my Executive Order No. 7C, dated March 15, 2020, among other things, cancelled classes in public schools for at least two weeks, provided for closure and remote conduct of business at Department of Motor Vehicle branches, extended deadlines for municipal budget preparations, and suspended or modified laws and regulations governing health care data and visitation at certain health care and congregate care settings; and

**WHEREAS,** my Executive Order No. 7D, dated March 16, 2020, restricted social and recreational gatherings of all types to fewer than 50 people, closed bars and restaurants to all service except food and non-alcoholic beverage takeout and delivery, closed gyms, fitness centers and movie theaters, and prohibited on-site operations at off-track betting facilities; and

**Exhibit
D**

**WHEREAS,** my Executive Order No. 7E, dated March 17, 2020, among other things, waived the requirement for an 180-day school year, suspended fingerprinting availability to that for critical requirements, extended the duration of various licenses and permits under the authority of the Commissioner of Emergency Services and public protection, and suspended certain requirements for recoupment of overpayment and hearings conducted by the Department of Social Services; and

**WHEREAS,** my Executive Order No. 7F, dated March 18, 2020, ordered the closure of Large Shopping Malls, the closure of places of public amusement except public parks and open recreation areas, expanded Medicaid telehealth coverage, waived in-person service, hearing, and screening requirements for certain Probate Court proceedings in vulnerable group care settings, and clarified my order cancelling school classes; and

**WHEREAS,** my Executive Order No. 7G, dated March 19, 2020, ordered the postponement of the presidential primary, suspended non-critical court operations, expanded the availability of telehealth services, and enacted additional public health measures;

**WHEREAS,** COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death; and

**WHEREAS,** the World Health Organization has declared the COVID-19 outbreak a pandemic; and

**WHEREAS,** the risk of severe illness and death from COVID-19 appears to be higher for individuals who are 60 years of age or older and for those who have chronic health conditions; and

**WHEREAS,** to reduce spread of COVID-19, the United States Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment of the virus and to slow transmission of the virus, including cancellation of gatherings of people and social distancing in smaller gatherings; and

**WHEREAS,** to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for the State of Connecticut to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds;

**WHEREAS,** in a short period of time, COVID-19 has rapidly spread throughout Connecticut, necessitating updated and more stringent guidance from federal, state, and local officials; and

**NOW, THEREFORE, I, NED LAMONT,** Governor of the State of Connecticut, by virtue of the authority vested in me by the Constitution and the laws of the State of Connecticut, do hereby **ORDER AND DIRECT:**

1. **Restrictions on Workplaces for Non-Essential Businesses.** Effective on March 23, 2020 at 8:00 p.m. and through April 22, 2020, unless earlier modified, extended, or terminated by me, all businesses and not-for-profit entities in the state shall employ, to the maximum extent possible, any telecommuting or work from home procedures that they can safely employ. Non-essential businesses or not-for-profit entities shall reduce their in-person

workforces at any workplace locations by 100% not later than March 23, 2020 at 8:00 p.m. Any essential business or entity providing essential goods, services or functions shall not be subject to these in-person restrictions.

Not later than 8 p.m. on March 22, 2020, the Department of Economic and Community Development ("DECD") shall issue lawfully binding guidance about which businesses are essential. Those business shall include, but not be limited to, the 16 critical infrastructure sectors as defined by the Department of Homeland Security and available at https://www.cisa.gov/critical-infrastructure-sectors, essential health care operations including hospitals, clinics, dentists, pharmacies, elder care and home health care workers, companies and institutions involved in the research and development, manufacture, distribution, warehousing, and supplying of pharmaceuticals, biotechnology therapies, health care data, consumer health products, medical devices, diagnostics, equipment, services and any other healthcare related supplies or services; essential infrastructure, including utilities, wastewater and drinking water, telecommunications, airports and transportation infrastructure; manufacturing, including food processing, pharmaceuticals, and industries supporting the essential services required to meet national security commitments to the federal government and U.S. Military; the defense industrial base, including aerospace, mechanical and software engineers, manufacturing/production workers, aircraft and weapon system mechanics and maintainers; essential retail, including grocery stores and big-box stores or wholesale clubs, provided they also sell groceries; pharmacies, gas stations and convenience stores; food and beverage retailers (including liquor/package stores and manufacturer permittees) and restaurants, provided they comply with previous and future executive orders issued during the existing declared public health and civil preparedness emergency; essential services including trash and recycling collection, hauling, and processing, mail and shipping services; news media; legal and accounting services; banks, insurance companies, check cashing services, and other financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services and goods necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses, including pest control and landscaping services; vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and the provision of goods, services or functions necessary for the health, safety and welfare of the public.

Any other business may be deemed essential after requesting an opinion from DECD, which shall review and grant such request, should it determine that it is in the best interest of the state to have the workforce continue at full capacity to properly respond to this emergency.

2. **Coordinated Response Effort.** Effective immediately and for the duration of the public health and civil preparedness emergency, notwithstanding Section 28-8a of the Connecticut General Statutes, in order to ensure the coordinated, clear and expeditious execution of civil preparedness functions for the protection of the public health, and pursuant to my emergency powers, including but not limited to Section 28-9(b) of the Connecticut General Statutes, no municipal chief executive officer or designee may enact or enforce any order that conflicts with any provision of any of my Executive Orders or an order issued by an executive agency pursuant to the existing public health and civil preparedness emergency, or issue any shelter-in-place order or order prohibiting travel, unless they first seek and receive written permission from the Department of Emergency Services and Public Protection. The provisions of this order shall not be deemed to invalidate any order previously issued by a municipal chief executive or designee or preclude a municipality from enforcing any existing local rule or ordinance that does not conflict with any executive order issued pursuant to my March 10, 2020 declaration of public health and civil preparedness emergency.

Dated at Hartford, Connecticut, this 20th day of March, 2020.

Ned Lamont
Governor

By His Excellency's Command

Denise W. Merrill
Secretary of the State

# Exhibit E

**STATE OF CONNECTICUT**

**BY HIS EXCELLENCY**

**NED LAMONT**

**EXECUTIVE ORDER NO. 7J**

**PROTECTION OF PUBLIC HEALTH AND SAFETY DURING COVID-19 PANDEMIC AND RESPONSE – CLARIFYING EO NO. 7H REGARDING OPERATIONS AT NON-ESSENTIAL BUSINESSES AND PROVIDING FOR RAPID STATE GOVERNMENT EMERGENCY RESPONSE**

**WHEREAS,** on March 10, 2020, I issued declarations of public health and civil preparedness emergencies, proclaiming a state of emergency throughout the State of Connecticut as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed spread in Connecticut; and

**WHEREAS,** my Executive Order No. 7, dated March 12, 2020, among other things, prohibited gatherings of 250 people or more for social and recreational activities, including but not limited to, community, civic, leisure, and sporting events; parades; concerts; festivals; movie screenings; plays or performances; conventions; and similar activities, and suspended various statutes and regulations to protect public health and safety; and

**WHEREAS,** my Executive Order No. 7A, dated March 13, 2020, authorized the Commissioner of Public Health to restrict entrance into nursing homes and similar facilities to protect people who are most vulnerable to COVID-19; and

**WHEREAS,** my Executive Order No. 7B, dated March 14, 2020, among other things, modified in-person open meetings requirements, waived certain rules to mitigate the critical shortage of hand sanitizer and personal protective equipment (PPE), maintain and increase the availability of childcare, and provide for increased healthcare resources and facilities; and

**WHEREAS,** my Executive Order No. 7C, dated March 15, 2020, among other things, cancelled classes in public schools for at least two weeks, provided for closure and remote conduct of business at Department of Motor Vehicle branches, extended deadlines for municipal budget preparations, and suspended or modified laws and regulations governing health care data and visitation at certain health care and congregate care settings; and

**WHEREAS,** my Executive Order No. 7D, dated March 16, 2020, restricted social and recreational gatherings of all types to fewer than 50 people, closed bars and restaurants to all service except food and non-alcoholic beverage takeout and delivery, closed gyms, fitness centers and movie theaters, and prohibited on-site operations at off-track betting facilities; and

**WHEREAS,** my Executive Order No. 7E, dated March 17, 2020, among other things, waived the requirement for an 180-day school year, suspended fingerprinting availability to that for critical requirements, extended the duration of various licenses and permits under the authority of the Commissioner of Emergency Services and public protection, and suspended certain requirements for recoupment of overpayment and hearings conducted by the Department of Social Services; and

**WHEREAS,** my Executive Order No. 7F, dated March 18, 2020, ordered the closure of Large Shopping Malls, the closure of places of public amusement except public parks and open recreation areas, expanded Medicaid telehealth coverage, waived in-person service, hearing, and screening requirements for certain Probate Court proceedings in vulnerable group care settings, and clarified my order cancelling school classes; and

**WHEREAS,** my Executive Order No. 7G, dated March 19, 2020, ordered the postponement of the presidential primary, suspended non-critical court operations, expanded the availability of telehealth services, and enacted additional public health measures; and

**WHEREAS,** my Executive Order No. 7H, dated March 20, 2020, limited the workplace operations of non-essential businesses, and on-profit, created a process to designate those that are essential, and provided for consistency across the state in governmental response to the COVID-19 pandemic; and

**WHEREAS,** my Executive Order No. 7I, dated March 21, 2020, among other things, granted various forms of financial relief to recipients of public health and economic assistance, enacted measures to protect the health of children in the care of the Department of Children and Families, and enacted a series of measures to allow municipalities and their administrative bodies to conduct essential business while reducing the risk of COVID-19 transmission; and

**WHEREAS,** COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death; and

**WHEREAS,** the World Health Organization has declared the COVID-19 outbreak a pandemic; and

**WHEREAS,** the risk of severe illness and death from COVID-19 appears to be higher for individuals who are 60 years of age or older and for those who have chronic health conditions; and

**WHEREAS,** to reduce spread of COVID-19, the United States Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment of the virus and to slow transmission of the virus, including cancellation of gatherings of fifty people or more and social distancing in smaller gatherings; and

**WHEREAS,** if COVID-10 is transmitted to an elderly person, there is a high risk of serious illness or mortality; and

**WHEREAS,** the availability of methadone for ongoing medication assisted treatment is critical for the treatment of patients by Methadone Maintenance Clinics;

**WHEREAS** the delivery of methadone take-home doses will allow for patients that are unable to travel to the facility an opportunity to receive their medication in their home and decrease the risk of transmission of COVID-19; and

