UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHIEF OF STAFF LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HISCOX INSURANCE COMPANY INC.,<br><br>Defendant. | )<br>)<br>)  20 C 3169<br>)<br>)  Judge Gary Feinerman<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

Chief of Staff, a hospitality support agency based in Connecticut, alleges in this putative class action that Hiscox Insurance Company, its insurer, wrongfully denied coverage for losses that it suffered due to government-ordered shutdowns arising from the COVID-19 pandemic. Doc. 28. Hiscox moves to dismiss the complaint under Civil Rule 12(b)(6), arguing that the policy does not cover Chief of Staff's claimed losses. Doc. 31. The motion is granted.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Chief of Staff's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Chief of Staff as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the

facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

In March 2020, near the outset of the COVID-19 pandemic, the Governor of Connecticut issued a series of closure orders, one of which prohibited access to all nonessential businesses throughout the state. Doc. 28 at ¶ 32; *see* Ned Lamont, Governor, State of Conn., Exec. Order No. 7H: Protection of Public Health and Safety During COVID-19 Pandemic and Response— Restrictions on Workplaces for Non-Essential Business, Coordinated Response Effort (Mar. 20, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7H.pdf. The orders forced Chief of Staff, located in Hartford, to cease operations. Doc. 28 at ¶¶ 14-15. Chief of Staff sought to recover its lost income under a commercial property insurance policy issued by Hiscox, *id*. at ¶ 48, the pertinent terms of which are set forth below. Hiscox denied coverage. *Id*. at ¶¶ 48, 50.

## Discussion

The parties agree that the Hiscox policy is governed by Connecticut law. Doc. 32 at 6 & n.2; Doc. 37 at 5-6. Under Connecticut law, "[t]he terms of an insurance policy are to be construed according to the general rules of contract construction." *Galgano v. Metro. Prop. & Cas. Ins. Co.*, 838 A.2d 993, 997 (Conn. 2004); *see also Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 739 (Conn. 2005) ("[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law.") (internal quotation marks omitted). "[T]he determinative question is the intent of the parties, that is, what coverage the … [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy." *Karas v. Liberty Ins. Corp.*, 228 A.3d 1012, 1020 (Conn. 2019) (second, third, and fourth alterations in original). A court evaluating the parties' expectations

must be "mindful of the principle that provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters." *R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, 216 A.3d 629, 641 (Conn. 2019) (alteration in original).

Chief of Staff asserts coverage under three of the Hiscox policy's coverage provisions: the "Business Income" provision, the "Excess Expense" provision, and the "Civil Authority" provision. Doc. 28 at ¶¶ 37-48, 69-115; Doc. 37 at 6-14. Hiscox contends that none of those provisions applies, Doc. 32 at 6-13; Doc. 38 at 2-10, but argues that even if one or more do, the policy's virus exclusion defeats coverage, Doc. 32 at 13-15; Doc. 38 at 10-13. Because none of the coverage provisions applies, there is no need to address the virus exclusion.

## A. Business Income Provision

The Business Income provision states:

> [Hiscox] will pay for the actual loss of Business Income [Chief of Staff] sustain[s] due to the necessary suspension of [its] "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Doc. 32-1 at 14. "Business Income," in turn, is defined (with irrelevant exceptions) as the net income "that would have been earned or incurred if no physical loss or damage had occurred," plus normal operating expenses that continue to accrue. *Id*. at 15. Even assuming without deciding that the Governor's closure orders effected a "necessary suspension" of Chief of Staff's "operations" during some "period of restoration," the Business Income provision does not provide coverage because that suspension was not "caused by direct physical loss of or damage to property at the described premises." *Id*. at 14.

Chief of Staff contends that the closure of its business qualifies as a "direct physical loss of … property at [its] premises"—though not "damage to" such property—because "it lost the

3

use of its insured property for its intended purpose." Doc. 37 at 7. Hiscox takes the contrary view, contending that the term "direct physical loss" "unambiguously require[s] some physical manifestation [of] change" to the property, which is not alleged to have happened here. Doc. 32 at 7 (alterations in original) (quoting *England v. Amica Mut. Ins. Co.*, 2017 WL 3996394, at *6 (D. Conn. Sept. 11, 2017)). Hiscox's reading is the far better one.