**WHEREAS,** it is critical that fire service personnel in the midst of certification testing are able to to meet contractual, bylaw, and probationary requirements as mandated by their employers, and are able to perform their vital public safety role throughout this state of emergency; and

**WHEREAS,** Governor Rell's Executive Order No. 27, adopted and extended by Governor Malloy's Executive Order No. 3, restricts the rehiring of Temporary Worker Retirees (TWRs) to two calendar years; and

**WHEREAS,** Public Acts 3-01 and 03-2 prohibit the rehiring of any state employee who participated in the Early Retirement Incentive Program offered in 2003; and

**WHEREAS,** the COVID-19 pandemic has created staffing disruptions in state agencies and has also increased the need for services provided by state agencies, resulting in critical skills shortages in certain areas, including those related to healthcare and public safety; and

**WHEREAS,** people who have retired from state service already possess the requisite knowledge, experience and/or licenses and are willing to return to work on a temporary basis can help agencies mitigate the such staffing shortages; and

**WHEREAS,** during the current public health crisis, accommodations for safe and effective operations of state agencies and state employees and the clients of these agencies are rapidly changing and evolving; and

**WHEREAS,** during the current public health crisis, additional accommodations and facilities beyond what is currently available in Connecticut may be necessary to address the effects of COVID-19, including but not limited to housing, health care, and medical treatment; and

**WHEREAS,** it is imperative to the health and safety of the general public that the State of Connecticut is able to adapt to the current crisis on an emergency basis, and provide essential human services for the duration of this emergency; and

**WHEREAS,** it is critical to the protection of the public health and safety that the Department of Administrative Services and the agencies for which it provides real estate services be able to respond to these emergency circumstances as expeditiously as possible; and

**WHEREAS,** in order to effectively respond to and alleviate the effects of the emergency, certain statutorily mandated procedures for the leasing, assignment and use of real estate for state agencies, employees and the general public should be condensed and streamlined, to enable the State to enter into leases relating to emergency needs created by the COVID-19 crisis; and

**WHEREAS,** effective utilization of leased real estate may require the State to make certain minor capital improvements, or acquire furniture, fixtures and equipment; and

**WHEREAS,** non-essential retailers provide useful and necessary products and employ tens of thousands of people throughout the state, and with proper precautions, may be able to conduct limited operations without increasing the risk of transmission of COVID-19; and

**WHEREAS,** it is critical to the safety and recovery of non-essential businesses and nonprofit organizations that their buildings and grounds remain secure and in good working order and continue to receive and process mail and packages; and

**WHEREAS,** upon a proclamation that a civil preparedness emergency exists, section 28-9(b) of the Connecticut General Statutes authorizes the modification or suspension in whole or in part by executive order of any statute or regulation or requirement or part thereof that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of public health;

**NOW, THEREFORE, I, NED LAMONT,** Governor of the State of Connecticut, by virtue of the authority vested in me by the Constitution and the laws of the State of Connecticut, do hereby **ORDER AND DIRECT:**

1. **Clarification of Executive Order No. 7H Regarding Non-Essential Business Operations.** Executive Order No. 7H, dated March 20, 2020 is hereby amended to permit 1) non-essential retailers to be staffed on site, provided that they may only offer remote ordering (e.g. phone, internet, mail, dropbox) and delivery or curb-side pick-up, and 2) non-essential businesses and nonprofits to allow staff or third parties on site to the minimum extent necessary to provide security, maintenance, and receipt of mail and packages, or other services deemed essential in implementing guidance issued by the Department of Economic and Community Development.

2. **Extension of Time Period for Fire Service Personnel Examinations.** Section 7-323l-18a (d) (1) of the Regulations of Connecticut State Agencies is modified to authorize the Commissioner of Emergency Services and Public Protection to extend the time by which examination components for a given level of certification for fire-service personnel must be completed, by 90 days, provided that he is authorized, in his sole discretion, to revoke such extensions as he deems necessary to protect public safety, and to further extend such timeline as he deems necessary.

3. **Delivery of Methadone to Homebound Patients by Methadone Maintenance Clinics.** Section 21a-252 of the Connecticut General Statutes is modified to permit the delivery of take-home doses of methadone for the treatment of drug dependent patients who are determined to be unable to travel to the treatment facility due to COVID-19 or related concerns. The Commissioner of Consumer Protection may issue any implementing orders or guidance that she deems necessary to implement this order.

4. **Suspension of Rehiring Procedures and Restrictions on Temporary Worker Retirees (TWR).** In order to enable agencies to meet critical staffing needs caused by COVID-19 with skilled and experienced employees who require little to no additional training, Gov. Rell's Executive Order No. 37, Gov. Malloy's Executive Order No. 3, Section 6(b)(F) of Public Act 03-01 and Section 6(b)(G) of Public Act 03-02 are suspended to remove the two-year limitation TWRs and to authorize rehiring employees who participated in retirement incentive programs. Agencies shall expedite review and approval of any related extension or hiring requests.

5. **Modification of Real Property Statutes to Facilitate Leasing, Repairs, Alterations and Use of Real Property to Address the COVID-19 Emergency.** In accordance with the provisions of Section 28-9(b)(1) of the Connecticut General Statutes, the following statutes are modified as set forth herein to authorize the Secretary of the Office of Policy and Management or her designee, or the Commissioner of Administrative Services, as applicable, to take any action they deem necessary to expedite the leasing or use of real property by the State of Connecticut to respond to the COVID-19 emergency:

   a. subsections (a), (k) and (o) of Section 4b-23 of the Connecticut General Statutes, which require agencies to submit requests for space for approval by the Secretary of the Office of Policy and Management; to obtain approval for any space that was not included in the state facilities plan, and require the approval of the Secretary of the Office of Policy and Management of all leases, lease renewals and holdover agreements proposed by the Commissioner of the Department of Administrative Services;

   b. subsections (3) and (4) of Section 4-67g(f) of the Connecticut General Statutes, which requires the approval of the Secretary of the Office of Policy and Management prior to any use of state real property by an entity other than a state agency, or use of state real property by a state agency other than the state agency with custody and control over such state real property;

   c. subsection (f) of section 4b-3 of the Connecticut General Statutes, as to that portion of the statute that requires the approval of the State Properties Review Board of real estate acquisitions, sales, leases and subleases proposed by the Commissioner of Administrative Services;

   d. section 4b-29 of the Connecticut General Statutes, only as to that portion of the statute that requires the approval of the State Properties Review Board for the Commissioner of Administrative Services to order the assignment and removal of state agencies to and from real estate available

to the state, through ownership or lease, when he deems it necessary to provide space, facilities and necessary accommodations to meet the needs of any of such agencies and when such assignment or removal will be in the best interests of the state;

e. section 4b-33 of the Connecticut General Statutes in its entirety, which requires any person, firm, partnership, association, corporation or other entity, seeking to enter into a lease or lease-purchase agreement with the state through the Commissioner of Administrative Services to file a sworn statement with said Commissioner disclosing the names of any persons having a financial interest in the property or premises involved, and which provides that failure to make such disclosure is punishable by a civil penalty;

f. section 4b-34 of the Connecticut General Statutes in its entirety, which mandates advertising for leased space and notification to the Connecticut Association of Realtors of requirements for leased space by executive branch agencies;

6. **State Contracting Statutes Modified to Facilitate Leasing, Repairs, Alterations and Use of Real Property to Address the COVID-19 Emergency.** In accordance with the provisions of Section 28-9(b)(1) of the Connecticut General Statutes, the following statutes are modified as set forth herein to authorize the Secretary of the Office of Policy and Management or her designee, or the Commissioner of Administrative Services, as applicable, to take any action they deem necessary to expedite the state-wide property transfers, assignments of space and leasing or use of real property by the State of Connecticut to respond to the COVID-19 emergency:

   a. sections 4-252 and 9-612(f)(2)(E) of the Connecticut General Statutes and Governor Malloy's Executive Order 49, which require disclosure of certain gifts and campaign contributions by state contractors and prospective state contractors for state contracts over $50,000;

   b. section 4e-70 of the Connecticut General Statutes, which requires state contractors to comply with certain confidentiality requirements;

   c. sections 4e-29 and 4e-30 of the Connecticut General Statutes, which require state contractors to permit certain audit and inspection activities by the State at the contractors' expense;

   d. section 4a-57 requiring competitive solicitations for all purchases and contracts for supplies, materials, equipment and contractual services, including, pursuant to section 4d-8, the purchasing, leasing and

contracting for information system and telecommunication system facilities, equipment and services; and

e.  section 4b-91 that sets forth the process for competitive solicitation for public works contracts.

7.  **Approval for Transactions Covered by Sections 5 and 6 of This Order.** Department of Administrative Services shall submit all proposed real estate transactions subject to this order to the Deputy Secretary of the Office of Policy and Management or his/her designee for review and approval. The Deputy Secretary or his/her designee shall have one (1) calendar day to respond to any proposed transaction pursuant to this Order, after which it shall be deemed approved.

Unless otherwise specified herein, this order shall take effect immediately and shall remain in effect for the duration of the public health and civil preparedness emergency, unless earlier modified or terminated by me.

Dated at Hartford, Connecticut, this 22nd day of March, 2020.

Ned Lamont
Governor

By His Excellency's Command

Denise W. Merrill
Secretary of the State

# Exhibit F

1    STATE OF MICHIGAN

2    IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

3    _____
4    GAVRILIDES MANAGEMENT COMPANY,
5                        Plaintiff,
6    vs.                                    File No. 20-258-CB
7
8    MICHIGAN INSURANCE COMPANY,
9            Defendant.

10   _____/

11

12            DEFENDANTS MOTION FOR SUMMARY DISPOSITION
13     BEFORE THE HONORABLE JOYCE DRAGANCHUK, CIRCUIT COURT JUDGE
14            LANSING, MICHIGAN – WEDNESDAY, JULY 01, 2020
15
16

17   APPEARANCES:
18   For the Plaintiff:          Matthew J. Heos-P73786
19                               3452 East Lake Lansing Road
20                               East Lansing, Michigan 48823
21                               517-256-4240
22
23
24   For the Defendant:          Henry Emrich-P29948
25                               2025 East Beltline Avenue SE-#600
26                               Grand Rapids, Michigan 49546
27                               616-285-0143
28
29
30   Recorded/transcribed by:    Susan C. Melton, CER 7548
31                               Certified Electronic Reporter
32                               (517) 483-6500 x6703
33
34
35
36
37
38
39
40
41
42
43
44

**Exhibit** [1]
**F**

TABLE OF CONTENTS

WITNESSES                                    PAGE

None.


EXHIBITS

None admitted.