True enough, the noun "loss," standing alone, can refer to "depriv[ation] of … a possession." *Loss*, Oxford English Dictionary (2d ed. 1989) (def. 2a); *see also Loss*, Webster's Third New International Dictionary (1961) (def. 1a) ("the act or fact of losing," "failure to keep possession," "deprivation"). But the noun "loss" in the Business Income provision is modified by the adjective "physical," which in context means "tangible, concrete." *Physical*, Oxford English Dictionary (3d ed. updated Mar. 2006) (def. 6); *see also Physical*, Black's Law Dictionary (11th ed. 2019) (def. 2) ("pertaining to real, tangible objects"); *Physical*, Webster's Third New International Dictionary, *supra* (def. 2b) ("of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary"). So "physical loss" refers to a deprivation caused by a tangible or concrete change in or to the thing that is lost. But the complaint does not allege any such deprivation. Instead, the complaint alleges that Chief of Staff's loss of use of its property was due to the Governor's closure orders, Doc. 28 at ¶¶ 46-47—hardly a concrete or tangible "loss of … property at [its] premises," Doc. 32-1 at 14.

Pressing the contrary result, Chief of Staff invokes the principle that "a policy should not be interpreted so as to render any part of it superfluous." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1184 (Conn. 2014) (internal quotation marks omitted). Applying that principle—and noting that the Business Income provision covers losses "caused by direct physical loss of *or* damage to property," Doc. 32-1 at 14 (emphasis added)—Chief of

4

Staff argues that "[i]f a loss could not occur without damage, then the Policy would contain surplus language," which means that "'direct physical loss' must mean something other than 'direct physical damage.'" Doc. 37 at 7. Among those other meanings of "direct physical loss," Chief of Staff contends, is "loss of use," for otherwise, all "loss" would be "damage" and there would be no need for the provision to mention "loss" at all. *Id*. at 7-8.

Chief of Staff is correct that the phrases "direct physical loss" and "direct physical … damage" are best read so as not to completely overlap and thereby render one or the other superfluous. But it does not follow that mere loss of *use*—without any tangible alteration to the physical condition or location of property at the insured's premises—falls within the meaning of either phrase. Read naturally, the two phrases can be read to exclude loss of use without rendering either superfluous. To illustrate, consider a thief who attempts to steal a desktop computer. If the thief succeeds, the computer is "physical[ly] los[t]" but not necessarily "physical[ly] … damage[d]." If the thief cannot lift the computer, so instead of stealing it takes a hammer to its monitor in frustration, the computer would be "physical[ly] … damage[d]" but not "physical[ly] los[t]." Yet if the thief were only to change the password on the system so that employees could not log in, there would be neither "physical … damage" nor "physical loss," though the computer would be unusable for some while. The Business Income provision might cover the first two cases, but it does not cover the third.

In fact, it is Chief of Staff's interpretation that would violate the surplusage-avoidance principle by reading the word "physical" out of the Business Income provision. After all, if the mere loss of use were covered, what would be the difference between "direct loss" and "direct *physical* loss"? Chief of Staff does not say, and the court cannot tell.

5

Chief of Staff's interpretation is also difficult to square with the Business Income provision's "period of restoration" language. As noted, the provision covers losses "due to the necessary suspension of [the business's] 'operations' during the 'period of restoration.'" Doc. 32-1 at 14. The policy defines the "period of restoration" to "end[] on the earlier of: (a) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (b) [t]he date when business is resumed at a new permanent location." Doc. 32-1 at 39. Under Chief of Staff's theory—that the mere loss of use of property at the premises, without any physical alteration to the condition or location of that property, is covered—when would the period of restoration end? If there has been no physical alteration to the condition or location of the property, there is nothing to "repair[], rebuil[d] or replace[]." *Ibid*. Nor is there any reason to expect that, absent physical alteration to "property at the [insured's] premises," the business would resume at "a new permanent location." *Ibid*. The uneasy fit between the "period of restoration" language and Chief of Staff's reading of the Business Income provision confirms that the better reading of the provision is the one that requires some physical change to the condition or location of property at the insured's premises. *Accord Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Chief of Staff argues in the alternative that the Business Income provision is ambiguous, and thus that its meaning should be resolved in Chief of Staff's favor. Doc. 37 at 12-13; *see Conn. Ins. Guar. Ass'n v. Fontaine*, 900 A.2d 18, 24 (Conn. 2006) ("[O]ur interpretation of ambiguous policy language in favor of coverage under the doctrine of contra proferentem has become near axiomatic in insurance coverage disputes."). For the reasons just given, the