2

Lansing, Michigan

Wednesday, July 01, 2020

2:58:57 PM

4                THE COURT: This is, pardon me if I massacre

5        this, Gavri--, Gavrilides Management Company, et al versus

6        Michigan Insurance Company, docket number 20-258-CB. And

7        this is the time set for Defendant Michigan Insurance

8        Company's Motion for Summary Disposition. And just for the

9        record, could I have your appearances, please?

10                MR. HEOS: Yes, your Honor. Matthew Heos and Nick

11       Gavrilides is here in the courtroom also with me. He is

12       the owner of the immediate plaintiff company's.

13                MR EMRICH: Henry Emrich on behalf of Michigan

14       Insurance Company, your Honor and my assistant Chenney

15       Ward.

16                THE COURT: Okay, thank you. And your motion, Mr.

17       Emrich, if you wish to go ahead.

18                MR. EMRICH: Thank you, your Honor. I am going to

19       assume that the Court has read all of the pleadings in

20       this case, so I'll try not to belabor some of the points.

21       I think the, the key fact that we need to focus on is that

22       as we've argued is that there's no question here but the

23       policies that insure Mr. Gavrilides properties against,

24       against direct physical loss or damage to the property and

25       contrary, any claim with the policy benefits in question

                                3

1    this business income coverage is illusory, the policy in

2    question here clearly provides that for the business

3    coverage, the business income coverage to apply and, and

4    most of the other primary coverages under their policy,

5    there must be a direct physical loss of or damage to the

6    insured property in order for it to apply.

7        And I think it's important as we'll discuss

8    later in our argument depending on what Mr. Heos has to

9    say, why this is important, we must focus on the fact that

10   there must be direct physical loss or damage to the

11   insured property and not direct physical loss of use of or

12   damage to the property as has been suggested by Mr.

13   Gavrilides and his attorney in order for the coverage at

14   issue to apply.

15       While I acknowledge, your Honor, that this is a

16   somewhat unique, extraordinary if you will, matter to be

17   filing at this point in the proceedings as our initial

18   pleading; I think it's important to understand that when

19   we look at Mr. Gavrilides complaint, it does not contain

20   one single allegation that this insured property has in

21   any way been damaged or lost.  To the contrary, the

22   allegations in the complaint affirmatively allege that the

23   plaintiff business interruption claim is based on the

24   "Stay at Home" orders of Governor Whitmer. There is no

25   allegation of any kind that the property in question has

4

in any way been damaged, lost or anything of the sort.

Given that this motion has been brought under 2.116(c)(10), plaintiff must produce some evidence to contradict the uncontroverted facts that have been alleged not only in the complaint, but in the affidavit submitted Mr. Gavrilides and in any of the other materials that Mr. Heos has attached to his response as, as indicated, most importantly, the affidavit of Mr. Gavrilides that reiterates the admissions in the complaint that there has not been any loss of or damage to either of the properties for which they seek coverage.

The insureds property today exists in the very same condition as it existed the day prior to the effective date of the "Stay at Home" order. They have not been lost, they have not been damaged, they have not required any repairs because of any damage to those properties. The business operation, its, its operation as a restaurant today is, is the same as the day prior to the effective date of the order, albeit with some modifi- cations that had been required to avoid grouping and to maintain social distancing in, in a sense improvements to the real estate. Not repairs, you know, and, and it's been maintained as a take-out, take-out operation at least until recently when they resumed the dining operation. There has been no loss of or damage to either building

| 1 | that has prevented the plaintiff from operating as a |
| 2 | restaurant or entering it for that matter if--, as they |
| 3 | have. If plaintiffs wanted to sell either building today, |
| 4 | they could do so. And while plaintiffs have provided some |
| 5 | speculative evidence about the decreased value of that |
| 6 | property, although, as I read Mr.--, as I read the |
| 7 | materials that Mr. Heos kindly attached to his response, |
| 8 | the fact of the matter is it pointed out in that article |
| 9 | was that while they operation of a commercial property may |
| 10 | get harder, it's not impossible to operate it in the |
| 11 | future under our new normal. |
| 12 | Because plaintiffs complaint, the affidavit, the |
| 13 | other information that has been provided to your Honor |
| 14 | provides no evidence of any damage to that property. |
| 15 | Plaintiffs could never prove that either property suffered |
| 16 | any direct physical loss from the imposition of Governor |
| 17 | Whitmer's emergency order. And thus, could never recover |
| 18 | business interruption coverage under this policy based on |
| 19 | the facts that have been presented to the Court. The same |
| 20 | holds true under the business cover, income coverage, if a |
| 21 | civil authority prevents or prohibits access to either |
| 22 | property because of direct physical damage to an adjacent |
| 23 | or nearby property for the very same reason. There has |
| 24 | been no direct physical loss or damage to any adjacent |
| 25 | property that has been alleged, that has been provided to |

6

1   the Court in Mr. Heos response. And frankly, when you look

2   at the order that they have, that is at issue in this

3   case, there's nothing there that prevents access to Mr.

4   Gavrilides properties whatsoever.

5           In summary, your Honor, there are no facts

6   alleged in the complaint or in any of the materials that

7   I've looked at, including Mr. Gavrilides affidavit, that

8   shows there has been direct physical loss of or damage to

9   the insured property. And for those reasons, your Honor,

10  we believe that our motion--, for those reasons alone, we

11  believe our motion for summary disposition should be

12  granted.

13          I'd just like to make a couple of additional

14  points before I shut up. I really believe summary

15  disposition is warranted on this basis alone and I would

16  turn the Court to the case that we've discussed in our, in

17  our brief, your Honor, that's referred to Universal

18  Insurance Production versus Chubb. And that's the decision

19  of the Eastern District of Michigan involving a claim that

20  involved insured property. It was damaged by a pervasive

21  odor that developed in the property as a result of mold

22  that grew in the property because of some water seepage.

23  And why that case is important is because it discusses the

24  Michigan Rules of Contract Interpretation, that still

25  apply today, policy language is clear and unambiguous on

7

its face, which we believe is clearly the case here that states that the words and the terms of the policy should be enforced utilizing plain and commonly understood meanings.

And when I said earlier that that's important when we talk about what direct physical loss of or damage to property means, it means we look at those words. We don't add words such as loss of use, that Mr. Heos and Mr. Gavrilides have added in order to understand what we're talking about here. We look at the language in the policy. Every case that Mr. Heos produced your Honor, says the very same thing. In Univer--, Universal, like here, the policy was an 'all-risk' policy that required, like here, direct physical loss or damage to the insured property in order to trigger coverage unless that coverage was excluded.

As Universal pointed out, applying a dictionary meaning of direct and physical as meaning something immediate or proximate as a premise to something that is distant or incidental and physical meaning something that has a material existence meant in the context of a loss involving a contaminant that, unlike here, per the uncon-troverted allegations of the complaint and other evidence produced by plaintiff in response to this motion. That in order for direct physical loss of the property in this

8

| | |
|---|---|
| 1 | context, the contaminant must actually alter the structure |
| 2 | integrity of the property in order to trigger coverage |
| 3 | under language that is at issue in this case. And it |
| 4 | didn't happen in Universal, as the Court denied coverage |
| 5 | there, granted affirmed summary disposition. And |
| 6 | importantly your Honor, it hasn't even been alleged in |
| 7 | this case. Regardless of any authority to the contrary, |
| 8 | anywhere else in the country, this remains the law in our |
| 9 | courts when interpreting policy terms at issue. There is a |
| 10 | requirement that there be direct physical loss of or |
| 11 | damage to property. And the allegations produced here in |
| 12 | the complaint and the evidence that's been attached have |
| 13 | specifically acknowledged no such contamination and no |
| 14 | such damage to the property as a result of that contami- |
| 15 | nation. |
| 16 | As in Universal, your Honor, the mere presence |
| 17 | of odor or even mold was not any evidence of structural or |
| 18 | tangible damage to the insured property. And as such, no |
| 19 | direct physical loss or damage to the property had-, was |
| 20 | occurred. Here, your Honor, we have the very same thing |
| 21 | except that we have not even had any allegations of any |
| 22 | damage to the property caused by this unfortunate, this |
| 23 | horrible virus. |
| 24 | Finally, and although we do not believe the |
| 25 | Court even has to get to this point, even if we assume for |

9

| | |
|---|---|
| 1 | purposes of this motion that contamination occurred on |
| 2 | each premises and that somehow effected the structural |
| 3 | integrity of either building, again, neither scenario is |
| 4 | alleged. And even if it were, we do not believe under the |
| 5 | circumstances and the science that exists that it would |
| 6 | necessarily constitute direct physical loss over damage to |
| 7 | the property. The buyer's exclusion of the policy, which |
| 8 | clearly and unequivocally states that it applies to all |
| 9 | coverages and endorsement and that the company will not |
| 10 | pay for loss or damages caused by or resulting from any |
| 11 | virus, bacteria or other microorganism that induces or is, |
| 12 | is capable of inducing physical distress, illness or |
| 13 | disease. And Lord knows, that that has certainly been the |
| 14 | case with what's happened with Covid-19 throughout our |
| 15 | country. |
| 16 | Clearly, your Honor, that exclusion, again, I |
| 17 | don't believe you even have to get there, but that |
| 18 | exclusion would clearly exclude any claim here even if |
| 19 | plaintiff's could prove direct physical loss of or damage |
| 20 | to the insured property or any nearby property that |
| 21 | resulted in a civil authority issuing an order prohibiting |
| 22 | access to the property. As of eight days ago, your Honor, |
| 23 | they have only been few jurisdictions in this country, |
| 24 | Florida and Pennsylvania, that have discussed and applied |
| 25 | this, a similar exclusion as at issue in this case and in |

10

|   |   |
|---|---|
| 1 | every one of those cases, the Court has enforced that |
| 2 | exclusion as written because it's clear and unambiguous. |
| 3 | Again, your Honor, for all the reasons that we've set |
| 4 | forth here today and the brief that we filed and our |
| 5 | reply, we request that the Court grant our Motion for |
| 6 | Summary Disposition at this time. Thank you. |
| 7 | THE COURT: Thank you. Mr. Heos? |
| 8 | MR. HEOS: Thank you, your Honor and may it |
| 9 | please the Court. And obviously Mr. Emrich and I have a |
| 10 | different interpretation of direct physical loss of or |
| 11 | damage to covered properties because here the loss comes |
| 12 | from the issue of the executive order restricting use of |
| 13 | property. Physically you cannot use for, for dine-in |
| 14 | services any of the interior of the building for a period |
| 15 | of time. And a complete prohibition isn't contemplated by |
| 16 | the language of the contract, I think a limited |
| 17 | restriction also falls within the coverage. And I think |
| 18 | that if you're gonna accept the defendants argument you |
| 19 | would have to limit the meaning to destruction of the |
| 20 | physical building itself, but we know that the coverage |
| 21 | extends to non-destructive loss, civil authority being |
| 22 | one. |
| 23 | I put in example in the brief subterranean |
| 24 | pollution, you can look at asbestos or a computer virus is |
| 25 | something that would occur that there would be no physical |

11

destruction to the property itself. The fact of the matter
is that Mr. Gavrilides can't use the covered properties
because of or he's lost rather the use of those properties
because of the order and it looks like that will continue
in some form for a while. So, I think that counsel is
wrong in trying to limit the scope even with the case law
he cited, most of which is persuasive and not binding.
That's number one, Judge.