provision's language is not ambiguous, so the *contra proferentem* interpretive principle does not come into play. In so holding, the court acknowledges that several district court decisions have interpreted similar contractual language to cover losses due to government-imposed COVID-19 closure or shutdown orders. *See*, *e.g.*, *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, 2021 WL 767617, at *3-5 (N.D. Ill. Feb. 28, 2021); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2021 WL 679109, at *8-10 (N.D. Ill. Feb. 22, 2021); *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020). But contrary to Chief of Staff's submission, Doc. 37 at 12-13, disagreement among courts regarding the interpretation of an insurance policy provision does not, by itself, render the provision ambiguous. *See Erie Ins. Grp. v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996) (rejecting the argument that an insurance policy term was ambiguous "on the basis of conflicting case law" interpreting the term); *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 580 (6th Cir. 2010) (Sutton, J.) ("[A] disagreement among three judges about whether a contractual provision is ambiguous does not establish that it is ambiguous … ."); *City of Austin v. Decker Coal Co.*, 701 F.2d 420, 426 n.17 (5th Cir. 1983) ("[T]he fact that courts may disagree as to the import of a contract term does not, by that fact alone, mean that it is ambiguous."); *Cont'l Ins. Co. v. Bones*, 596 N.W.2d 552, 556-58 (Iowa 1999) (holding an insurance policy provision to be unambiguous even though other courts had interpreted similar language differently).

In an effort to create ambiguity, Chief of Staff observes that in an entirely separate portion of the policy—the section providing liability coverage, Doc. 32-1 at 40-55—the term "[p]roperty damage" is defined to include both "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured." *Id*. at 54. Chief of Staff argues that in order "[f]or the Policy's terms to

have consistent meaning," the phrase "physical loss of or damage to property" in the Business Income provision "must include situations where property is rendered functionally unusable, even if there is no alteration to that property." Doc. 37 at 13. But the definition of "property damage" cited by Chief of Staff, which by its terms applies only to the liability coverage, Doc. 32-1 at 52, does not upset the court's reading of the Business Income provision, which appears in the section of the policy providing property coverage, *id*. at 10-39. As discussed above, the conclusion that the Business Income provision is not implicated by losses arising from the Governor's closure orders is driven by the word "physical." Although the policy may cover "[l]oss of use of tangible property that is not physically injured" in the liability context, that has no bearing on whether "*physical* loss of … property" in the Business Income provision requires a physical alteration to the property or its location. And it is not at all anomalous that the phrase "property damage," with its explicit and expansive definition in the liability section of the policy, would carry a different meaning from the pertinent, differently worded language in the Business Income provision in the property section of the policy. *See United Am. Ins. Co. v. Wilbracht*, 825 F.2d 1196, 1203 (7th Cir. 1987) (presuming that differently worded provisions in an insurance policy carry different meanings).

In sum, the policy's Business Income provision does not apply where, as here, a government closure order prohibits access to a business's premises for reasons unconnected to any change in the physical condition of those premises, or in the physical condition or location of property at those premises. In so holding, this court joins the many other courts to have interpreted materially identical provisions in the same manner. *See*, *e.g.*, *Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1131640, at *3-5 (D. Mass. Mar. 24, 2021) ("[C]onstruing the language 'physical loss of' to cover the deprivation of a property's