And as for the virus exclusion itself, the only
case law we have relates to person to person transmission
of a virus at the covered property. And I think that fits
more with what's going on. We see in the news that Harpers
in East Lansing and even the Hotcat in Kalamazoo is making
headlines of people contracting Covid there. But, the
impetus of the order was to protect public health and
welfare, which is the governor's duty. It's not caused by
a virus. It would be the same order as with the damn in
Midland being issued to protect public health and welfare.
It wasn't caused by a flood. It was caused by the
Governor's duty to act and protect the people she's
charged with protecting and I think that's what happening.

Or it's distinguishable from the case and I
think it's Bowler, the case cited regarding the virus. And
I think that if you go further in accepting defendant's
position, then we get into the illusory promise of well if

12

|    |                                                            |
|----|------------------------------------------------------------|
| 1  | the government issues an order, we're not gonna cover it    |
| 2  | because any decision of a government body or group of       |
| 3  | people is excluded. And so then, you get into the circle    |
| 4  | in the contract where if you're going to buy into counsels  |
| 5  | logic, it would make that provision illusory. And for       |
| 6  | those reasons, I think that the motion should actually      |
| 7  | roll back on the defendants because the language to         |
| 8  | support the claim, to the extent that the Court thinks      |
| 9  | there's a deficiency in my pleading and is gonna grant      |
| 10 | defendants motion, I'd like Leave to Amend the Complaint.   |
| 11 | But, I don't think that's the case here. And with that,     |
| 12 | I'll leave it, if the Court would like to ask any           |
| 13 | questions, I'm happy to take them.                          |
| 14 | THE COURT: I don't have any. Thank you. I'll                |
| 15 | give Mr. Emrich rebuttal time.                              |
| 16 | MR. EMRICH: Thank you, your Honor. Your Honor,              |
| 17 | what I would say is that when we talk about these cases      |
| 18 | that Mr. Heos has mentioned that might provide coverage in   |
| 19 | certain situations, I read those cases a little while ago   |
| 20 | and I'm kind of tired reading some of these cases about     |
| 21 | insurance coverage. But, the point in every one of those    |
| 22 | cases is that the condition she referred to actually        |
| 23 | caused damage to the property.                              |
| 24 | In this case, there has not been any such                   |
| 25 | damage. And if we look at what the coverage for business    |

13

| 1 | loss or business--, the business income loss that they're |
| 2 | seeking says, it says that if the business, the coverage |
| 3 | would apply if the business operation is suspended |
| 4 | provided the suspension must be caused by the direct |
| 5 | physical loss of or damage to property. In this case, that |
| 6 | hasn't occurred. Nothing prevents Mr. Gavrilides from |
| 7 | using that property. It has been used as such. The fact |
| 8 | that there may be other coverages that may provide some |
| 9 | limited coverage, they're against what Mr. Heos is arguing |
| 10 | because clearly, if those coverages were covered under |
| 11 | this language, then why have a special coverage that |
| 12 | provides certain conditions for its application. |
| 13 | The point is, in each of those civil authority |
| 14 | cases that he talked about, the property actually |
| 15 | sustained damage. Here it didn't sustain damage. As to his |
| 16 | claim in this case, that he wants an opportunity to amend |
| 17 | his complaint if the Court feels compelled to grant my |
| 18 | motion, what is that going to accomplish? He's already |
| 19 | alleged in his complaint and his client has already signed |
| 20 | an affidavit where he no doubt put his hand up and swore |
| 21 | to the contents of that affidavit in which he said there |
| 22 | has been no damage to that property. |
| 23 | We don't create coverage by-, because somebody |
| 24 | thinks they ought to have coverage. But, that, that, that |
| 25 | whole line of cases Roy versus Continental Insurance and |

14

some of the other cases in our, in our brief that we
cited, clearly supports the notion that the reasonable
expectation concept doesn't apply in Michigan. It just
doesn't cut it. There is no coverage here, your Honor.
That exclusion is clear. If the Court feels that there may
be or that there may be a situation that would give rise
to, but again, you have to come forward at the time that
you, that you respond to this motion with some evidence
that suggests that. That hasn't happened here. I mean even
when you look at the response that he's filed, he talks
about scenario's that have absolutely no bearing to this
case.

And you know, I'll just make one last point,
your Honor, you know, when I was a young Prosecutor, I had
the benefit of being able to argue a number of cases to
juries that required me to prove the defendant's guilt
beyond a reasonable doubt. And in those cases, I was
trained to listen closely to the defendant's argument and
had been the case where the facts were particularly
egregious, a defense attorney would often not even talk
about those facts and talk about the law. And he talked
about how that law was somehow created this reasonable
doubt in hopes of creating some confusion on the part of
one juror who might then find in his clients favor because
reasonable doubt existed. And, and in those cases, I would

15

make sure that when I got up in rebuttal, just as I have been given the opportunity to here, I would point that out to the jury and indicate to them that there's a reason for that. And that's because they didn't want you to talk about the facts that clearly supported conviction.

On the other hand, if it was a case where the law, you know, or the facts may have been murky, but the law was clear, the defense attorney would only focus on, you know, on those facts and not talk about the law. And again, I point that out to the jury there. But, in this case, you know, and there were cases back then to, like our case here that were neither supported by the facts or the law. Which I believe is clearly the case in this case. And the defense attorney would get up and argue something that to the jury that had absolutely nothing to do with the case in hopes of confusing them. Just like Mr. Heos has suggested by talking about these asbestos cases or some of these other cases that have nothing to do with this.

Well in this case, when you look at his responsive pleading, he talks about an accident situation that has absolutely no application here. Nothing to do with this case. While in his argument, he starts out talking about a discussion of the virus of racism and as there, as there, we would point out, if we were in front

of a jury, just like I'd point out to them and I'm

pointing out to you, it hasn't got anything to do with

this case. Your Honor, the reason for that and the reason

for the topic of that is that he knows that neither the

facts or the law support his claim and nothing he could

file as an amendment would change that.

He is hoping to somehow create this little bit

of possibility, some scintilla that some evidence is gonna

pop up that shows that the property has been damaged in

hopes that he could trigger coverage. And as this Court

knows under the cases we've discussed in our brief, that

is not sufficient to deny summary disposition in a case

that clearly warrants it even at this early stage.

Thank you your Honor for your patience. Thank

you Mr. Heos, we've never met. I've heard a lot of good

things about you. Mr. Gavrilides, nice to have met you,

very sorry for the situation you're in. It's just crazy

all the way around. And just like having to argue this

case on TV is really just disconcerting for me. But, in

any event, thank you your Honor for your patience.

THE COURT: Thank you. You're on Youtube not TV.

But--

MR. EMRICH: I meant screen. Yeah, whatever.

THE COURT: Right.

MR. EMRICH: The screen.

THE COURT: I, I did read the briefs. I studied them very carefully and I've listened to the argument of counsel today. And taking all the-, that together I, I note that the plaintiff speaks of and focuses on arguments about access to the property, use of the property and definitions of loss and damage. But, the first inquiry has to start with a full look, not just isolating some words or phrases from the policy. But, a full look at the coverage that's provided under the policy.

Coverage is provided for actual loss of business income sustained during a suspension of operations. The policy goes on to provide the 'suspension must be caused by direct physical loss of or damage to property.' And it also provides 'the loss or damage must be caused by or result from a covered cause of loss. The causes of loss special form provides that a covered cause of loss means risks of direct physical loss.'

So, whether we're talking about the cause for the suspension of the business or the cause for the loss or the damage, it is clear from the policy coverage provision only direct physical loss is covered. Under their common meanings and under federal case law as well, that the plaintiff has cited that interprets this standard form of insurance, direct physical loss of or damage to the property has to be something with material existence.

18

Something that is tangible. Something according to the one case that the plaintiff has cited from the Eastern District, that alters the physical integrity of the property. The complaint here does not allege any physical loss of or damage to the property. The complaint alleges a loss of business due to executive orders shutting down the restaurants for dining, for dining in the restaurant due to the Covid-19 threat.

But, the complaint also states that a no time has Covid-19 entered the Soup Spoon or the Bistro through any employee or customer and in fact, states that it has never been present in either location. So, there simply are no allegations of direct physical loss of or damage to either property. The plaintiff seems to make in the briefing, at least, two arguments about the language in the coverage provision and what it means.

The first argument is that the plaintiff says coverage applies to "direct physical loss or damage to property." Even if that were the wording of the coverage provision, it wouldn't save the plaintiff from the requirement that the loss or damage must be physical and the analysis could end right there. But, I have to go on to say that this is not even the wording of the coverage provision. Coverage according to the policy applies to a suspension caused by "direct physical loss of or damage to

19

property." So, I'm not going to get into a detailed analysis of the rules of grammar. But, common rules of grammar would apply to make that phrase a short-cut way of saying "direct physical loss of property or direct physical damage to property." So, again, the plaintiff just can't avoid the requirement that there has to be something that physically alters the integrity of the property. There has to be some tangible, i.e., physical damage to the property.

Then the plaintiff in the briefing, at least, seems to make a second argument that and this is not 100% clear, but, it seems like the plaintiff is saying that the physical requirement is met because people were physically restricted from dine-in services. But, that argument is just simply nonsense. And it comes nowhere close to meeting the requirement that there's some, there has to be some physical alteration to or physical damage or tangible damage to the integrity of the building.