business use absent any tangible damage distorts the plain meaning of the Policy."); *Family Tacos, LLC v. Auto Owners Ins. Co.*, __ F. Supp. 3d __, 2021 WL 615307, at *3-5 (N.D. Ohio Feb. 17, 2021) ("As the trigger for coverage, this policy language excludes financial or monetary losses resulting from the novel coronavirus, SARS-CoV-2, which occasioned this dispute for the simple reason that the virus did not work any perceptible harm to the properties at issue … ."), *appeal docketed*, No. 21-3224 (6th Cir. Mar. 9, 2021); *Berkseth-Rojas v. Aspen Am. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 101479, at *5 (N.D. Tex. Jan. 12, 2021) ("[D]irect physical loss or damage requires something more than mere loss of use or function."); *4431, Inc. v. Cincinnati Ins. Cos.*, __ F. Supp. 3d __, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) ("[F]or Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises."); *Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, __ F. Supp. 3d __, 2020 WL 5938755, at *6 (N.D. Ga. Oct. 6, 2020) ("[T]he contract language issue here is not ambiguous, and because the Governor's Executive Order did not create a 'direct physical loss of' the Plaintiffs' [premises], the Business Income provision does not apply to the Plaintiffs' claims."), *appeal docketed*, No. 20-14156 (11th Cir. Nov. 4, 2020); *Mark's Engine Co. No. 28 Rest., LLC v. Travelers Indem. Co. of Conn.*, __ F. Supp. 3d __, 2020 WL 5938689, at *3 (C.D. Cal. Oct. 2, 2020) ("[L]osses from inability to use property do not amount to 'direct physical loss of or damage to property' within the ordinary and popular meaning of that phrase. Physical loss or damage occurs only when property undergoes a distinct, demonstrable, physical alteration.") (some internal quotation marks omitted), *appeal docketed sub nom. Marks Engine Co. No. 28 Rest., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 20-56031 (9th Cir. Oct. 6, 2020); *see also*

9

*Uncork & Create LLC v. Cincinnati Ins. Co.*, __ F. Supp. 3d __, 2020 WL 6436948, at *4 (S.D. W. Va. Nov. 2, 2020) ("The majority of courts to address the issue … have found that COVID-19 and governmental orders closing businesses to slow the spread of the virus do not cause physical damage or physical loss to insured property."); Docs. 40, 47-48, 50, 56-57 (citing these and other similar decisions).

II.     **Extra Expense Provision**

The Extra Expense provision states:

> [Hiscox] will pay necessary Extra Expense [Chief of Staff] incur[s] during the "period of restoration" that [it] would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Doc. 32-1 at 16. The parties agree that, given their similar language, the applicability of the Extra Expense provision rises or falls with the applicability of the Business Income provision. Doc. 32 at 7 ("Business Income and Extra Expense coverages require 'direct physical loss of or damage to Covered Property.'"); Doc. 37 at 6-7 ("Hiscox's promise to pay Business Income and Extra Expense coverage kicks in when Chief of Staff suffers a suspension of business operations caused by direct physical loss of, or damage to, property at the described premises."). Chief of Staff offers no argument why the Extra Expense provision would provide coverage if the Business Income provision does not. Accordingly, because the Business Income provision is inapplicable, the Extra Expense provision is as well.

III.    **Civil Authority Provision**

The Civil Authority provision states:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Doc. 32-1 at 16-17. By its plain terms, the provision applies only when the following have occurred: (1) there is "damage to property" somewhere "other than," but within one mile of, the insured's premises; (2) some government action prohibits "[a]ccess to the area immediately surrounding th[at] damaged property"; and (3) that government action is taken either "in response to dangerous physical conditions resulting from the damage" or "to enable a civil authority to have unimpeded access to the damaged property." *Ibid*.

Chief of Staff argues that "[f]or the same reasons [it] has suffered 'physical loss of or damage to' its property as a result of … Connecticut's closure orders such that the loss is covered under the regular business interruption coverage, other property within one mile of the insured property was likewise damaged by the orders." Doc. 37 at 14. Even setting aside the fact that Chief of Staff's premise—that it has suffered "physical loss of or damage to" its own property—is wrong, the argument fails. The reason is plain: the Civil Authority provision requires that the "other property" have suffered "damage," and the complaint does not allege, nor does Chief of Staff argue, that the closure orders were due to some other property within one mile of Chief of Staff's premises having been damaged by the coronavirus. It necessarily follows that the Civil Authority provision provides no coverage here.

As an analogy, consider a hurricane sweeping through inland Connecticut. *Cf.* Nancy Finlay, *Hurricane of 1938: Connecticut's Worst Disaster*, Conn. Hist. (Sept. 21, 2019),

11

https://connecticuthistory.org/hurricane-of-1938-connecticuts-worst-disaster (discussing the Hurricane of 1938, which made landfall near New Haven and placed "[p]ortions of Hartford, Middletown, and other Connecticut River towns … completely underwater"). If the hurricane were to blow the roof off a building and access to the street had to be completely closed to allow the debris to be cleared and the building to be repaired, the Civil Authority provision likely would cover losses suffered by nearby businesses on that street. But if the entire city were to shut down prophylactically in anticipation of the hurricane—*i.e.*, before there has been any damage—the provision would not apply. The latter scenario mirrors the closure orders in this case.