So, the next argument that the plaintiff makes is that the virus and bacteria exclusion is vague and can't apply here. The plaintiff has not adequately explained how the term virus is vague. And in fact, supplies a completely workable, understandable, usable definition of the word virus. The argument in this regard really seems to be more that the virus exclusion doesn't

apply. And it goes something like this as far as I can tell, first, a virus can't cause physical loss or damage to property because virus' harm people, not property. Second, the damage caused here was really caused by actions of the civil authority to protect public health. And then third, therefore, coverage for acts of any person, group, organization or governmental body applies. But, that argument bring us right back to the direct physical loss or damage requirement. Again, going back to the cause of loss special form B, as in boy, exclusions provides that acts of government are only covered when they result in a covered cause of loss. A covered cause of loss, again, is direct physical loss. So, even if the virus exclusion did not apply, which the plaintiff has not supported that it doesn't apply, I only argue that it's vague, which I reject. But, even if it did not apply, it could only be coverage for governmental actions that resulted in direct physical loss or damage.

And then, finally, the plaintiff argues that the policy has a contradiction in it that renders it illusory. So, the plaintiff says that the policy extends coverage for governmental acts. But, then, it takes it away in the causes of loss special form. But, that's simply not true. Coverage is provided for actual loss of business income sustained during the suspension of operations. However,

21

1    according to the coverage provision, the suspension must

2    be caused by direct physical loss of or damage to

3    property. And governmental acts are likewise covered if

4    it results in a covered cause of loss, which is again, a

5    direct physical loss. There is no granting of coverage

6    and then excluding the same coverage in the policy. As a

7    matter of fact, the policy is consistent throughout and

8    consistent with federal law cited by the plaintiff. It

9    requires physical loss or damage.

10   There is a virus exclusion even if plaintiff was

11   alleging, was alleging, even if there were allegations in

12   the complaint alleging actual physical loss or damage,

13   which the complaint does not do. But, there is a virus

14   exclusion that would also apply. And governmental action

15   that results in direct physical loss is covered. But

16   again, there is no direct physical loss alleged here.

17   Now, I have to address a little bit this, that

18   it was brought as a (c)(10) motion. The actually the

19   defendant hasn't provided any support by way of factual

20   support, depositions, affidavits, et cetera, for a (c)(10)

21   motion. So, if the defendant doesn't do that, then the

22   plaintiff has no burden under Maiden versus Rosewood. So,

23   there's no shifting burden until the moving party first

24   does it. But, I don't think it properly is labeled a

25   (c)(10) motion. I think it's a (c)(8) motion. Because this

22

|   |   |
|---|---|
| 1 | is the motion that can be decided as a matter of law. Take |
| 2 | all the allegations in the complaint as true and examine |
| 3 | nothing more than the contract upon which the complaint is |
| 4 | based, the policy of insurance and as a matter of law, the |
| 5 | plaintiffs complaint cannot be sustained. And although the |
| 6 | plaintiff has requested a chance to amend without any |
| 7 | indication of how they would do that, there actually is no |
| 8 | factual development that could change the fact that the |
| 9 | complaint is complaining about the loss of access or use |
| 10 | of the premised due to executive orders and the Covid-19 |
| 11 | virus crisis. So, there's no factual development that |
| 12 | could possibly change that or amendment to the complaint |
| 13 | that could possibly change that those things do not |
| 14 | constitute the direct physical damage or injury that's |
| 15 | required under the policy as I've outlined. |
| 16 | So, for those reasons, I am granting the |
| 17 | Defendant's Motion for Summary Disposition. I'm doing it |
| 18 | under MCR 2.116 (c)(8). And Mr.— |
| 19 | MR. EMRICH: Thank you, your Honor. |
| 20 | THE COURT: Mr. Emrich, will you submit an order? |
| 21 | MR. EMRICH: Certainly will, your Honor. |
| 22 | THE COURT: Okay. |
| 23 | MR. EMRICH: Thank you. |
| 24 | THE COURT: Thank you. |
| 25 | MR. HEOS: Thank you very much. |

23

1    THE COURT: That will conclude our hearing.

2    (Hearing concludes at 3:32:35 PM.)

3

4

5

6

7

8

9

10   STATE OF MICHIGAN)

11            )

12   COUNTY OF INGHAM)

13

14

15

16   I certify that that this transcript, consisting of 24

17   pages, is a complete, true, and correct transcript of the

18   proceedings and testimony taken in this case on Wednesday,

19   July 01, 2020.

20

21

22   July 09, 2020                    _____

23                                    Susan C. Melton-CER 7548
24                                    30th Circuit Court
25                                    313 West Kalamazoo Avenue
26                                    Lansing, Michigan 48901
27                                    517-483-6500 ext. 6703

28

24

# Exhibit G

k5e2SocH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SOCIAL LIFE MAGAZINE, INC.,

4                  Plaintiff,                New York, N.Y.

5          v.                                20 Civ. 3311(VEC)

6   SENTINEL INSURANCE COMPANY
    LIMITED,
7
                   Defendant.
8
    ------------------------------x       Teleconference
9                                         Order to Show Cause

10
                                          May 14, 2020
11                                        10:00 a.m.

12  Before:

13                  HON. VALERIE E. CAPRONI,

14                                        District Judge

15

16                        APPEARANCES
17

18  GABRIEL J. FISCHBARG
         Attorney for Plaintiff
19

20  STEPTOE & JOHNSON, LLP
         Attorneys for Defendant
21  BY:  CHARLES A. MICHAEL
         SARAH D. GORDON
22

23

24

25

Exhibit
G

1          THE COURT:  Good morning, everybody.

2          Do I have a court reporter on the line?

3          THE COURT REPORTER:  Good morning, your Honor.

4    Kristen Carannante.

5          THE COURT:  Good morning.

6          Okay.  Do I have Mr. Fischbarg for the plaintiff?

7          MR. FISCHBARG:  Yes, Judge.  Hi.

8          THE COURT:  Mr. Fischbarg, is anyone else on the line

9    for the plaintiff?

10          MR. FISCHBARG:  Yes.  The plaintiff is on a separate

11    phone available if you need evidence or --

12          THE COURT:  The principal of Social Life?

13          MR. FISCHBARG:  Yes.  He is in my office, you know,

14    more than six feet away, and --

15          THE COURT:  Okay.

16          And who do I have for the defendant?

17          MR. MICHAEL:  Good morning, your Honor.  This is

18    Charles Michael, from Steptoe & Johnson, for the defendant.

19    With me is my partner Sarah Gordon, who was just admitted *pro*

20    *hac vice*, and who will be doing the presentation today.

21          THE COURT:  Terrific.

22          All right --

23          MS. GORDON:  Good morning, your Honor.

24          THE COURT:  Good morning.

25          Only people who are speaking need to note their

1  appearances, and I have got those, Mr. Fischbarg and

2  Ms. Gordon.  Everybody else, please mute your telephone.

3        Also, if you hear that sound that sounds like someone

4  has dropped off the line once we get started, I need you to

5  stop talking so that I can make sure that I have still got the

6  court reporter and your adversary on the line.

7        So, Mr. Fischbarg, this is your motion, so you get to

8  go first.

9        MR. FISCHBARG:  Yes.  So I submitted a reply

10  memorandum, you know, in the afternoon yesterday.  I was just

11  wondering if --

12        THE COURT:  Yes.  I saw that.  Thank you.

13        MR. FISCHBARG:  Okay, so you were also able to read

14  it, I suppose?

15        THE COURT:  Yes, yes.

16        MR. FISCHBARG:  Okay.

17        So I guess the only other thing I want to add that's

18  not in the papers, and then I don't know if your Honor has any

19  issues that you want to talk about, is I mentioned that Liberty

20  Mutual had this exclusion for viruses and it is also evident

21  that other insurance companies have the same exclusion,

22  including Travelers Insurance Company, and they filed the --

23  they actually filed a federal lawsuit for declaratory judgment

24  in California, Docket No. 20 Civ. 3619, to preempt such claims,

25  I guess to enforce their exclusion for viruses.  So to the

1   extent that the defendant is claiming some kind of overreach by

2   the plaintiff here, I don't think it is proper.  There are

3   several insurance companies who are capable of putting in a

4   virus exclusion in their policies, and in this case there is

5   none.  So --

6           THE COURT:  Let me ask you something.  First off, I

7   want to start with basics.  Do you agree that New York law

8   applies?

9           MR. FISCHBARG:  Yes.

10          THE COURT:  All right.  So the -- is it the *Roundabout*

11  *Theatre* case?

12          MS. GORDON:  Yes, your Honor.

13          THE COURT:  First Department case?

14          MS. GORDON:  Yes, your Honor.  This is Ms. Gordon on

15  behalf of Sentinel.

16          THE COURT:  Thank you.

17          Mr. Fischbarg, it would seem to me that the *Roundabout*

18  case is a real problem for your position.

19          Would you like to explain to me why it doesn't

20  preclude your claim?

21          MR. FISCHBARG:  Yes.  That case applies to off-site

22  property damage rendering the premises at issue inaccessible.

23  So in this case, you don't have off-site property damage.  You

24  have on-site property damage.

25          THE COURT:  What is the damage?  There is no damage to

1    your property.

2              MR. FISCHBARG:  Well, the virus exists everywhere.

3              THE COURT:  It damages lungs.  It doesn't damage

4    printing presses.

5              MR. FISCHBARG:  Right.  Well, that's a different

6    issue, whether or not -- that's a different issue than the

7    *Roundabout* case that had to do with accessibility.  Now we are

8    jumping to the topic of whether a virus can cause physical

9    damage to a printing press, as your Honor mentioned.  So that's

10   a separate issue, and there are a lot of cases that we have

11   cited where this type of material, a virus, does cause physical

12   damage.

13             THE COURT:  What's your best case?  What do you think

14   is your best case under New York law?

15             MR. FISCHBARG:  Well, the problem is, under New York

16   law, there isn't much law.  The New Jersey federal court, in

17   *TRAVCO*, citing other cases, including from other circuits,

18   where physical damage had a broader interpretation that

19   includes loss of use and not just, you know, something where

20   you take a hammer and break an item.

21             THE COURT:  With loss of use, I mean, loss of use from

22   things like mold is different from you not being able to,

23   quote, use your premises because there is a virus that is

24   running amuck in the community.

25             MR. FISCHBARG:  Okay.  I would disagree with that.  I

1  would say virus and mold are equivalent.  They are both

2  physical items which, if they land on a surface or are on a

3  surface, just like spores that are also listed in the policy,

4  mold is also listed in the policy.  I would say that the virus,

5  mold spores --

6           THE COURT:  Hang on --

7           MR. FISCHBARG:  -- anything --

8           THE COURT:  A second.

9           Do I still have the court reporter?

10           THE COURT REPORTER:  Yes, your Honor.

11           THE COURT:  Do I have I still have, Ms. Gordon?

12           MS. GORDON:  Yes, your Honor.

13           THE COURT:  All right.  Go ahead.

14           MR. FISCHBARG:  Mold spores, bacteria, virus, all

15  those are physical items which damage whatever they are on,

16  whatever they land on.  And in this case, the virus, when it

17  lands on something and you touch it, you could die from it.