That is not to say that the Civil Authority provision necessarily would apply if Chief of Staff *had* alleged that the coronavirus had been detected somewhere within one mile of its premises. Undoubtedly, the virus existed within that radius. But even assuming the presence of the coronavirus qualifies as "damage," the complaint does not allege that the Governor's closure orders were "a result of," or "taken in response to," Doc. 32-1 at 16-17, the virus's presence within that radius. *See Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) ("The general rule is that '[c]ivil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued *as a direct result of* physical damage to *other premises in the proximity of the insured's property*.'") (alteration in original) (second emphasis added) (quoting Clark Schirle, *Time Element Coverages in Business Interruption Insurance*, Brief, Fall 2007, at 32, 38); *see also*, *e.g.*, *10012 Holdings, Inc. v. Sentinel Ins. Co.*, __ F. Supp. 3d __, 2020 WL 7360252, at *4 (S.D.N.Y. Dec. 15, 2020) ("It is plausible that the risk of COVID-19 being physically present in neighboring properties caused state and local authorities to prohibit access to those properties.

12

But the Complaint does not allege that these closures of neighboring properties 'direct[ly] result[ed]' in closure of Plaintiff's own premises, as the Civil Authority provisions require.") (alterations in original), *appeal docketed sub nom. 10012 Holdings, Inc. v. Hartford Fire Ins. Co.*, No. 21-80 (2d Cir. Jan. 14, 2021). Indeed, Chief of Staff's complaint expressly alleges that the closure orders did *not* result from the virus's physical presence in any particular location within or outside that radius. Doc. 28 at ¶ 46 ("[T]he sole and proximate cause of Plaintiff's and other Class members' losses were the Closure Orders, not because coronavirus was found in or on Plaintiff's or the Class'[s] insured property.").

Moreover, the complaint does not allege that the closure orders "prohibit[ed]" "[a]ccess to the area immediately surrounding" any damaged premises, as required by the Civil Authority provision. Doc. 32-1 at 16. That is, the complaint does not allege that the closure order prevented people from accessing Hartford's sidewalks and roads, including those adjacent to any damaged premises, even if it did bar people from entering the premises of nonessential businesses.

In holding that the Civil Authority provision does not provide coverage to Chief of Staff, this court joins the many other courts to have interpreted materially identical provisions in the same manner. *See, e.g., Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, 2021 WL 1069038, at *4-5 (W.D. Ky. Mar. 18, 2021) ("The 'Civil Authority' coverage sought by [the insured] requires a claim for a tangible loss to property other than the insured property, which [the insured] has failed to identify."); *Kahn v. Pa. Nat'l Mut. Cas. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 422607, at *8 (M.D. Pa. Feb. 8, 2021) ("Plaintiffs here do not allege any loss of or damage to another property caused by any 'covered cause of loss' that triggered an action of civil authority."); *O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co.*, __ F. Supp. 3d __, 2021 WL

13

105772, at *5 (N.D. Cal. Jan. 12, 2021) ("[I]t is apparent from the plain language of the cited civil authority orders that such directives were issued to stop the spread of COVID-19 and not as a result of any physical loss of or damage to property."); *Gerleman Mgmt., Inc. v. Atl. States Ins. Co.*, __ F. Supp. 3d __, 2020 WL 8093577, at *6 (S.D. Iowa Dec. 11, 2020) ("Plaintiffs have not alleged damage to another property."), *appeal docketed*, No. 21-1082 (8th Cir. Jan. 12, 2021); *see also* Docs. 40, 47-48, 50, 56-57 (citing these and other similar decisions). And the court respectfully disagrees with those courts to have reached the contrary result. *See, e.g., Studio 417*, 478 F. Supp. 3d at 803-04.

## Conclusion

Hiscox's motion to dismiss is granted. Although it is difficult to imagine how Chief of Staff might cure the deficiencies in its complaint, it will be given one chance to replead. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend … ."). The operative complaint is dismissed without prejudice, and Chief of Staff is given until April 21, 2021, to file a second amended complaint. If Chief of Staff does not do so, the dismissal will convert automatically to a with-prejudice dismissal and judgment will be entered.

March 31, 2021

United States District Judge