18  So --

19           THE COURT:  That damages you.  It doesn't damage the

20  property.

21           MR. FISCHBARG:  But you are not able to use the

22  property because it damages you.  So it's a corollary.  In

23  other words, this policy, by the way, mentions the word "virus"

24  and "bacteria" in it in two places.

25           THE COURT:  Where does it mention it?

1    MR. FISCHBARG:  It mentions it in the PDF as well as

2    Exhibit 9, page 36 and 37, which is page 7 of 25 of the special

3    property coverage form under additional coverages, section

4    5(j), where the insured would cover certain law enforcement

5    orders requiring you to -- requiring remediation.  But it

6    contains an exclusion for bacteria and viruses, and it uses the

7    word "bacteria" and it uses the word "virus."

8         So what this is really referring to is the *Legionella*

9    bacteria, which is causes Legionnaires' disease typically.

10   That's the bacteria.  Virus is obviously something else.  So

11   this is obviously referring to when there is a Legionnaires'

12   outbreak in a building, which could happen in New York pretty

13   often, every few years, and then the building gets shut down

14   and they have to do remediation.  Either they -- at least as a

15   bacteria*, Legionella* bacteria only occurs in water or pipes or

16   in mist.  So the building is shut down, and then you might have

17   to -- and now there is a new code where the buildings have to

18   test their cooling systems for *Legionella* bacteria.  So that's

19   an example where a bacteria causes property loss, or loss of

20   use, or damage, physical damage to property.  And I would say

21   the virus is equivalent to that bacteria.  So --

22        THE COURT:  But it's not.  This is different.  The

23   virus is not specifically in your property that is causing

24   damage.  It is everywhere.  The Legionnaire example is very

25   different.  Because it's not like Legionnaire is running

1    rampant throughout the city, and therefore your office building

2    can get closed.  It is that the Legionnaire bacteria is in that

3    building causing --

4              MR. FISCHBARG:  Yes.

5              THE COURT:  -- that building to be shut down.

6              MR. FISCHBARG:  Yes.  Yes.

7              So this virus is everywhere, including this office in

8    particular, this office.  In other words, they just did a

9    random survey of people going into a grocery store in New York,

10   and 20 percent tested positive.  So, Judge, that's just a

11   one-sample test.  So if the infection rate in New York City is

12   20 percent, then the virus is literally everywhere.  So if

13   it --

14             THE COURT:  That's what --

15             MR. FISCHBARG:  -- is --

16             THE COURT:  That is what has caused the damage is that

17   the governor has said you need to stay home.  It is not that

18   there is any particular damage to your specific property.

19             MR. FISCHBARG:  Well, okay, that's --

20             THE COURT:  You may not even have the virus in your

21   property.

22             MR. FISCHBARG:  Well, okay, that's -- I would

23   disagree.  The virus not just causes -- it lands on equipment,

24   it lands everywhere.  That's why all of these -- all of the

25   health guidelines from the World Health Organization and

1  elsewhere talk about wearing gloves, talk about wiping things

2  down, because it lands on surfaces.  It doesn't just get

3  transmitted through the air.  Another way of getting it is

4  through contact --

5            THE COURT:  Right, but what --

6            MR. FISCHBARG:  -- when it touches your --

7            THE COURT:  What evidence do you have that your

8  premises are infected with the COVID bug.

9            MR. FISCHBARG:  Well, the plaintiff is here.  He got

10 COVID.  So that's evidence there.

11           THE COURT:  Well, it's not evidence that he got it in

12 his office.

13           MR. FISCHBARG:  Yes, but, okay, it's not -- we're

14 not -- I don't know what burden of proof we are looking at,

15 whether it is beyond a reasonable doubt --

16           THE COURT:  No, it's --

17           MR. FISCHBARG:  -- or more likely than not, more

18 likely than not, he can testify where he was and more likely

19 than not he either got it from his office or he got it from his

20 home.  So that's a different burden of proof.  If you are

21 looking for some kind of burden of proof to show that he got it

22 from his office, I mean, that's an evidentiary question, and we

23 can get an epidemiologist to testify and get an expert to

24 testify on that, which I understand is going to happen in the

25 other lawsuits that have been filed across the country

1    regarding --

2                THE COURT:  Okay.

3                MR. FISCHBARG:  -- this issue.

4                THE COURT:  Okay.

5                MR. FISCHBARG:  So . . .

6                THE COURT:  Anything further, Mr. Fischbarg?

7                MR. FISCHBARG:  No, I guess that's all for now.  Thank

8    you.

9                THE COURT:  Okay.  Thanks.

10               Ms. Gordon.

11               MS. GORDON:  Thank you, your Honor.  This is Sarah

12   Gordon on behalf of Sentinel, and we agree with your Honor's

13   thoughts here.

14               The property policy has two distinct requirements

15   here.  There has to be direct physical loss or physical damage

16   to the property and the cause of the business interruption

17   damages they are seeking has to be direct physical loss or

18   damage, and the cause here is not physical damage.

19               We think, you know, as your Honor rightly pointed out,

20   *Roundabout* controls.  It is under New York law.  It's a First

21   Department case from 2002.  There are no subsequent decisions

22   that have disagreed or overturned it here in New York; and, if

23   anything, it has been confirmed by this . . .

24               THE COURT:  Hang on.  Did I lose my court reporter?

25               THE COURT REPORTER:  No, Judge.  I'm here.

1      THE COURT:  Did I lose Mr. Fischbarg?

2      MR. FISCHBARG:  No, I'm here.

3      THE COURT:  Okay.

4      MS. GORDON:  This court, your Honor, in *Newman Myers*,

5  adopted the exact same rationale for a law firm that was trying

6  to assert damages where there were no -- business interruption

7  damages, where there was no physical harm to the property.

8  And, you know --

9      THE COURT:  Let me interrupt you for a second.

10      So Judge Engelmayer in *Newman* went out of his way to

11  talk about a case where there was a bunch of -- there was a

12  rock slide which didn't actually hit the house or the premises,

13  and yet they got coverage and coverage for the invasion of

14  fumes.

15      MS. GORDON:  Yes, your Honor.

16      So for most of the cases, there are a number of them,

17  there is -- what has happened is something physically has

18  happened to the property that prevents people from being on the

19  property.  So, for example, in *Gregory Packaging*, in New

20  Jersey, there was ammonia leaked out and they couldn't be on

21  the property, so something physically happened.  You couldn't

22  necessarily see it or touch it, but there were fumes and it was

23  unsafe to be there.  The same thing with *Motorists*, where there

24  was *E. coli* in the well.  You couldn't be in that house because

25  you were exposed to other things that had the *E. coli*.

1    The property has to be entirely unusable or

2  uninhabitable for physical loss or damage to constitute a loss

3  of use.  We don't think that's the law in New York in any

4  circumstance, but even in those other cases, there is nothing

5  equivalent here.  Mr. Fischbarg's client can go to his

6  premises.  There is no ammonia or mold or anything in the air

7  that's not going to allow him on to the property.  In fact, the

8  governor's orders explicitly allow him to go to the property

9  and get his mail or do routine business functions.  The only

10  rule is that he has to stay six feet apart from other people.

11  So those cases are entirely distinguishable.

12    And when a business, a property is allowed to remain

13  open or people can still occupy the premises, there is no

14  direct physical loss or damage.  That was the case -- that's

15  what the court said in *Port Authority*, that's what happened in

16  *Mama Jo's*, where the restaurant was allowed to be open.  The

17  cases where there is direct physical loss or damage, you

18  literally cannot be on the premises because there is something

19  there that is making it uninhabitable, and here that just isn't

20  true.

21    THE COURT:  Okay.  Mr. Fischbarg I will give you the

22  last word.

23    MR. FISCHBARG:  All right.  So I would disagree that

24  he is allowed to go to the premises.  In fact, the opposite is

25  true.  The executive order 202.8 says it requires 100 percent

1    reduction.  So he can't go there, and he is not allowed to go

2    there, and that is a separate claim.  It is the civil authority

3    claim besides the breach of contract claim.

4              THE COURT:  Doesn't the executive order say -- I'm

5    sorry, which executive order are you talking about?

6              MR. FISCHBARG:  It is . . .

7              It is Exhibit 3 of the declaration, and then on page

8    2, "Each employer shall reduce the in-person workforce at any

9    work locations by 100 percent no later than March 22 at 8p.m."

10   And then it says --

11             THE COURT:  Right, but that doesn't mean the boss

12   can't go to the work location.

13             MR. FISCHBARG:  I would say he is -- he is an employee

14   and he can't go.  I think it does.  In my building here in New

15   York, there is nobody here.  I'm the only one.  There is no

16   bosses in any of the offices.

17             THE COURT:  There is nothing about the governor's

18   order that prohibits a small businessperson or a big

19   businessperson from going into their office to pick up mail, to

20   water the plants, to do anything like --

21             MR. FISCHBARG:  Your Honor --

22             THE COURT:  -- that, including employees that are

23   working.

24             MR. FISCHBARG:  Sorry.

25             MS. GORDON:  Your Honor, this is Sarah Gordon.  Oh, go

1    ahead, Mr. Fischbarg.

2            MR. FISCHBARG:  Okay.

3            Again, I would disagree.  I think the order is pretty

4    clear that 100 percent means that you are not supposed to go to

5    work, and that's what people have been doing in New York.  They

6    are not going into the office.  And to the extent they are

7    getting mail, I mean, there is work-arounds where the workers

8    in the building have been leaving it downstairs for people to

9    pick up, but the way it's been implemented is that 100 percent

10   means no one is going to any office.

11           THE COURT:  You are in your office.

12           MR. FISCHBARG:  Yeah, I'm not -- I'm considered, by

13   the way -- lawyers are considered essential, and if you are a

14   sole practitioner, you are considered essential.  So I have the

15   exclusion, and that's why I am here, but otherwise I wouldn't

16   be here.  So . . .

17           MS. GORDON:  Your Honor, if I may?  We submitted with

18   Mr. Michael's affidavit, Exhibit D, a printout from the Empire

19   State Development website.  And on question 13, it addresses

20   exactly this issue.  It says, "What if my business is not

21   essential but a person must pick up mail or perform a similar

22   routine function each day?"  And the answer provided by the

23   Empire State is, "A single person attending a nonessential

24   closed business temporarily to perform a specific task is

25   permitted so long as they will not be in contact with other

1    people."

2          THE COURT:  I thought I had read that somewhere.

3          MS. GORDON:  Yes.  It is in Mr. Michael's declaration,

4    and I think it's ECF 18-4, page 304.

5          THE COURT:  Okay.

6          MR. FISCHBARG:  Right, but I think the executive order

7    supersedes that is what I would argue.

8          THE COURT:  Okay.

9          Mr. Fischbarg, you have got to demonstrate a

10   probability of success on the merits.  I feel bad for your

11   client.  I feel bad for every small business that is having

12   difficulties during this period of time.  But New York law is

13   clear that this kind of business interruption needs some damage

14   to the property to prohibit you from going.  You get an A for

15   effort, you get a gold star for creativity, but this is just

16   not what's covered under these insurance policies.

17          So I will have a more complete order later, but your

18   motion for preliminary injunction is going to be denied.

19          Anything further for the plaintiff?

20          MR. FISCHBARG:  I guess just a housekeeping thing.  We

21   filed an amended complaint.  Are we going to deem it served or

22   does it have to be re-served?

23          THE COURT:  Has the defendant -- does the defendant

24   want to be reserved or will you take the amended complaint?

25          MR. MICHAEL:  Your Honor, this is Charles Michael.

1     We have entered a notice of appearance, and so I think

2  once they filed it on ECF, that service, we are happy to

3  consider it served.  That's fine.  And he does have one

4  amendment as of right.

5     THE COURT:  Correct.

6     MR. MICHAEL:  That was within his right to file it.

7     THE COURT:  Does defendant plan to move or answer?

8     MR. MICHAEL:  Probably to move.  We would have to

9  discuss it with our client, but I believe so.

10    THE COURT:  Okay.  What are the parties' position on

11 discovery while the motion to dismiss is pending?

12    MR. FISCHBARG:  Well, I would say there are two

13 motions filed —- there is one in the Eastern District of

14 Pennsylvania and one in, I think, the Northern District of

15 Illinois —- for an MDL, multi-district litigation, involving a

16 lot of lawsuits combining, so I think this might be happening

17 in each state until that motion is decided, and I think the

18 briefing schedule is in June --

19    MS. GORDON:  We —- your Honor --

20    MR. FISCHBARG:  —- so I think --

21    MS. GORDON:  Sorry, Mr. Fischbarg.

22    MR. FISCHBARG:  So I would say that this case might be

23 transferred to the multi-district panel at some point.

24    THE COURT:  Okay.  So, Mr. Fischbarg, what I am

25 hearing you say is that you are perfectly happy to have the

1 defendants not move until we find out whether or not your case

2 is going to get scooped up into the MDL?

3         MR. FISCHBARG:  Yes, correct.

4         THE COURT:  All right.  I presume that the defendants

5 are perfectly happy to do nothing until you hear back from the

6 MDL.

7         MS. GORDON:  Your Honor, I need to consult with my

8 client on that.  I'm not sure that that's true.  We don't think

9 these cases are appropriate for consolidation in the MDL for

10 many of the reasons which were evident today, given the

11 different states' conclusions on these laws.  So I need to

12 consult with my client on the motion practice.  We may intend

13 to want to move in any event.

14         THE COURT:  Okay.  Well, you could move, but if there

15 is a likely -- if there is some likelihood that they are going

16 to get scooped into the MDL, I'm not likely to decide it until

17 that decision is made.  So it is entirely -- I guess from my

18 perspective I don't really care, but from your client's

19 perspective, they may be making a motion to dismiss that's

20 unnecessary.  If you are right, and you may well be right, that

21 they are not going to MDL these kinds of cases, then all that's

22 happening is this is just being delayed into the summer for you

23 to incur fees making a motion to dismiss.

24         So why don't you talk to your client, figure out what

25 you want to do.  One way or the other, it does not seem to me

1   to make sense to proceed with discovery in this matter,

2   certainly under the circumstances that everyone is in, and

3   particularly the plaintiff is in, strapped for revenue, until

4   we figure out whether a lawsuit is going to go forward.

5        So talk to your client, figure out whether -- the

6   defendant should talk to Sentinel.  Figure out whether you are

7   happy staying this case pending a decision on the MDL or not,

8   and just write me a letter and let me know.

9        MS. GORDON:  Yes, your Honor.  Thank you.

10        MR. MICHAEL:  Your Honor --

11        THE COURT:  Anything further from the plaintiff?

12        MR. MICHAEL:  Just one housekeeping matter.  This is

13   Charles Michael, again, for the defendant.

14        THE COURT:  Okay.

15        MR. MICHAEL:  I just wondered if there was any special

16   procedures for ordering the transcript or if we go just through

17   the normal Southern District website?  I didn't know, under the

18   COVID circumstances, if there is something different we should

19   do.

20        THE COURT:  I don't think there is anything different,

21   but we have got the court reporter on.

22        So, Madam Court Reporter, is there anything different

23   they need to do?

24        THE COURT REPORTER:  At the end of this proceeding, I

25   am going to email the parties with their instructions.

1          THE COURT:  Okay.

2          MR. MICHAEL:  Terrific.  Thank you so much.

3          THE COURT:  Anything further from the plaintiff,

4   Mr. Fischbarg?

5          MR. FISCHBARG:  No.  Thank you, Judge.

6          THE COURT:  Anything further from the insurance

7   company?  Ms. Gordon?

8          MS. GORDON:  No.  Thank you, your Honor.

9          THE COURT:  All right.  Thank you, all.

10          MR. FISCHBARG:  Okay.  Bye, Judge.

11          MR. MICHAEL:  Thank you, your Honor.

12                          oOo

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit H

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION—CIVIL ACTIONS BRANCH**

| | | |
|---|---|---|
| **ROSE'S 1, LLC, et al.,** | * | |
| | * | |
| **Plaintiffs,** | * | Civil Case No. 2020 CA 002424 B |
| | * | Civil II, Calendar I |
| **v.** | * | Judge Kelly A. Higashi |
| | * | |
| **ERIE INSURANCE EXCHANGE,** | * | |
| | * | |
| **Defendant.** | * | |

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") and Defendant's Cross-Motion for Summary Judgment ("Defendant's Motion"). While the Court is sympathetic to the plight of Plaintiffs, it must grant summary judgment to Defendant as a matter of law.

I.      **FACTS**

Plaintiffs own and operate a number of prominent restaurants in the District of Columbia. They all purchased "Ultrapack Plus Commercial Property Coverage" from Defendant Erie Insurance Exchange. Included in this policy is coverage for "loss of 'income' and/or 'rental income'" sustained "due to partial or total 'interruption of business' resulting directly from 'loss' or damage" to the property insured. Rose's 1 Ultrapack Plus Commercial Property Coverage ("Coverage") at 3. The coverage document further states that the "policy insures against direct physical 'loss'" with the exception of several exclusions that are not relevant to this matter. *Id.* at 4.

This case comes in the context of the COVID-19 pandemic. COVID-19 is "a novel severe acute respiratory illness that has killed … more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be



Exhibit
H

infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring). On March 11, 2020, D.C. Mayor Muriel Bowser declared a state of emergency and a public health emergency due to the "imminent hazard of or actual occurrence of widespread exposure" to COVID-19. Plaintiffs' Statement of Material Facts ("SMF") ¶3. On March 16, Mayor Bowser issued an order prohibiting table seating at restaurants and bars in D.C. SMF ¶4. On March 20, Mayor Bowser extended this ban to "standing customers at restaurants, bars, taverns, and multi-purpose facilities." SMF ¶5. On March 24, Mayor Bowser ordered the closure of all non-essential businesses. SMF ¶6. On March 30, she ordered all D.C. residents to stay in their residences except for limited "essential" reasons, a restriction that continued for several months. SMF ¶¶7-8.

As a result of Mayor Bowser's orders, the restaurant Plaintiffs were forced to close their businesses and suffered serious revenue losses. SMF ¶¶21-22. To cover those losses, they filed insurance claims with Defendant pursuant to insurance policies that "are substantively identical in all ways relevant to this action." SMF ¶78. When Defendant denied their claims, Plaintiffs filed this lawsuit seeking a declaratory judgment that their claims were covered by the express language of their insurance contracts with Defendant. Both sides subsequently moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

D.C. Superior Court Rule of Civil Procedure 56 allows a court to grant summary judgment to a party when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. D.C. Super. Ct. Civ. R. 56(a); *Perkins v. District of Columbia*, 146 A.3d 80, 84 (D.C. 2016). In considering a motion for summary judgment, the

court must view the evidence "in the light most favorable to the nonmoving party, who is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 936 (D.C. 2002) (internal quotation marks omitted). The Court "may not resolve issues of fact or weigh evidence at the summary judgment stage." *Fry v. Diamond Construction, Inc.*, 659 A.2d 241, 245 (D.C. 1995) (internal quotation marks omitted). Even if no material dispute of fact exists, the moving party must still establish that it is entitled to judgment as a matter of law. D.C. Super. Ct. Civ. R. 56(a).

## III.    ANALYSIS

Under District of Columbia law, "[c]ontract principles are applicable to the interpretation of an insurance policy." *Carlyle Inv. Mgmt. LLC v. Ace Am. Ins. Co.*, 131 A.3d 886, 894 (D.C. 2016). "The proper interpretation" of an insurance contract, "including whether [the] contract is ambiguous, is a legal question." *Id.* (internal quotation mark omitted) (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). "[A]n insurance policy is to be . . . enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1205 (D.C. 1999) (internal quotation marks omitted) (quoting *Peerless Ins. Co. v. Gonzalez*, 697 A.2d 680, 682 (Conn. 1997)). A court must "give the words used in an insurance contract their common, ordinary, and . . . popular meaning," *Id.* (omission in original) (internal quotation marks omitted) (quoting *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994)), and must interpret the contract "as a whole, giving reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made," *Carlyle Inv. Mgmt.*, 131 A.3d at 895 (internal quotation mark omitted) (quoting *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009)).

"[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Carlyle Inv. Mgmt.*, 131 A.3d 886 at 895 (internal quotation marks omitted) (quoting *Debnam*, 976 A.2d at 197-98). "Where," however, "insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Fogg v. Fidelity Nat. Title Ins. Co.*, 89 A.3d 510, 514 (D.C. 2014) (internal quotation marks omitted) (quoting *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002)). Indeed, the Court "should not seek out ambiguity where none exists." *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003) (citing *Medical Serv. of Dist. of Columbia v. Llewellyn*, 208 A.2d 734, 736 (D.C. 1965)).

At the most basic level, the parties dispute whether the closure of the restaurants due to Mayor Bowser's orders constituted a "direct physical loss" under the policy. Plaintiffs start with dictionary definitions to support their case. For example, they cite the American Heritage Dictionary definition of "direct" as "[w]ithout intervening persons, conditions, or agencies; immediate." Plaintiffs' Motion at 9-10. They also cite the Oxford English Dictionary definition of "physical" as pertaining to things "[o]f or pertaining to matter, or the world as perceived by the senses; material as [opposed] to mental or spiritual." *Id.* at 10. As for "loss," it is defined by the coverage document as "direct and accidental loss of or damage to covered property." Coverage at 36.

Plaintiffs use these definitions to make three primary arguments. *First*, Plaintiffs argue that the loss of use of their restaurant properties was "direct" because the closures were the direct result of the mayor's orders without intervening action. Plaintiffs' Motion at 9-10. But those orders were governmental edicts that commanded individuals and businesses to take certain

actions. Standing alone and absent intervening actions by individuals and businesses, the orders did not effect any direct changes to the properties.

*Second*, Plaintiffs argue that their losses were "physical" because the COVID-19 virus is "material" and "tangible," and because the harm they experienced was caused by the mayor's orders rather than "some abstract mental phenomenon such as irrational fear causing diners to refrain from eating out." Plaintiffs' Motion at 11. But Plaintiffs offer no evidence that COVID-19 was actually present on their insured properties at the time they were forced to close. And the mayor's orders did not have any effect on the material or tangible structure of the insured properties.

*Third*, Plaintiffs argue that by defining "loss" in the policy as encompassing either "loss" or "damage," Defendant must treat the term "loss" as distinct from "damage," which connotes physical damage to the property. Plaintiffs' Motion at 11-12. In contrast, Plaintiffs argue, "loss" incorporates "loss of use," which only requires that Plaintiffs be deprived of the use of their properties, not that the properties suffer physical damage. *Id.* at 12-13. But under a natural reading of the term "direct physical loss," the words "direct" and "physical" modify the word "loss." As such, pursuant to Plaintiffs' dictionary definitions, any "loss of use" must be caused, without the intervention of other persons or conditions, by something pertaining to matter—in other words, a direct physical intrusion on to the insured property. Mayor Bowser's orders were not such a direct physical intrusion.

Further, none of the cases cited by Plaintiffs stand for the proposition that a governmental edict, standing alone, constitutes a direct physical loss under an insurance policy. In *Gregory Packaging, Inc. v. Travelers Property Casualty Co. of America*, the court found that the release of ammonia into a juice cup packaging factory was a "direct physical loss" because it constituted

"an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event *directly upon the property* causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." 2014 U.S. Dist. LEXIS 165232 at *13-19 (D.N.J. Nov. 25, 2014) (quoting *AFLAC Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306, 319-20 (Ga. Ct. App. 2003)) (internal quotation marks omitted) (emphasis added). Similarly, in *Western Fire Insurance Co. v. First Presbyterian Church*, the Colorado Supreme Court found a "direct physical loss" when gasoline fumes from an unknown source entered an insured church and the fire department ordered the church's closure. 437 P.2d 52, 55 (Colo. 1968). The court based its reasoning on the fact that the church "became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous." *Id.* At the same time, the Court noted that "[i]t is perhaps quite true" that the fire department's closure order, "*standing alone*, does not in and of itself constitute a 'direct physical loss.'" *Id*. (emphasis added). All of the other cases cited by Defendant involved some compromise to the physical integrity of the insured property. *See Port Authority v. Affiliated FM Insurance Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (presence of asbestos in building was not "physical loss" because building owner could not show real or imminent "contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable"); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 826-27 (3d Cir. 2005) (presence of bacterium on property could constitute "direct physical loss" if it "reduced the use of the property to a substantial degree"); *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699, 709-10 (E.D. Va. 2010), *aff'd* 504 F. Appx. 251 (4th Cir. 2013) (home rendered uninhabitable by toxic gases released by defective drywall constituted "direct physical loss"); *Mellin v. Northern Security Insurance Company, Inc.*, 115 A.3d 799, 805 (N.H. 2015) (cat urine odor from neighboring apartment may constitute "direct

physical loss" if plaintiff could show "distinct and demonstrable alteration to the unit"); *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1, 16-17 (W.Va. 1998) (landslide rendering homes uninhabitable, due to either actual physical damage or palpable future risk of physical damage from a follow-on landslide, was a "direct physical loss"); *Sentinel Management Co. v. New Hampshire Insurance Co.*, 563 N.W.2d 296, 300-01 (Minn. Ct. App. 1997) (asbestos contamination in building was "direct physical loss" when "property rendered useless").

In contrast, courts have rejected coverage when a business's closure was not due to direct physical harm to the insured premises. In *Roundabout Theatre Co. v. Continental Casualty Co.*, the City of New York ordered the closure of a theater after a portion of a neighboring building under construction collapsed onto the street and adjacent buildings. 302 A.D.2d 1, 2-3 (N.Y. App. Div. 2002). The theater itself sustained minor damage that was repaired in one day. *Id.* at 3. Nonetheless, the court found that the theater did not suffer a "direct physical loss" as a result of the city-mandated closure. *Id.* at 7. It found that "[t]he plain meaning of the words 'direct' and 'physical'" narrowed the scope of coverage and mandated "the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy." *Id.* Similarly, in *Newman Myers Kreines Gross, P.C. v. Great Northern Insurance Co.*, a federal district court found that a law firm did not suffer a "direct physical loss" when an electric utility preemptively shut off power in advance of Hurricane Sandy. 17 F. Supp. 3d 323 (S.D.N.Y. 2014). The court distinguished the cases cited by the law firm (several of which were also cited by Plaintiffs in this case) as either "involv[ing] the closure of a building due to either a physical change for the worse in the premises … or a newly discovered risk to its physical integrity." *Id*. at 330. Citing *Roundabout*, the Court reasoned:

> The critical policy language here—"direct physical loss or damage"—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to

trigger loss of business income and extra expense coverage. Newman Myers simply cannot show any such loss or damage to the 40 Wall Street Building as a result of either (1) its inability to access its office from October 29 to November 3, 2012, or (2) Con Ed's decision to shut off the power to the Bowling Green network. The words "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure.

*Id.* at 331; *see also United Airlines, Inc. v. Insurance Co. of State of Pa.*, 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005), *aff'd* 439 F.3d 128 (2d Cir. 2006) ("The inclusion of the modifier 'physical' before 'damages' . . . supports [defendant's] position that physical damage is required before business interruption coverage is paid."); *Philadelphia Parking Auth. v. Federal Insurance Co.,* 385 F. Supp. 2d 280, 287-88 (S.D.N.Y. 2005) (noting that "'direct physical' modifies both loss and damage," and therefore "the interruption in business must be caused by some physical problem with the covered property . . . which must be caused by a 'covered cause of loss'").

While the Court can find no published cases in this jurisdiction analyzing the exact term "direct physical loss," cases addressing similar issues do not help Plaintiffs. Most relevantly, in *Bros., Inc. v. Liberty Mutual Fire Insurance Co.*, the District of Columbia Court of Appeals considered whether a restaurant could recover on its claim after it lost business due to a curfew imposed by the D.C. government as a result of the riots following the assassination of Dr. Martin Luther King, Jr. in 1968. 268 A.2d 611 (D.C. 1970). The insurance contract included this relevant language:

In consideration of the premium for this coverage shown on the first page of this policy [Building and Contents] . . . the coverage of this policy is extended to include direct loss by . . . Riot . . . [and] Civil Commotion . . . .

When this Endorsement is attached to a policy covering Business Interruption, . . . the term "direct," as applied to loss, means loss, as limited and conditioned in such policy, *resulting from direct loss to described property from perils insured against*; . . . .

*Id.* at 613 (emphasis in original).[1]   The Court of Appeals interpreted the term "direct loss" in the contract to mean "a loss proximately resulting from physical damage to the property or contents caused by a riot or civil commotion." *Id*.  Under that definition, the Court found that the restaurant was unable to recover, since, "at the most," the restaurant's lost business due to the curfew "was an indirect, if not remote, loss resulting from riots" and there was no "physical damage to the property." *Id.*  Accordingly, while the Court agrees with Plaintiffs that *Bros., Inc.* is not directly on point, the case does support the proposition that, in the context of property insurance, the term "direct loss" implies some form of direct physical change to the insured property.

With both dictionary definitions and the weight of case law supporting Defendant's interpretation of the term "direct physical loss," Plaintiffs' additional arguments are unconvincing.  First, Plaintiffs argue that because the insurance contract has specific exclusions for "loss of use" under some coverage lines but not for Income Protection coverage, the Court should infer that the Income Protection coverage covers losses such as Plaintiffs'.  Plaintiffs' Motion at 13-14.  But as already discussed, even if "loss of use" was covered, Plaintiffs would still have to show that the loss of use was a "direct physical loss" similar to those in the cases discussed *supra* at 5-7.  And for the reasons explained in this order, there was no "direct physical loss" to Plaintiffs.  Second, Plaintiffs argue that, unlike some similar insurance policies, their policies do not include a specific exclusion for pandemic-related losses.  *Id.* at 19-20.  But again,

---

[1] This Court notes that the phrase at issue in the *Bros., Inc.* contract was "direct loss," as opposed to "direct physical loss," at issue in the present case, and that in the *Bros., Inc.* case, there was an issue as to whether the "Building and Contents" Form, which was mistakenly attached to the policy at the time of signing, or the "Business Interruption" Form, which the insurance company later substituted, was construed by the trial court.  However, the Court of Appeals found it "unnecessary to ascertain which of the two forms was construed by the trial court," 268 A.2d at 612, as the Court found that the insurance company prevailed under both forms.

even in the absence of such an exclusion, Plaintiffs would still be required to show a "direct physical loss." Because they cannot do so, the Court grants summary judgment to Defendant.

Accordingly, it is this **6th** day of **August, 2020**, hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED**; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that judgment is **ENTERED** in favor of Defendant Erie Insurance Exchange and against Plaintiffs, the initial scheduling conference is **VACATED**, and the case is **CLOSED**.

_____
**Kelly A. Higashi**
Associate Judge
(Signed in Chambers)

**COPIES TO:**
David L. Feinberg
Michael C. Davis
George E. Reede, Jr.
Jessica Pak
*Via CaseFileXpress*